Behram V. Parekh, State Bar #180361
**WISNER BAUM LLP**
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
Telephone: (310) 207-3233
Facsimile: (310) 820-7444
bparekh@wisnerbaum.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SEAN MITCHELL,<br><br>*Plaintiff*,<br><br>v.<br><br>BOSTON SCIENTIFIC CORPORATION; and BOSTON SCIENTIFIC NEUROMODULATION CORPORATION;<br><br>*Defendants*. | Case No. 2:26-cv-13207<br><br>**COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |
| A member of MDL 3181:<br><br>IN RE: BOSTON SCIENTIFIC CORPORATION SPINAL CORD STIMULATOR PRODUCTS LIABILITY LITIGATION | Case No. 2:26-ml-03181-JLS-PD |

## COMPLAINT - ACTION FOR DAMAGES

This action is directly filed in the United States District Court for the Central District of California pursuant to Pretrial Order No. 4, entered August 18, 2026 (Dkt. No. 58) in MDL No. 3181, *In re: Boston Scientific Corporation Spinal Cord Stimulator Products Liability Litigation*, Case No. 2:26-ml-03181-JLS. This action is a member case of that MDL, filed for pretrial purposes only, without waiver of any party's objections, defenses, or rights as more fully set forth in Pretrial Order No. 4. This Complaint conforms to the Master Personal Injury Complaint filed on October 23, 2026 (Dkt. No. 84) pursuant to Pretrial Order No. 6.

Plaintiff SEAN MITCHELL ("Plaintiff") by and through undersigned counsel, brings this Complaint against Defendants BOSTON SCIENTIFIC CORPORATION, and BOSTON SCIENTIFIC NEUROMODULATION CORPORATION, (collectively, "Boston Scientific," "BSC," or "Defendants"), and alleges as follows:

## I. INTRODUCTION

1. Plaintiff is a chronic pain patient who, like many others, has suffered with debilitating and life-altering pain and has sought medical treatment for his condition with the ever-present hope of finding relief. It was in this hopeful search for relief that Boston Scientific targeted Plaintiff and convinced him that a Boston Scientific Spinal Cord Stimulator ("SCS") device would provide the relief that he sought. However, Plaintiff ultimately did not receive the relief promised by Boston Scientific, but instead saw his condition worsened by exacerbated pain and terrible complications.

2. Boston Scientific treated Plaintiff and other chronic pain patients as vulnerable revenue sources, easy marks who would agree to be implanted with an expensive, defective medical device that did not live up to the specific promises made to them. These vulnerable patients, including Plaintiff, believed Boston Scientific and its sales representatives when they promised that the SCS device would provide life-changing pain relief.

3. Boston Scientific was not the first healthcare company to take advantage

of chronic pain patients' pain-induced vulnerability. Beginning in the 1990s, pharmaceutical companies aggressively marketed opioid painkillers as safe and effective for chronic pain, downplaying addiction risk. Opioid prescriptions exploded through the 2000s, and the consequences of the pharmaceutical industry's dangerous marketing scheme boiled over.

4. As the opioid crisis of the 1990s and 2000s faded, and the public and governmental agencies began to address the serious risks of prescription opioid painkillers, many chronic pain patients began to look elsewhere for relief. These were the circumstances under which Boston Scientific sold its SCS products to Plaintiff.

5. Using marketing tactics that exceeded even those used by the opioid painkiller manufacturers, Boston Scientific sold its SCS devices to desperate pain patients across the country. As part of their extensive operations, Boston Scientific extended its reach deep into the patient experience, using sales representatives to go far beyond typical device marketing to physicians. Boston Scientific designed their products so that adjustments to the devices were made on electronic devices controlled and operated by their employees, not the physicians.

6. As a result, patients' interactions with their assigned Boston Scientific sales representatives began with device selection, continued through the operating room during the placement of the trial device, to initial device programming, to coaching through the trial period to qualify for a permanent device, to persuasion to receive the permanent implant, through the second operating room experience, to programming of the permanent device and, critically, continued long past patients' follow-up and interactions with their physicians.

7. As Plaintiff experienced complications and other issues with his implanted SCS device, the Boston Scientific sales representatives were his first contact. Rather than involve the patient's physician, the representatives would address the patients' concerns themselves and actually make adjustment to the SCS devices stimulation therapy *without consulting the* physician.

8. As repeatedly and consistently demonstrated in written text messages and emails with patients, these representatives would make false statements in response to patient concerns, statements that, among other things, contradicted the FDA-approved labeling, concealed defects and the cause of injuries from the patients, made unfounded promises to the patients, and induced the patients to delay reporting their device issues to their physicians for as long as possible. The sales representatives reassured Plaintiff that the SCS devices would allow him to reduce or even eliminate his dependence on opioid painkillers. Boston Scientific thereby stepped into the space previously occupied by the opioid painkiller manufacturers and assumed the lucrative revenue stream offered by chronic pain patients.

9. The SCS products implanted in Plaintiff originate from and are predicated on Premarket Approval ("PMA") P030017, initially approved by the FDA in 2004 for the Precision Spinal Cord Stimulator System. Since that time, the devices have been materially altered through PMA supplements, and other changes affecting battery chemistry, firmware, waveform control, leads, and user interfaces, and manufactured outside of the approved design and manufacturing specifications.

10. The SCS devices marketed by Boston Scientific under PMA P030017 include:

a. Precision Spinal Cord Stimulator System
b. Precision Plus
c. Precision Spectra
d. Precision Montage
e. Precision Montage MRI
f. Precision Spectra WaveWriter
g. Precision Novi
h. WaveWriter Alpha
i. WaveWriter Alpha Prime

11. SCS devices are associated with significant complications and poor

clinical results, including inadequate effectiveness in providing the pain relief their manufacturers promise. The devices are also associated with complex risks of device failures, including but not limited to: device failure, inconsistent therapeutic treatment, device and lead migration, lead breakage, lead insulation failure, battery failure, IPG overheating, excessive electrical stimulation, and unintended electrical stimulation.

12. These device failures, in turn, are the proximate cause of foreseeable injuries in Plaintiff including but not limited to: exacerbation of pain, burns, vasovagal responses such as syncope, unexpected shocking, autonomic dysfunction, and severe and/or permanent electrical-induced neuropathy and neurological injuries such as paresthesia, nerve pain, urinary and/or fecal incontinence, urinary retention, dysphagia, gastroparesis, cardiac arrhythmia, and paralysis.

13. Plaintiff suffered injuries caused by a defective, adulterated, misbranded, and dangerous medical device designed, manufactured, marketed, distributed, packaged, and sold by Defendants in violation of state and applicable parallel federal laws and standards.

## II. PARTIES

### A. Plaintiff

14. **Plaintiff Sean Mitchell** is a resident and citizen of the State of Texas. At the time this Complaint is filed, Plaintiff resides in Riviera, Kleberg County, Texas. The device at issue was implanted in Plaintiff in Texas. Plaintiff has received medical treatment related to the device in Texas, and the device was explanted in Texas. Plaintiff had his Boston Scientific SCS permanent device implanted on or about November 12, 2024.

15. Plaintiff suffered personal injuries as a result of the implantation of a Boston Scientific Spinal Cord Stimulator system.

### B. Defendants

#### 1. Boston Scientific Corporation

16. Defendant Boston Scientific Corporation ("Boston Scientific Corp") is a

corporation organized under the laws of the State of Delaware, and its principal place of business and global headquarters is in Marlborough, Massachusetts.

17. Defendant Boston Scientific is registered and interacts with the United States Food and Drug Administration ("FDA") through its offices located at 25155 Rye Canyon Loop, Valencia, CA 91355. Defendant Boston Scientific conducts business throughout the United States and within California, including marketing, selling, and distributing SCS devices, including Precision Spinal Cord Stimulator System, Precision Plus, Precision Spectra, Precision Montage, Precision Montage MRI, Precision Spectra WaveWriter, Precision Novi, WaveWriter Alpha, and WaveWriter Alpha Prime.

**2. Boston Scientific Neuromodulation Corporation**

18. Defendant Boston Scientific Neuromodulation Corporation ("Boston Scientific Neuromodulation") is a corporation organized under the laws of the State of Delaware, and its principal place of business and global headquarters is in Marlborough, Massachusetts.

19. Defendant Boston Scientific Neuromodulation maintains device-related operations in Valencia, California, as described below. Boston Scientific Neuromodulation's registered agent in California is CSC–Lawyers Incorporating Service located at 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California.

20. Defendant Boston Scientific Neuromodulation is registered with the FDA as the Specification Developer for SCS devices through its facilities located at 25155 Rye Canyon Loop, Valencia, CA 91355.

21. Defendant Boston Scientific Neuromodulation conducts business throughout the United States and within California, including the design, manufacture, regulatory submission, and distribution of Class III neuromodulation devices, including the Precision Spinal Cord Stimulator System, Precision Plus, Precision Spectra, Precision Montage, Precision Montage MRI, Precision Spectra WaveWriter, Precision Novi, WaveWriter Alpha, and WaveWriter Alpha Prime devices.

22. As the Specification Developer for the device at issue in this case, Boston Scientific Neuromodulation was responsible for the development and design of the device at issue, including crucial functions such as design validation, gap analysis, and coordination of Corrective and Preventive Actions ("CAPAs") required by the Food, Drug & Cosmetic Act.

23. Boston Scientific Corporation and Boston Scientific Neuromodulation Corporation will hereafter be referred to collectively as "Boston Scientific," "BSC" or "Defendants."

24. Upon information and belief, Boston Scientific is the employer of all sales representatives and employees involved in the design, development, manufacture, marketing, sales and client interactions pertaining to Boston Scientific's SCS devices.

## III. JURISDICTION AND VENUE

25. This action is directly filed in this District for pretrial proceedings only, pursuant to 28 U.S.C. § 1407 and the Direct Filing Order entered August 18, 2026 (Dkt. No. 58) in MDL No. 3181. The designation of this District for pretrial proceedings does not constitute a determination that venue is proper here for trial, and does not waive any party's objections to venue or personal jurisdiction for purposes of trial, as expressly preserved under that Order.

26. *Venue.* Venue and pretrial administration are proper in this District for one or more of the following reasons: (1) a substantial part of the events and omissions giving rise to Plaintiff's causes of action occurred in this District; (2) this action is directly filed under the Court's Direct Filing Order (Pretrial Order No. 4); and/or (3) this action is administered in this District for pretrial purposes pursuant to 28 U.S.C. § 1407 and the June 5, 2026, Transfer Order of the Judicial Panel on Multidistrict Litigation. These allegations do not waive Plaintiff's applicable remand or trial-venue rights.

27. This Court has subject matter jurisdiction over Plaintiff's claims against Defendants Boston Scientific Corporation and Boston Scientific Neuromodulation

Corporation pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

28. *Personal Jurisdiction.* This Court has personal jurisdiction over this action because Defendants did/do business in and have continuous and systematic contacts with the State of California, thereby consenting to jurisdiction in the State of California. Upon information and belief, Defendants also advertised, made material omissions and representations, and breached warranties in this District. This Court also has personal jurisdiction over Defendants because they committed the acts complained of herein in this State and District and, in some cases, caused injury to persons located in this State and District.

29. For purposes of these pretrial proceedings, Defendants are subject to the jurisdiction of this Court pursuant to the Direct Filing Order. Defendants' objections, if any, to personal jurisdiction for purposes of trial in the venue designated below are expressly preserved and not waived by this filing.

30. Plaintiff designates the United States District Court for the Central District of California as the presumptive venue for remand upon completion of pretrial proceedings, as Defendant Boston Scientific Neuromodulation maintains its SCS device-related operations, including its FDA-registered Specification Developer facility, in Valencia, California, within this District, and a substantial part of the events and omissions giving rise to this action occurred here, and venue is proper there pursuant to 28 U.S.C. § 1391.

**Applicable Law and Choice of Law Considerations**

31. Plaintiff pleads all claims in this Complaint in the broadest sense, pursuant to any laws that may apply under choice-of-law principles, including, but not limited to, the law of Plaintiff's state of residence, the state in which Plaintiff was injured, the state in which this action was filed, or the state where Boston Scientific maintains its headquarters.

32. Plaintiff's injuries occurred in Texas. Plaintiff's product liability and personal injury claims arise under applicable state law, including Texas law, and any other law determined by the Court's choice-of-law analysis. Federal law is referenced solely to identify parallel safety duties applicable to the device.

33. California applies a functional choice-of-law analysis that considers the place where the injury occurred, the place where the conduct causing the injury occurred, the domicile and residence of the parties, and the center of the relationship. *See McCann v. Foster Wheeler*, 225 P.3d 516 (2010); Restatement (Second) of Conflict of Laws § 6.

34. Because this action involves conduct undertaken by Boston Scientific Neuromodulation through its Valencia, California facilities, including its role as Specification Developer for the SCS devices, and safety-related activities directed from this District, California has a significant interest in regulating corporate conduct occurring within its borders and in ensuring that manufacturers provide complete risk information to physicians and patients.

35. Plaintiff does not seek a determination of governing law at the pleading stage and alleges claims under all applicable state laws to be determined by the Court.

## IV. FACTUAL ALLEGATIONS

### A. Applicable Regulatory Framework

#### 1. Regulatory Framework: Premarket Approval

36. PMA is the FDA process of scientific and regulatory review to evaluate the safety and effectiveness of Class III medical devices. Class III medical devices are those that support or sustain human life, are of substantial importance in preventing impairment of human health, or which present a potential unreasonable risk of illness or injury. Due to the level of risk associated with Class III devices, these devices require PMA application under § 515 of the Federal Food, Drug, and Cosmetic Act ("FDCA")

before they can be sold in the United States.[1]

37. In the PMA application, the applicant is required to supply information to the FDA. The information required includes device description, clinical safety trials, methods of its product testing, design of the device, specific manufacturing controls, outcome evaluation, and proposed labeling. The FDA does not conduct independent testing on a medical device in a PMA application. The FDA reviews the documents provided to them by the PMA applicant and relies on the veracity of the company. The PMA applicant is solely responsible for submitting all truthful and necessary documentation to the FDA.

38. Once an application for PMA is approved, the holder (here, Boston Scientific) must comply with any and all post-approval requirements established by statute, the FDA, and federal regulations. Further, any proposed changes to the device's design, labeling, intended use, or manufacturing process must be submitted to the FDA as a PMA supplement. *See* 21 C.F.R. § 814.39(a).

39. In particular, federal regulations require a PMA holder such as Boston Scientific to comply with the following requirements:

a. Adverse Events. Review, evaluate, and report to the FDA adverse events associated with the medical device: (i) Report individual adverse events within 30 days after becoming aware of an adverse event or aware of a reportable death, serious injury or malfunction, 21 C.F.R. § 803.10(c)(1); and (ii) Report individual adverse events no later than five workdays after becoming aware of a "reportable event that requires remedial action to prevent an unreasonable risk of substantial harm to the public health," 21 C.F.R. § 803.10(c)(2)(i);

b. Quality System. Establish and maintain a quality system that is appropriate for the specific medical devices designed or manufactured and

[1] 21 U.S.C. § 360e; 21 C.F.R. Part 814.

that meets the requirement of this part. 21 C.F.R. § 820.5;

c. Management Responsibility. Management with executive responsibility shall establish its policy and objectives for, and commitment to quality. 21 C.F.R. § 820.20[2];

d. Qualified Personnel. Have sufficient personnel with the necessary educational background, training, and experience to assure that all activities required by this part are correctly performed. 21 C.F.R. § 820.25;

e. Corrective and Preventative Action (CAPA). Establish and maintain procedures for implementing corrective and preventive action and document all CAPA activities. 21 C.F.R. § 820.100;

f. Complaint Files. Maintain complaint files, processed in a uniform and timely manner; oral complaints must be documented and must be evaluated to determine whether the complaint represents a reportable event under Medical Device Reporting. 21 C.F.R. § 820.198; and

g. Statistical Techniques. Establish and maintain procedures for identifying valid statistical techniques required for establishing, controlling and verifying the acceptability of process capability and product characteristics. 21 C.F.R. § 820.250.

40. Among the aforementioned requirements is to provide the FDA with the evidence required to establish reasonable assurance of the device's safety and effectiveness under the applicable regulatory standards.

41. The FDCA's implementing regulations require that an applicant for Premarket Approval of a device submit, with respect to the device proposed to be marketed: results of the clinical investigations involving human subjects with the device including clinical protocols, number of investigators and subjects per

---

[2] Unless otherwise noted, references to 21 C.F.R. § 820 refer to the version effective through February 1, 2026.

investigator, subject selection and exclusion criteria, study population, study period, safety and effectiveness data, adverse reactions and complications.[3] The permissible evidence and the information needed for a particular original application or supplement must be assessed under the applicable regulations.

42. The MDA distinguishes between different types of PMA supplements based on the nature and significance of the change. A "panel-track supplement" is required for changes that affect the safety or effectiveness of the device, such as new indications for use, major design modifications, or significant changes to component materials.[4]

43. For any change that could affect safety or effectiveness, the FDA must receive and approve the PMA supplement before the manufacturer implements the change.[5] The burden of proof remains with the manufacturer to demonstrate that the modified device continues to be safe and effective. *See id.*

**2. Regulatory Framework: Post-Marketing Surveillance and Reporting Obligations**

44. Manufacturers of PMA devices are also required to comply with post-market surveillance and reporting obligations, including:

a. Timely submission of adverse event reports under 21 C.F.R. § 803.50;

b. Maintenance of complaint files under 21 C.F.R. § 820.198;

c. Evaluation of nonconforming products under 21 C.F.R. § 820.90; and

d. Implementation of corrective and preventive actions under 21 C.F.R. § 820.100.

---

[3] 21 C.F.R. § 814.20(b)(6)(ii)
[4] *See* 21 C.F.R. § 814.39(c).
[5] 21 C.F.R. § 814.39(a).

### 3. Federal Requirements are Paralleled by State Law Duties

45. The federal requirements described above are mandatory, not discretionary. Although those requirements are enforced by the United States, 21 U.S.C. § 337(a), Plaintiff does not sue to enforce the FDCA. Plaintiff sues under state law for the breach of duties that state law independently imposes, that existed before the Medical Device Amendments, and that are owed directly to patients. Those state-law duties are parallel to, and impose no requirement different from or in addition to, the federal requirements identified herein.

46. The federal requirements applicable to PMA device manufacturers are paralleled by state law duties applicable to Plaintiff's claims. The specific state law applicable to Plaintiff's claims is identified in the Applicable Law section above and in Section V below. The principal sources of those parallel state-law duties include state statutes, state common law, and state adoptions of provisions of the Restatement (Second) of Torts, the Restatement (Third) of Torts: Products Liability, and the Uniform Commercial Code addressing, among other things, products sold in a defective condition unreasonably dangerous to the user, products that depart from their intended design and specifications, negligent manufacture, the failure to warn, post-sale conduct, and affirmative representations made to the public.

47. First, several jurisdictions have codified product-liability duties in statutes, including by consolidating common-law theories into statutory causes of action. To the extent Plaintiff's claims are governed by the law of such a jurisdiction, the parallel state-law duties arise under the corresponding statutory provisions for manufacturing defect, inadequate warning (including post-marketing warning), and nonconformance with representations.

48. Most jurisdictions have adopted, by statute or common law, the rule stated in Restatement (Second) of Torts § 402A (1965) that one who sells a product in a defective condition unreasonably dangerous to the user is subject to liability for physical harm caused to the ultimate user, even though the seller has exercised all

possible care. A product manufactured in departure from its manufacturer's own specifications is in a defective condition under § 402A.

49. In the context of a PMA device, the manufacturer's "specifications" include the design, materials, manufacturing processes, and acceptance criteria approved by FDA in the device's PMA and PMA supplements, and the conditions of approval. Federal law[6] prohibits manufacturing a PMA device in a manner inconsistent with those conditions. The state-law duty not to sell a device that departs from its specifications is therefore identical to the federal requirement and imposes no additional obligation.

50. Jurisdictions that have adopted the Restatement (Third) of Torts: Products Liability (1998) impose the same duty. Under § 1, one engaged in the business of selling or distributing products who sells a defective product is subject to liability for harm caused by the defect. Under § 2(a), a product contains a manufacturing defect "when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product." Section 6(b)(1) applies that standard to prescription medical devices. A device that departs from its FDA-approved design and specifications departs from its "intended design" within the meaning of § 2(a).

51. Many jurisdictions also recognize the principle stated in Restatement (Third) of Torts: Products Liability § 4(a) that a product's noncompliance with an applicable product-safety statute or administrative regulation renders the product defective with respect to the risks that the statute or regulation seeks to reduce. The PMA conditions of approval, the quality management system requirements of 21 C.F.R. Part 820, and the reporting requirements of 21 C.F.R. Part 803 are product-safety regulations within this principle. Under § 4(a), state law treats noncompliance with those requirements as establishing defect. It does not create any standard beyond

[6] 21 C.F.R. § 814.80.

them.

52. Every jurisdiction recognizes a common-law duty of reasonable care in manufacturing products.[7] A manufacturer that fails to follow its own validated processes, acceptance criteria, and CGMP controls, including inspection, process validation, nonconforming-product controls, and corrective and preventive action, breaches that duty. The scope of the duty, as applied to the devices here, is defined by and coextensive with the federal requirements identified herein.

53. Jurisdictions likewise recognize the rule of Restatement (Second) of Torts § 388 that one who supplies a chattel for another's use is subject to liability if the supplier knows or has reason to know the chattel is or is likely to be dangerous for its intended use and fails to exercise reasonable care to inform those whom it expects to use it.

54. Many jurisdictions treat the violation of a statute or regulation designed to protect a class of persons, including the plaintiff, against the type of harm suffered, as negligence per se or as evidence of negligence.[8] The federal requirements identified herein are designed to protect patients implanted with Class III devices against the very harms alleged here. Where governing state law permits, Plaintiff invokes the federal requirements as the standard of care for his state-law negligence claims, not as an independent cause of action.

55. Federal law requires PMA manufacturers to report deaths, serious injuries, and malfunctions likely to cause or contribute to serious injury within specified periods.[9] Some jurisdictions recognize a state law duty to report adverse events to the FDA that are failure to warn claims.

56. To the extent Defendants' labeling, instructions for use, or

---

[7] *See* Restatement (Second) of Torts § 395 (manufacturer who fails to exercise reasonable care in the manufacture of a chattel that, unless carefully made, involves an unreasonable risk of physical harm is subject to liability).

[8] *See* Restatement (Second) of Torts §§ 286, 288B; Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 14.

[9] 21 U.S.C. § 360i; 21 C.F.R. Part 803 § 803.50.

communications to physicians departed from, minimized, or contradicted the FDA-approved labeling, or Defendants failed to provide warnings that federal law required, that conduct breaches state-law warning duties that parallel the federal requirements.[10]

57. Jurisdictions adopting Restatement (Third) of Torts: Products Liability § 10 recognize a duty to provide post-sale warnings when the seller knows or reasonably should know a product poses a substantial risk of harm. This parallels the FDA methods under 21 C.F.R. § 814.39 for Defendants to alert the FDA of newly acquired information regarding safety and efficacy, or to implement those changes under the Changes Being Effected regime.

58. Plaintiff does not seek to enforce the FDCA directly. Rather, Plaintiff asserts state-law tort claims based on duties that parallel and incorporate federal requirements, as detailed above. Plaintiff does not assert any claim premised on fraud on FDA, on any obligation owed solely to FDA, or on the existence of the FDCA alone. To the extent any federal requirement is referenced, it is referenced only to establish that the state-law duty Defendants breached is parallel to, and not different from or in addition to, federal requirements.

### B. Boston Scientific's SCS Devices

#### 1. Overview of Spinal Cord Stimulation Devices

59. SCS devices are Class III implantable neuromodulation systems designed to deliver electrical impulses to the spinal cord to mask or modulate chronic pain. SCS systems typically consist of an implantable pulse generator ("IPG"), one or more electrical leads, and external patient controllers for adjusting therapeutic levels.

60. The underlying therapeutic premise of SCS devices involves electrical stimulation to the dorsal columns to "mask" or "override" the transmission of pain signals to the brain, pursuant to the gate control theory of pain.

61. SCS devices' classification as Class III medical devices by the FDA mean

---

[10] *See* Restatement (Third) of Torts: Products Liability §§ 2(c), 6(d).

they present the highest risk to patients and require Premarket Approval ("PMA") demonstrating safety and effectiveness before commercialization.[11] Any proposed changes to a PMA-approved device's design, labeling, intended use, or manufacturing process must be submitted to the FDA as a PMA supplement.[12]

62. SCS devices are prescription devices within the meaning of 21 C.F.R. § 801.109 and may only be used by or upon the order of a licensed healthcare practitioner.

63. SCS devices are also associated with significant complications and poor clinical results, including inadequate effectiveness in providing the pain relief their manufacturers promise. The devices are also associated with complex risks of device failures, including but not limited to: device failure, inconsistent therapeutic treatment, device and lead migration, lead breakage, lead insulation failure, battery failure, IPG overheating, excessive electrical stimulation, and unintended electrical stimulation.

64. These device failures, in turn, are the proximate cause of foreseeable injuries including but not limited to: exacerbation of pain, burns, vasovagal responses such as syncope, unexpected shocking, autonomic dysfunction, and severe and/or permanent electrical-induced neuropathy and neurological injuries such as paresthesia, nerve pain, urinary and/or fecal incontinence, urinary retention, dysphagia, gastroparesis, cardiac arrhythmia, and paralysis.

65. In September 2020, following a Public Citizen report, the FDA issued a letter to healthcare providers advising that over the preceding four years it had received 107,728 adverse event reports regarding SCS devices, including 30,321 reports of unsatisfactory pain relief and 428 patient deaths.[13] These figures include reports

---

[11] 21 U.S.C. § 360e; 21 C.F.R. Part 814.
[12] *See generally* 21 C.F.R. § 814.39(a).
[13] MedTech Dive, "FDA Flags 428 Spinal Cord Stimulator Patient Deaths, Urges More Tests Before Implanting" (Sept. 4, 2020), reporting on FDA Letter to Healthcare Providers regarding 107,728 adverse event reports received over the preceding four-year period. Available at: https://www.medtechdive.com/news/fda-flags-428-spinal-cord-stimulator-patient-deaths-urges-more-tests-befor/584714/.

involving Boston Scientific's SCS devices.

66. Peer-reviewed literature has increasingly associated SCS therapy, particularly multiwaveform stimulation platforms like the newer iterations of Boston Scientific's SCS devices, with unexpected autonomic side effects.[14]

67. A 2023 Cochrane Review[15] led by University of Sydney researchers found that, based on all randomized controlled trials and cross-over trials comparing SCS with placebo or no treatment for low back pain, current evidence suggests that SCS probably does not have sustained clinical benefits that would outweigh the costs and risks of this surgical intervention. The review concerned low back pain and is cited for the limitations of that evidence, not as a finding that every SCS model is ineffective for every indication.

**2. Boston Scientific's Original PMA**

68. Boston Scientific's entire SCS product line originates from, and is for all intents and purposes, predicated on PMA P030017, initially approved by the FDA in 2004 for its Precision Spinal Cord Stimulator System. All Boston Scientific SCS products, including the device implanted in Plaintiff — the Precision SCS System, Precision Plus, Precision Spectra, Precision Montage, Precision Novi, Spectra WaveWriter, WaveWriter Alpha, and WaveWriter Alpha Prime — operate under a single PMA number: P030017.

69. FDA approved PMA P030017 for the original Precision SCS System on April 27, 2004. Critically, the original PMA was not based on a manufacturer-sponsored, patient-level pivotal IDE trial unique to the Precision system. Instead, as documented by Public Citizen's Health Research Group, the only clinical study data provided to support the application was a review of 16 previously published studies of

---

[14] *See, e.g.*, Steven Smeijers et al., Spinal Cord Stimulation and Urinary Dysfunction, 23 Pain Med. 1204, 1204-1216 (2022).

[15] Traeger AC, Gilbert SE, Harris IA, Maher CG. Spinal Cord Stimulation for Low Back Pain; Cochrane Database of Systematic Reviews 2023, Issue 3; Art. No.: CD014789. DOI: 10.1002/14651858.CD014789.pub2.

other commercially available SCS devices. No formal Neurological Devices Advisory Panel meeting was convened for the original Precision PMA.[16]

70. As a condition of PMA approval, Boston Scientific was required to maintain ongoing post-approval obligations under 21 C.F.R. § 814.84, including submission of annual post-approval study reports, timely Medical Device Reports ("MDRs") for serious injuries (within 30 days) and events requiring remedial action (within 5 days), and submission of PMA supplements for any changes to the device's design or manufacturing process.[17] Any failure to meet these obligations constitutes a violation of PMA conditions and potentially a misbranding or adulteration violation under 21 U.S.C. §§ 331 and 351.[18]

71. The original approval relied in part on clinical data from "available peer reviewed published literature for similar implantable spinal cord stimulation (SCS) systems."[19] The FDA's original Summary of Safety and Effectiveness Data describes published literature concerning similar SCS systems and also reports actual clinical experience with the Precision system. Later supplements include additional clinical evidence.

72. Plaintiff alleges that Boston Scientific exceeded the scope of permissible representations and overstated the extent to which clinical studies established the long-term benefits and safety represented to Plaintiff and his physicians. The nature, controls, duration, and device-specific applicability of the studies are material to those allegations.

---

[16] U.S. Food and Drug Administration, PMA P030017 Original Approval, April 27, 2004 Available at: https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?ID=P030017. *See also* Michael Carome, *Implanted Spinal Cord Stimulators for Pain Relief* (June 10, 2020), https://www.citizen.org/wp-content/uploads/2526_200610_Spinal-Cord-Stimulator-Report_FINAL.pdf.

[17] *See* 21 C.F.R. §§ 814.82, 814.84, 803.50, 803.53 (2025).

[18] *See* 21 U.S.C. §§ 331(a)-(b), 351 (2025); *see also* 21 C.F.R. § 814.82(c) (2025).

[19] Plaintiff disputes, in the separately tracked APA proceeding where properly asserted, whether the FDA's evidentiary basis for the relevant approval satisfied the applicable statutory and regulatory requirements.

### 3. Subsequent SCS Devices Were Created Through Material Changes to Device Architecture and Functionality

73. Since the original approval of P030017, Boston Scientific has introduced numerous subsequent models and upgrades under PMA supplements, including the Precision Plus, Precision Spectra, Precision Montage, Precision Montage MRI, Precision Spectra WaveWriter, Precision Novi, WaveWriter Alpha, and WaveWriter Alpha Prime.

74. Boston Scientific's subsequent SCS system generations received approval through PMA supplements to P030017: the Precision Plus through supplement S100 (approved February 2010); the Precision Spectra through supplement S134 (received May 2012); the Precision Montage and Precision Novi through supplement S235 (approved May 19, 2016); the Spectra WaveWriter through supplement S271 (approved March 2017), which was the first FDA-approved SCS system capable of delivering simultaneous paresthesia-based and sub-perception therapy; the WaveWriter Alpha through supplement S338 (approved December 1, 2020); and the WaveWriter Alpha Prime through supplements S357 (DPN indication, approved October 5, 2023) and S363 (NSBP indication, approved February 5, 2024).[20]

75. Since the original approval of P030017, Boston Scientific has filed nearly 400 supplements to P030017.

76. The newer generations of Boston Scientific's devices incorporated significant modifications, including multiwaveform stimulation (simultaneous tonic, burst, and sub-perception modes), posture-adaptive programming, expanded electrode arrays, changes in the way in which sales representatives and patients communicate

[20] U.S. Food and Drug Administration, PMA P030017/S100 (Precision Plus, approved Feb. 2010); PMA P030017/S134 (Precision Spectra, approved 2013); PMA P030017/S235 (Precision Montage/Precision Novi, approved May 19, 2016); PMA P030017/S271 (Spectra WaveWriter, approved March. 2017); PMA P030017/S338 (WaveWriter Alpha, approved Dec. 1, 2020); PMA P030017/S357 (WaveWriter Alpha Prime DPN indication, approved Oct. 5, 2023); PMA P030017/S363 (NSBP indication, approved Feb. 5, 2024). Available at: https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?ID=P030017.

with the device, and major revisions to battery architecture and lead designs.

77. Over time, Boston Scientific introduced substantial modifications to the originally approved Precision SCS system, including:

a. The addition of simultaneous multiwaveform stimulation, including tonic, burst, and sub-perception programming;

b. The redesign of the implantable pulse generator battery system and revision to communication capabilities;

c. The integration of posture-adaptive stimulation algorithms; and

d. The expansion of lead configurations and multi-source current delivery systems.

78. These substantial modifications materially altered the new SCS devices' safety and effectiveness profiles compared to the originally approved Precision system.

79. By Boston Scientific's own admission, its various newer SCS devices are updated versions of its earlier SCS technology. For example, the Spectra WaveWriter SCS was "approved" by the FDA through Supplement S271 to PMA P030017. In a January 11, 2018, press release, Boston Scientific described the Spectra WaveWriter system as "industry leading SCS technology." Thus, the spinal cord stimulator systems implanted in Plaintiff are materially different in the respects described herein from the Precision system that was originally approved by the FDA in 2004.

80. Exemplifying the significant changes Boston Scientific has made to its SCS systems over the years, it currently advertises and markets three distinct systems on its website: the Precision Montage, Spectra WaveWriter, and the WaveWriter Alpha systems. Despite advertising three distinct systems, along with several others throughout the years, Boston Scientific has only received one PMA approval.

## C. Boston Scientific Repeatedly Violated Federal Requirements and Parallel State Duties

### 1. Boston Scientific Deviated from the Approved Specifications

**for the SCS Devices**

81. Boston Scientific deviated from the approved design and manufacturing specifications for the SCS devices, thereby introducing defective devices that did not conform to FDA requirements and violating both federal and parallel state law requirements.

82. At the time that Defendants received approval to market the SCS devices, the specifications featured a polycarbonate polyurethane insulation sheath on the lead wire for purposes including electrical insulation, biostability, and mechanical durability within the harsh environment of the human body.

83. Polycarbonate polyurethane, generally, is created by reacting (1) a diisocyanate, (2) an aliphatic chain extender, and (3) a polycarbonate polyol. Among the three components, the chemical properties of the soft-segment polycarbonate polyol are chiefly what endow a polyurethane with its functional properties such as flexibility, tensile strength, flex-fatigue resistance, and resistance to *in vivo* environmental degradation.

84. The specific formulation of polyurethane which Defendants used to conduct testing, and the specifications which Defendants provided to the FDA to obtain approval, required a single-source, 2000g/mol polycarbonate polyol called PC-1122 manufactured by Stahl United ("Stahl").

85. At all times relevant to this action, Defendants obtained the polyurethane used in lead insulation for the SCS devices from a company called AdvanSource Biomaterials Corporation ("AdvanSource"), which was acquired in 2020 by Mitsubishi Chemical Performance Polymers, Inc.

86. In the years prior to 2006, AdvanSource prepared polycarbonate polyurethane for Defendants using PC-1122 obtained from Stahl.

87. In fact, Stahl's facility in Peabody, Massachusetts was the only source in the world for PC-1122 and, thus, the sole source of the key component necessary to manufacture the polyurethane required to meet the approved specifications of the SCS

devices.

88. In 2006, Stahl was acquired by French investment firm Wendel SE, and the new owners ordered closure of the Peabody, Massachusetts facility, thereby terminating the sole supply of PC-1122.

89. AdvanSource promptly notified Defendants of the impending end of the supply of PC-1122 and, thus, the end of their ability to manufacture the biodurable polyurethane used in the lead insulation for the SCS devices.

90. This news was also well-known among other medical device manufacturers due to the ubiquity of PC-1122 in polyurethanes used in medical applications (e.g., Chronoflex®, Bionate®, Carbothane™) in medical device designs at that time.

91. At that point, Defendants had the duty to either obtain an approved material from another source or seek approval of alternative materials for their polycarbonate polyurethane insulation and submit notice of the proposed change in a new PMA application to the FDA.[21]

92. Rather than fulfilling this duty to patients, including Plaintiff, Defendants began manufacturing and/or acquiring lead wire insulation for their SCS devices using polyurethane synthesized from a different polycarbonate polyol, namely Eternacoll® UH-200 ("UH-200") manufactured by a company called UBE Corporation.

93. Upon information and belief, Defendants did not submit a proper PMA supplement to the FDA concerning this material change at all including not limited those times relative to its use.

94. Crucially, UH-200 has chemical properties which differ markedly from PC-1122, and the polyurethane resulting from synthesis using UH-200 is significantly stiffer, more prone to environmental stress cracking, and more prone to *in vivo* environmental degradation. Defendants knew or should have known about the material

---

[21] 21 C.F.R. § 814.39(a)(3).

weaknesses associated with UH-200 arising from its different chemical properties and that such weaknesses would introduce significantly increased device failure risks.

95. Specifically, as a result of these deviations from the FDA-approved specifications, the resulting properties of the lead wires manufactured and sold by Defendants significantly increased the risk of critical device failures in patients including Plaintiff, including but not limited to:

a. Insulation failure;

b. Lead fracture;

c. Unintended electrical shocking;

d. Nerve insult at the site(s) of insulation failure;

e. Unintended electrical stimulation at the site(s) of insulation failure;

f. Device infection due to degradation of the material surface, resulting in increased bacterial colonization and biofilm formation.

96. Defendants were on notice of the causal relationship between the insulation formulation change and the increase in the incidence of the aforesaid device failures due to basic materials science and the increased rate of adverse events demonstrated after PC-1122 became unavailable.

97. Further, it was reasonably foreseeable to Defendants that these critical device failures would cause the injuries complained of by Plaintiff, including but not limited to electrical shocks, device infection, vasovagal reactions such as syncope, and severe and/or permanent nerve injuries including nerve pain, electrical-induced neuropathy, numbness, lower limb paralysis, bowel and/or urinary incontinence, gastroparesis, and dysphagia.

98. Despite actual and constructive notice of the risk of device failure and subsequent injuries from the material change, Defendants failed to conduct necessary quality management procedures, including adequate investigations and Corrective and Preventative Action (CAPA) procedures to address these increased risks. These failures violated the FDA Quality System Regulations and newer Quality Management System

Regulations[22] and parallel state law requirements.

99. Parallel state law requirements include, but are not limited to, those prohibiting the sale of unreasonably dangerous devices, such as those adopting the Restatement (Second) of Torts prohibition in §402(A) and comment g.

**2. Boston Scientific Manufactured Defective SCS Devices As a Result of its Violations of Current Good Manufacturing Practices (cGMPs) and Parallel State Law Duties.**

100. The pattern of lead and device failures in Boston Scientific's SCS products, as documented in MAUDE reports and reflected in Plaintiff's injuries, is consistent with deviations from Boston Scientific's FDA-approved manufacturing specifications and cGMP requirements. When an SCS lead fractures, breaches its insulation, or migrates in a manner inconsistent with the device's approved design specifications, or when an IPG resets or malfunctions in a manner inconsistent with approved performance standards, the device has deviated from Boston Scientific's approved design specifications, formula, and performance standards.[23]

101. Boston Scientific manufactured, marketed, and sold defective SCS devices that were not manufactured in conformity with the FDA-approved design and manufacturing specifications. These deviations from approved specifications resulted from Boston Scientific's violation of Current Good Manufacturing Practices (cGMPs) cGMP requirements codified at 21 C.F.R. Part 820 as both the prior Quality System Regulations and the new Quality Management System Regulations,[24] including those governing design control, process validation, complaint handling, and CAPAs. These

---

[22] Effective February 2, 2026. 21 C.F.R. Part 820 was amended to explicitly incorporate ISO 13485:2016(E), deeming the new version "Quality Management System Regulations.

[23] U.S. Food and Drug Administration, Summary of Safety and Effectiveness Data (SSED), PMA P030017/S338, Boston Scientific WaveWriter Alpha SCS System (Dec. 1, 2020) (listing lead migration, insulation breaches, and device malfunction as potential risks inconsistent with approved device performance).

[24] Unless otherwise noted, all references to 21 CFR 820 in this Complaint refer to the version in effect prior to February 2, 2026.

non-conforming manufacturing processes and the sale of defective devices violated both federal and parallel state law requirements, including but not limited those adopting, or otherwise similar to, the Restatement (Second) of Torts §402(A) with comment g, §395, §398, and the Restatement (Third) of Torts §§ 1 and 2.

***a) Deviations in Lead Sheath Material***

102. First, as described above, Boston Scientific deviated from the specified and FDA-approved material for its lead wire insulation sheath, PC-1122, to instead use UH-200. Those deviations from approved design and manufacturing specifications resulted in the reasonably foreseeable device failures and resulting injuries described above.

103. By deviating in those ways, Boston Scientific committed violations of the applicable FDA regulations, including:

a. **21 C.F.R. § 814.39(a)(6)**: Failure to submit a PMA supplement for review and approval by FDA before making a change affecting the safety or effectiveness of the device for which the applicant has an approved PMA, including a change in performance, design specifications, components and ingredients;

b. **21 C.F.R. § 814. 39(f)**: Failure to submit a 30-day notice of modifications to manufacturing processes that affect the safety and effectiveness of a device subject to an approved PMA;

c. **21 C.F.R. § 820.5**: Failure to establish and maintain a quality system that is appropriate for the specific medical device(s) designed or manufactured, and that meets the requirements of this part;

d. **21 C.F.R. § 820.30**: Failure to establish and maintain adequate design control procedures for design verification, validation, and changes;

e. **21 C.F.R. § 820.50**: Failure to establish and maintain procedures to ensure that all purchased or otherwise received product and services conform to specified requirements;

f. **21 C.F.R. § 820.70**: Failure to develop, conduct, control, and monitor production processes to ensure that a device conforms to its specifications, including the failure to establish and maintain procedures for production and process changes to a specification, method, process, or procedure;

g. **21 C.F.R. § 820.90**: Failure to establish and maintain procedures to control a product that does not conform to specified requirements;

h. **21 C.F.R. § 820.100**: Failure to establish and maintain procedures for implementing corrective and preventive action; and

i. **21 C.F.R. §820.198**: Failure to establish and maintain procedures for receiving, reviewing, and evaluating complaints by a formally designated unit. Such procedures shall ensure that: (1) All complaints are processed in a uniform and timely manner; (2) Oral complaints are documented upon receipt; and (3) Complaints are evaluated to determine whether the complaint represents an event which is required to be reported to FDA under part 803 of this chapter, Medical Device Reporting.

104. These federal violations correspond to violations of parallel state law duties, including but not limited to those adopting or to similar to the Second Restatement (Second) of Tort's prohibition on selling dangerously defective products under §402(A) and comment g, its provision addressing a manufacturer's failure to exercise reasonable care in manufacturing a product under § 395, adoption of an unsafe design under § 398, or the Restatement (Third) of Tort's section on manufacturing defect in § 2.

105. Boston Scientific knew or should have known that failing to follow these requirements would foreseeably lead to the device failures and subsequent injuries described above.

***b) Infinion CX Leads***

106. Likewise, the failures of the Infinion CX leads used in the SCS device

systems as described in Boston Scientific's June 17, 2026 letter to customers and the September 3, 2026 recall communications, demonstrate defective leads that lacked the structural integrity provided for in the FDA designs for the products.

107. As noted in the recall materials, lead fractures could occur with these products, as well as high impedance measures that could lead to inadequate stimulation and additional intervention such as explantation or replacement. The variance in stimulation could lead to increased pain due to lack of efficacy in patients. These are all foreseeable risks Boston Scientific should have been aware could result from its failure to conform to federal and state requirements.

108. The deviations from federal requirements that resulted in the defective Infinion CX leads include but are not limited to:

a. **21 C.F.R. § 820.5**: Failure to establish and maintain a quality system that is appropriate for the specific medical device(s) designed or manufactured, and that meets the requirements of this part;

b. **21 C.F.R. § 820.30**: Failure to establish and maintain adequate design control procedures for design verification, validation, and changes;

c. **21 C.F.R. § 820.50**: Failure to establish and maintain procedures to ensure that all purchased or otherwise received product and services conform to specified requirements;

d. **21 C.F.R. § 820.70**: Failure to develop, conduct, control, and monitor production processes to ensure that a device conforms to its specifications, including the failure to establish and maintain procedures for production and process changes to a specification, method, process, or procedure;

e. **21 C.F.R. § 820.90**: Failure to establish and maintain procedures to control a product that does not conform to specified requirements;

f. **21 C.F.R. § 820.100**: Failure to establish and maintain procedures for implementing corrective and preventive action; and

g. **21 C.F.R. §820.198**: Failure to establish and maintain procedures for receiving, reviewing, and evaluating complaints by a formally designated unit. Such procedures shall ensure that: (1) All complaints are processed in a uniform and timely manner; (2) Oral complaints are documented upon receipt; and (3) Complaints are evaluated to determine whether the complaint represents an event which is required to be reported to FDA under part 803 of this chapter, Medical Device Reporting.

109. These federal violations correspond to violations of parallel state law duties, including but not limited to those adopting or similar to the Restatement (Second) of Tort's prohibition on selling dangerously defective products under §402(A) and comment g, its provision addressing a manufacturer's failure to exercise reasonable care in manufacturing a product under § 395, adoption of an unsafe design under § 398, or the Restatement (Third) of Tort's section on manufacturing defect in § 2.

110. Boston Scientific knew or should have known that failing to follow these requirements would foreseeably lead to the device failures and subsequent injuries described above.

***c) Defective Hermetic Seals***

111. Boston Scientific also manufactured SCS devices that included defective laser welds and seals that allow moisture and fluids to infiltrate the hermetically sealed IPG enclosure, thereby compromising the sensitive circuitry and causing humidity and/or moisture induced device failures.

112. The hermetic seals[25] of the SCS IPGs are meant to be maintained using,

---

[25] G. Jiang & D.D. Zhou, *Technology advances and challenges in hermetic packaging for implantable medical devices. Implantable neural prostheses 2: techniques and engineering approaches* (2010) at page 31, https://scispace.com/pdf/technology-advances-and-challenges-in-hermetic-packaging-for-3d0ffwjbhc.pdf.

among other things, laser-welded seams, encapsulation polymers, and feedthroughs[26] and are intended to maintain appropriate sealing and internal moisture levels for the duration of the implant's labeled service life.

113. Once moisture accumulates or condenses, it can cause corrosion, open circuits, metal damage, voltage leakage, current leakage, and electrical shorts that interrupt device function or cause device failure. Since the invention of implanted devices with circuitry inside, moisture level has often been considered the most critical piece of information as many electronic failures are directly related to moisture accumulation and condensation.[27][28][29]

114. As designed, the IPG in the Boston Scientific SCS devices provides power for both the electrical stimulation circuits and the Bluetooth transmitter used to communicate with patient controller application.

115. Moisture infiltration into the sealed IPG can affect the performance and power draw of the Bluetooth transmitter which in turn negatively impacts the power available for electrical stimulation. These negative effects affect the delivery of electrical stimulation including uncontrolled excess electrical stimulation, electrical leakage, increased battery drain, excess heat generated within the IPG, and a disrupted routine system check to cause a device reset. These device resets can then cause incorrect or inconsistent electrical stimulation delivery.

116. The device failures caused by the moisture infiltration then cause the injuries affecting Plaintiff, including lack of efficacy, burns, electrical shocks, device infection, vasovagal reactions such as syncope, and severe and/or permanent nerve

---

[26] PAVE Technology Co., *Hermetic feedthrough: Complete Guide to Sealed Electrical Connections*. https://www.pavetechnologyco.com/2024/10/19/hermetic-feedthroughs/ (accessed Aug. 17, 2026).

[27] R. W. Thomas, *Moisture, myths, and microcircuits, in IEEE Trans,* On Parts, Hybrids, and Packaging, p167 – 171 (1976).

[28] A. DerMarderosian, *Electrochemical migration of metals*, Proceedings of the International Microelectronics Symposium, pp. 134 – 141 (1978).

[29] A.E. Roswell & G.K. Clymer, *Thermal fatigue lead-soldered semiconductor device*, US Patent 3,735,208 (1971).

injuries including nerve pain, electrical-induced neuropathy, numbness, lower limb paralysis, bowel and/or urinary incontinence, gastroparesis, and dysphagia.

117. First, the very device failures and patient injuries alleged by Plaintiff and present in MAUDE reports correspond with the expected failures resulting from moisture ingress.

118. Second, evidence corroborating Boston Scientific's knowledge of the manufacturing defects and the feasibility of implementing processes to avoid manufacturing defects affecting the hermetic seals including but not limited to weld-specification nonconformance, can be seen in the corrective measures taken by Boston Scientific to cure the manufacturing defects. These corrective measures include, but are not limited to:

a. The increased capacitor described in PMA P030017 Supplement S371[30] that implemented a larger tank[31] to reduce the negative effects of the increased power drain created by the damage caused by moisture ingress in defectively manufactured SCS devices;

b. The submission of the 30-day notice in PMA P30017 Supplement S353 for a manufacturing process change to introduce two new laser welders at the Dorado, Puerto Rico facility[32];

c. The submission of the 30-day notice in PMA P30017 Supplement S355 for a manufacturing process change to introduce a reweld cycle for

---

[30] Notice to Boston Scientific Corp . (Jan. 30, 2024) (regarding PMA Supplement S371 for PMA P030017), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?ID=P030017S371.

[31] Of note, the increased capacitor size can in fact amplify the negative effects of infiltration, creating more drastic power drains and surges. *See* J. Kast, et al., *Chapter 9: Device Materials, Handling, and Upgradeability,* Essential Neuromodulation. Academic Press (2011).

[32] Notice to Boston Scientific Corp. (Dec. 2, 2022) (regarding PMA Supplement S353 for PMA P030017), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P030017S353.

the IPG at the Clonmel, Ireland facility[33];

d. The 2021 study titled *Laser Weld Technology and Compression Tool Improvement to Increase Capability and Prevent Continuity Failures*[34] addressing laser weld process problems in Boston Scientifics' neuromodulation operations, including weld variation and continuity-failure defects in the spinal cord stimulation units;

e. The submission of the 30-day notice in PMA P30017 Supplement S379 for a manufacturing process change to introduce a laser weld system for additional weld seams at the Clonmel, Ireland facility[35]; and

f. The submission of the 30-day notice in PMA P30017 Supplement S380 for a manufacturing process change to introduce an additional laser weld system at the Dorado, Puerto Rico facility.[36]

119. These repeated corrective actions to address manufacturing defects in the process for hermetically sealing the IPGs provide sufficient evidence of the occurrence of these manufacturing defects in Defendants' SCS devices.

120. These manufacturing defects occurred because of Boston Scientific's quality management system failures in violation of federal requirements and parallel state duties. These failures include but are not limited to:

a. **21 C.F.R. § 820.5**: Failure to establish and maintain a quality

---

[33] Notice to Boston Scientific Corp. (Dec. 7, 2022) (regarding PMA Supplement S355 for PMA P030017), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?start_search=1&PMANumber=P030017&SupplementNumber=S355.

[34] J. E. Barrios Torres, *Laser Weld Technology and Compression Tool Improvement to Increase Capability and Prevent Continuity Failures*. Manufacturing Competitiveness Program: Industrial Engineering Competitiveness, Polytechnic University of Puerto Rico (2021).

[35] Notice to Boston Scientific Corp . (Nov. 18, 2024) (regarding PMA Supplement S379 for PMA P030017), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id=P030017S379.

[36] Notice to Boston Scientific Corp. (Dec. 13, 2024) (regarding PMA Supplement S380 for PMA P030017), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?start_search=1&PMANumber=P030017&SupplementNumber=S380.

system that is appropriate for the specific medical device(s) designed or manufactured, and that meets the requirements of this part;

b. **21 C.F.R. § 820.30**: Failure to establish and maintain adequate design control procedures for design verification, validation, and changes;

c. **21 C.F.R. § 820.50**: Failure to establish and maintain procedures to ensure that all purchased or otherwise received product and services conform to specified requirements;

d. **21 C.F.R. § 820.70**: Failure to develop, conduct, control, and monitor production processes to ensure that a device conforms to its specifications, including the failure to establish and maintain procedures for production and process changes to a specification, method, process, or procedure;

e. **21 C.F.R. § 820.90**: Failure to establish and maintain procedures to control a product that does not conform to specified requirements;

f. **21 C.F.R. § 820.100**: Failure to establish and maintain procedures for implementing corrective and preventive action; and

g. **21 C.F.R. §820.198**: Failure to establish and maintain procedures for receiving, reviewing, and evaluating complaints by a formally designated unit. Such procedures shall ensure that: (1) All complaints are processed in a uniform and timely manner; (2) Oral complaints are documented upon receipt; and (3) Complaints are evaluated to determine whether the complaint represents an event which is required to be reported to FDA under part 803 of this chapter, Medical Device Reporting.

121. These federal violations correspond to violations of parallel state law duties, including but not limited to those adopting or to similar to the Restatement (Second)of Tort's prohibition on selling dangerously defective products under §402(A) and comment g, its provision addressing a manufacturer's failure to exercise reasonable care in manufacturing a product under § 395, adoption of an unsafe design under § 398,

or the Restatement (Third) of Tort's section on manufacturing defect in § 2.

122. Boston Scientific knew or should have known that failing to follow these requirements would foreseeably lead to the device failures and subsequent injuries described above.

123. These cGMP violations are not discretionary; they are binding legal obligations imposed by the FDA to ensure the safety and effectiveness of devices. They establish minimum standards for medical device manufacturers and are incorporated by reference into state laws as parallel duties.

124. Boston Scientific's violations of these cGMP requirements caused Plaintiff's injuries described herein. It was reasonably foreseeable that these violations would cause injury to Plaintiff and others. Specifically, these violations resulted in unsafe products being marketed to Plaintiff and deprived Plaintiff and his physicians of important information about the safety and efficacy of the devices at issue.

125. Boston Scientific's repeated and willful violations of cGMP requirements caused or substantially contributed to the defects and injuries at issue in this case, and support Plaintiff's claims under state laws.

126. These state law claims are not preempted under *Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008), or *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001) because they are premised on state-law duties that genuinely parallel federal requirements and do not exist solely by virtue of the FDCA.

**3. Boston Scientific Failed to Provide the FDA-Approved Warnings**

127. As part of the PMA process, the FDA approves the product labeling, including the warnings associated with the devices. Boston Scientific is then obligated to provide that warning for the patients' benefit, often times to their physician.

128. As part of the sales representatives' activity described in more detail below, Boston Scientific's sales representatives, acting within the scope of their employment, circumvented physicians so that they communicated and provided

warnings directly to patients.[37] This conduct occurred both orally and in confirmed written communications, thereby depriving patients of their physicians' independent assessment and communication of those warnings. Through this conduct, Boston Scientific circumvented the physician-patient relationship by going directly to the consumer and deprived the patients of any of the benefits of their physician acting as a learned intermediary. Furthermore, Boston Scientific inserted itself so thoroughly into the patient experience that any contact between the physicians and patients was extremely limited.

129. In these direct-to-patient communications, Boston Scientific representatives (1) failed to provide the full breadth of FDA-approved warnings and (2) undermined and/or nullified FDA-approved warnings through representations (and misrepresentations) to the patients about safety, efficacy, the lack of risk, lack of injury causation, and lack of company knowledge, among other topics. These deviations are further supported by the Plaintiff-specific allegations in Section V of this Complaint.

### 4. Boston Scientific Failed to Use the CBE Process to Warn of Newly Acquired Information Affecting the Safety and Efficacy of the SCS Devices

130. Although most device warnings must be approved by the FDA prior to dissemination, the regulations make an exception in 21 C.F.R. § 814. 39(d) under the Changes Being Effected ("CBE") process.

131. Under that process, certain changes to reflect newly acquired information that enhances the safety of the device or the safety in the use of the device may be placed into effect by the applicant prior to the receipt under § 814.17 of a written FDA order approving the PMA supplement provided that certain conditions are met.

---

[37] *See, e.g.*, *Maryann Bozichovich et al. v. Boston Scientific Corporation*, 2:26-cv-02830-JLS-PD; *Steven Joe Cooper v. Boston Scientific Corporation*, 2:26-cv-12020-JLS-PD; *Darrin Peterson v. Boston Scientific Corporation*, 2:26-cv-11312-JLS-PD; *Darcie Christiansen v. Boston Scientific Corporation*, 2:26-cv-10007-JLS-PD; *Jerri Thomas v. Boston Scientific Corporation*, 2:26-cv-11446-JLS-PD.

132. The kinds of changes allowed are:

a. Labeling changes that add or strengthen a contraindication, warning, precaution, or information about an adverse reaction for which there is reasonable evidence of a causal association.;

b. Labeling changes that add or strengthen an instruction that is intended to enhance the safe use of the device;

c. Labeling changes that delete misleading, false, or unsupported indications; and

d. Changes in quality controls or manufacturing process that add a new specification or test method, or otherwise provide additional assurance of purity, identity, strength, or reliability of the device.

133. As described below, Boston Scientific at various times possessed this kind of newly acquired evidence but did not make any CBE labeling changes to adequately warn the public, including Plaintiff and his physicians, of the known risks associated with the SCS devices.

134. Publicly available MAUDE (Manufacturer and User Facility Device Experience) database entries, peer-reviewed studies, and post-market surveillance data demonstrate that Boston Scientific's SCS systems are associated with serious complications, including:

a. Unsatisfactory pain relief;

b. Device migration and loss of therapeutic coverage;

c. Lead fractures requiring surgical revision;

d. Battery depletion and communication failures; and

e. Battery overheating.

135. The devices are also associated in MAUDE with injuries foreseeably caused by the device failures described above, including but not limited to:

a. Persistent ineffective pain relief despite extensive reprogramming.

b. Unexpected and severe shocking;

c. Nerve damage;

d. Burns from overheated IPG/batteries;

e. Delayed healing after implant;

f. Autonomic dysfunction such as orthostatic hypotension and syncope; and

g. Electrical-induced neuropathy and nerve injuries (severe and permanent) including urinary and fecal incontinence, cardiac arrhythmia, dysphagia; urinary retention, gastroparesis, paresthesia, and paralysis.

136. Despite knowing the adverse outcomes, Boston Scientific failed to update device labeling timely, issue field safety notices, timely file adverse event reports, educate its sales representatives on the true risk profile and therapeutic benefit expectations of its SCS devices, or seek revised PMA approvals as required under federal regulations.

137. Had Plaintiff, or his physicians, received these warnings, they would have been heeded, and Plaintiff would not have experienced the device failures and subsequent injuries described herein. Thus, Plaintiff's injuries occurred as a direct and foreseeable result of Defendant Boston Scientific's conduct.

**5. Boston Scientific Failed to Make Required Adverse Event Reports**

138. Likewise, upon information and belief, Boston Scientific failed to make the required adverse event reports when it learned of device issues through the patient-sales representative interactions, instead persuading patients, including Plaintiff, that were no issues with the SCS device.

139. Upon learning of a reportable adverse event, rather than alerting the physician and making the appropriate report, Boston Scientific's sales representatives would "address" the patients' concerns directly and steer the patient away from reporting their experiences to their physician. Thus, Boston Scientific could artificially control the number of reported adverse events associated with the SCS devices. Upon

information and belief, this delay in reporting would amount to months and even years of elapsed time before proper reports were made and the physicians were brought back into the fold.

140. Had appropriate reports been made, the information would be available to patients (including Plaintiff) and their physicians via the MAUDE database, and Plaintiff, with his physicians, would have heeded the warning prior to implantation, thus avoiding the risks and injuries associated with the SCS devices.

**D. Boston Scientific Engaged in Tortious Conduct Not Subject to Federal Regulation or Requirements**

**1. Conduct Outside of Federal Requirements**

141. Federal preemption under the Medical Device Amendments is limited. Section 360k(a) displaces only a state-law "requirement" that is "different from, or in addition to, any requirement applicable under this chapter to the device," and that relates to the device's safety or effectiveness or to another matter covered by a federal requirement applicable to the device.[38] FDA's own regulation states that state requirements "are preempted only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular device."[39]

142. FDA's premarket approval of Defendants' SCS Devices did not establish federal requirements governing many of Defendants' activities at issue in this Complaint, including the activities of Defendants' personnel in clinics, operating rooms, and direct contact with patients. No provision of the FDCA, FDA's regulations, or the PMA for any SCS Device authorizes, prescribes, or governs the following

[38] 21 U.S.C. § 360k(a).
[39] 21 C.F.R. § 808.1(d).

conduct, among other conduct:

a. Defendants' sales and field representatives assessing the cause of a patient's symptoms;

b. Representatives deciding whether a device or lead had failed;

c. Representatives directing reprogramming in place of clinical evaluation of hardware failure;

d. Representatives advising patients or physicians about whether to revise or explant a device;

e. Representatives making statements to patients about how their particular devices were working; and

f. Boston Scientific hiring, training, supervision, compensation, and retention conduct.

143. Plaintiff's claims based on such conduct rest entirely on duties that state law has long imposed on everyone, independent of the FDCA. These include:

a. The general duty to use ordinary or reasonable care to avoid harming others;

b. The duty to use reasonable care when undertaking to provide services;[40]

c. The duty not to misrepresent material facts, whether intentionally, negligently, or to the public;[41]

d. Obligations arising from express affirmations and promises under U.C.C. § 2-313 as enacted in each state; and

e. The statutory and common-law prohibitions, where state law provides a remedy, on the unlicensed practice of medicine and on rendering medical judgments without licensure.

144. Similarly, Plaintiff brings claims that are solely creatures of state law

---

[40] *See* Restatement (Second) of Torts §§ 323, 324A

[41] *See id*. §§ 310, 311, 402B.

statutory and common law, such as violations of the applicable consumer protection statutes.

145. Plaintiff therefore pleads two distinct categories of state-law claims. The first category covers conduct that federal law regulates. Plaintiff asserts those claims only to the extent the state-law duty parallels the federal requirement.

146. The second category covers conduct that no federal requirement reaches. For that conduct, state law alone defines Defendants' duties, and Section 360k(a) has no application.

***Boston Scientific's General Marketing Scheme***

147. Prior to being permanently implanted with a SCS device, a patient must first undergo a temporary SCS trial. During the temporary trial, the patient is implanted with temporary leads which are connected to an external, wearable pulse generator. The temporary trial usually lasts between seven (7) and fourteen (14) days.

148. The temporary SCS trial is required by most healthcare insurance providers and governmental healthcare payers (e.g., Medicare, Medicaid, and Veterans Affairs). Further, most third-party payers require the patient to report at least a fifty percent (50%) reduction in pain during the temporary trial before they will pay for the permanent SCS device. The Department of Veterans Affairs requires patients to report a sixty percent (60%) reduction in pain before it will pay for a permanent SCS device.

149. While Boston Scientific's SCS device pricing is not publicly available, and is subject to negotiated pricing with third-party payers and medical facilities, upon information and belief, Boston Scientific sells its SCS devices for between $20,000 and $30,000.

150. According to Boston Scientific's 2025 Annual Report, Boston Scientific reported approximately $1.2 billion in sales from its neuromodulation products for fiscal year 2025. Although Boston Scientific no longer breaks down the SCS portion of its device revenue, historically SCS revenue has represented over 80 percent of overall neuromodulation revenue. Thus, upon information and belief, SCS devices are

an important and lucrative part of Boston Scientific's medical device portfolio to this day.

151. Due to the invasiveness of the SCS implant, the significant cost of the devices and the implant procedure, the risks of the devices, and the overall lack of proven efficacy of the devices, aggressive and effective sales and marketing is, and always has been, critical to Boston Scientific's SCS portfolio.

152. To sell one of its SCS devices, Boston Scientific must, through its sales representatives, first convince physicians to recommend the devices to their patients. Once the physicians are convinced to recommend SCS therapy in their practices, the patients must then be convinced. After the patient is convinced, Boston Scientific must convince the third-party payer to pay for the device – this is achieved through the patient's report of the required percentage of reduced pain.

153. Boston Scientific achieves the three-step marketing process outlined above (physician, patient, third-party payer) through extensive, direct interaction between its sales representatives and physicians and patients.

154. Boston Scientific sales representatives extensively and directly interact with patients, including Plaintiff, throughout the entire process of SCS therapy.

155. After a physician suggested SCS therapy as a potential option for Plaintiff, he or she then referred the patient to a Boston Scientific sales representative. The sales representative then set up a face-to-face meeting or telephone call with the patient, which often occurred outside the presence of Plaintiff's physicians. The sales representative provided extensive information about the risks and benefits of the SCS device during these meetings and conversations.

156. Once Plaintiff decided to proceed with a temporary SCS trial, the sales representative consulted, either in person or via telephone, with Plaintiff about the trial. In fact, in most cases, the sales representative programmed the trial SCS device, initially and throughout the trial period. Further, the sales representative communicated with Plaintiff, often outside the presence of a physician, about the trial, including any

reduction in pain, or lack thereof, that the patient was experiencing.

157. Boston Scientific sales representatives were present in the operating room and programmed the temporary trial SCS device and made programming adjustments throughout the trial period.

158. Boston Scientific sales representatives discussed with patients the reduction in pain they had to report for third-party payers to pay for a permanent SCS device, and encouraged patients to report the requisite level of pain reduction.

159. Boston Scientific sales representatives represented to patients that the permanent SCS devices would provide a therapeutic benefit (i.e., level of pain relief) equal to or greater than the temporary trial SCS device.

160. Boston Scientific sales representatives programmed and reprogrammed the temporary trial SCS device to promote a greater therapeutic benefit (i.e., reduction in pain) than was feasible with a permanent stimulator on a long-term basis.

161. At the conclusion of the temporary SCS trial, Boston Scientific sales representatives continued to directly interact with Plaintiff to convince him to agree to the permanent implant. The cycle then repeated with the sales representatives being present in the operating room, programming the permanent implant, and maintaining direct and primary contact with the Plaintiff regarding his SCS device post-implant.

162. Plaintiff experienced the aggressive direct-to-patient sales efforts described above, as alleged below and in Section V of this Complaint.

***Sales Representative Conduct***

163. Face-to-face communications between Boston Scientific's sales representative and Plaintiff occurred at medical facilities, including the office of Plaintiff's implanting physician, Dr. Engle, in Corpus Christi, Texas, and outside of any medical setting, including in a parking lot in Corpus Christi, Texas, with no physician present. Boston Scientific's sales representative also communicated with Plaintiff by text message.

164. Plaintiff's pain management physician recommended the SCS trial. When

the trial device was removed approximately seven days later, Boston Scientific's sales representative was present and strongly recommended that Plaintiff proceed with the permanent SCS device, telling him that it would help with the neuropathy in his legs and that the representative would adjust the device if needed to make it help more.

165. Boston Scientific's sales representative was present in the physician's office at the conclusion of Plaintiff's trial implant procedure and programmed Plaintiff's temporary trial SCS device.

166. At the trial removal, Boston Scientific's sales representative also told Plaintiff that the permanent SCS device would be the same as the trial device, and that because the trial had gone so well, the permanent device would be good as well.

167. Boston Scientific's sales representative also told Plaintiff that the SCS device had little to no side effects. The representative did not disclose the risk of electrical shocking or the other adverse effects Plaintiff would later experience.

168. On information and belief, Boston Scientific sales representatives programmed the temporary trial SCS device to promote a greater therapeutic benefit, i.e., reduction in pain, than was feasible with a permanent stimulator on a long-term basis.

169. At the conclusion of the temporary SCS trial, Boston Scientific sales representatives continued to directly interact with the Plaintiff to convince him to agree to the permanent implant.

170. Plaintiff was informed by Boston Scientific's sales representative, beyond the scope of the approved label, that the device would help the neuropathy in his legs, that it had little to no side effects, and that the permanent device would perform as well as the trial. In reality, the device stopped providing Plaintiff any stimulation and caused electrical shocks and full-body itching.

171. Boston Scientific sales representatives, in direct interactions with Plaintiff, downplayed and undermined the FDA-approved labeling and warnings for the SCS devices, including risks and side effects contained in the FDA-approved

labeling and warnings, in contravention of the FDCA and implementing regulations.

172. Based on representations made by Boston Scientific sales representatives during and at the conclusion of the temporary SCS trial, Plaintiff elected to be implanted with a permanent Boston Scientific SCS system.

173. Boston Scientific sales representatives' intentional programming of the temporary trial SCS devices was intended to and did cause Plaintiff to believe the permanent SCS device would provide significant, long-term pain relief. In fact, the permanent SCS device rarely, if ever, provided equivalent pain relief to the trial SCS for any substantial amount of time.

174. After implantation, Boston Scientific representatives programmed and made therapeutic adjustments to Plaintiff's SCS systems without meaningful physician supervision, order or direction.

175. Boston Scientific's sales representative reprogrammed Plaintiff's SCS system on at least two occasions after the permanent implant, and Plaintiff also contacted the representative by text message to request additional adjustments.

176. On the occasions that Boston Scientific's sales representative reprogrammed Plaintiff's SCS device, the representative told Plaintiff that adjusting the device would make it feel better.

177. Boston Scientific's sales representative adjusted Plaintiff's SCS device settings because the device was not providing effective stimulation, but never disclosed to Plaintiff that inadequate stimulation could reflect a defect in the device.

178. Boston Scientific sales representatives continued to reprogram Plaintiff's SCS device after they knew or should have known that the reprogramming was not providing or increasing the SCS device therapeutic benefit.

179. Neither Boston Scientific's sales representative nor anyone else at Boston Scientific ever communicated with Plaintiff about known problems or defects with Boston Scientific's SCS devices, which caused Plaintiff to continue using the device until the shocks it delivered forced him to turn it off.

180. As a direct and proximate result of the defective and misrepresented nature of the devices, Plaintiff suffered physical injury, worsening pain, emotional distress, and economic damages, including medical expenses and loss of quality of life.

181. As a result of these complications, Plaintiff underwent surgical removal of his SCS device on or about August 25, 2026.

### *a) Unauthorized Practice of Medicine*

182. At all relevant times, Boston Scientific employed[42] and deployed clinical and sales representatives to assist with and actively participate in the selection, implantation, programming, and post-operative management of its SCS devices throughout the United States at both the trial and permanent device stages.

183. Boston Scientific's sales representatives, including the representative(s) who interacted with Plaintiff, were not licensed physicians or healthcare providers. In fact, the only required qualifications for positions with direct-patient contact were a bachelor's degree or equivalent combination of education and experience and a minimum of 2 years' work experience in a sales and/or clinical role.[43]

184. Nevertheless, in the course and scope of their employment with Boston Scientific, these representatives routinely engage in conduct including but not limited to:

a. Participated in and directed the programming of Plaintiff's SCS device, including selection of stimulation parameters, waveforms, amplitude, and frequency settings, during implantation surgery and post-operative care.

b. Made real-time clinical decisions about device settings based on their own assessment of patient responses, substituting their judgment for that of Plaintiff's licensed treating physician.

---

[42] See Master Personal Injury Complaint, *In re: Boston Scientific Corp. Spinal Cord Stimulator Prods. Liab. Litig.*, No. 2:26-ml-03181-JLS-PD (C.D. Cal. Oct. 23, 2026), Dkt. No. 84, Exhibit A (Boston Scientific Job Postings) ("Ex. A").

[43] *See id.*

c. Advised Plaintiff and Plaintiff's physicians about medical treatment decisions concerning the SCS device, including recommendations to continue implantation therapy, undergo reprogramming, and delay or decline device removal.

d. Directly reprogrammed Plaintiff's SCS device on post-operative occasions, including on occasions when Plaintiff's treating physician was not present.

e. Made representations directly to Plaintiff — acting as medical advisors — about the expected therapeutic outcomes of the device, the significance and etiology of complications Plaintiff was experiencing, and the anticipated results of device reprogramming, in a manner intended to and having the effect of influencing Plaintiff's treatment decisions.

185. State laws defining the practice of medicine generally include, among other things, being engaged in the diagnosis or treatment of disease or injuries of human beings, suggesting, recommending, or prescribing any form of treatment for the palliation, relief, or cure of any physical ailment with the intention of receiving, either directly or indirectly, any fee, gift, or compensation. The law applicable to Plaintiff's claims is identified in the Applicable Law section above and in Section V below.

186. Boston Scientific's sales representatives' activities constituted the practice of medicine within the meaning of applicable state laws prohibiting the practice of medicine without a valid license.

187. Furthermore, state law commonly creates civil liability for the violation of statutes or regulations under the theory of negligence per se. For example, Restatement (Second) of Torts §§ 286, 288B; Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 14 address treating the violation of a statute or regulation designed to protect a class of persons, including the plaintiff, against the

type of harm suffered, as negligence per se or as evidence of negligence.[44]

188. Upon information and belief, Boston Scientific's representatives were authorized and directed by Boston Scientific to engage in this conduct as part of Boston Scientific's device sales and clinical support model. Boston Scientific's compensation structure for its sales and clinical representatives created incentives for representatives to prioritize device sales and continued implantation over the medical welfare of patients.

189. Upon information and belief, these activities were undertaken by the representatives at the direction of Boston Scientific and within the scope of their employment. Accordingly, Boston Scientific would be vicariously liable for its employees' unauthorized practice of medicine.

190. Boston Scientific and their sales representatives knew or should have known the risk of harm they were exposing patients with this unqualified and unauthorized practice of medicine. In reliance on the sales representatives, Plaintiff experienced harms arising from decisions including but not limited to:

a. undergoing continuing reprogramming rather than device removal;

b. communicating solely with the sales representative rather than alerting the physician;

c. delaying proper medical treatment while undergoing repeated reprogramming by the sales representatives;

d. exposing himself to continued nerve insult, thus increasing the severity and permanence of nerve injuries; and

e. choosing replacement with another Boston Scientific SCS device rather than alternative treatment modalities.

191. These harms were not just foreseeable, but were the intended result of the sales representatives' conduct.

---

[44] *See* Restatement (Second) of Torts §§ 286, 288B; Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 14.

192. The exacerbation and worsening of the patients' injuries as a result of the delays in treatment resulting from the Plaintiff's misplaced reliance on the sales representatives was reasonably foreseeable, particularly in light of Boston Scientific and its' employees actual knowledge of the adverse events and harms associated with the use of the medical devices defective due to the deviation from FDA-approved specifications.

***b) Negligent Undertaking***

193. Because they are not licensed physicians, Boston Scientific's sales representatives did not initially owe a duty to patients relating to activities including but not limited to patient assessments, counseling, and determinations with respect to the therapeutic stimulation adjustments. Once they undertook those tasks, however, they acquired the duty to, at a minimum, perform such tasks with ordinary or reasonable care.

194. Most jurisdictions recognize, by statute, common law, or adoption of the Restatement (Second) of Torts, that one who undertakes to render services must perform them with reasonable care.[45]

195. Here, Boston Scientific's sales representatives' failure to exercise such care increased the risk of harm to Plaintiff and/or the harm suffered by Plaintiff because of his reliance upon sales representatives' undertaking.

196. Specifically, the sales representatives undertook conduct including but not limited to:

a. advising for or against revision or explant.

b. assessing whether Plaintiff's symptoms were caused by the device or by something else;

c. deciding whether a lead or IPG had failed;

d. recommending or performing repeated reprogramming instead of

---

[45] *See*, *e.g.,* Restatement (Second) of Torts § 323

referring Plaintiff for clinical evaluation of possible hardware failure; and

e. telling Plaintiff or Plaintiff's physician that the device was functioning properly.

197. The sales representatives' failure to perform such conduct with the required reasonable care is evident behavior including but not limited to:

a. attributing symptoms consistent with lead fracture, migration, insulation breach, or IPG malfunction to unrelated causes without adequate basis;

b. repeatedly reprogramming devices that showed signs of hardware failure instead of recommending clinical evaluation;

c. failing to tell Plaintiff and his physicians that device data, including impedance readings, indicated possible hardware failure;

d. making programming adjustments that caused harm to Plaintiff; and

e. telling Plaintiff and his physicians that devices were functioning properly when they were not.

198. Boston Scientific and its sales representatives knew or should have known of the risk of harm they were exposing patients to by failing to perform their undertakings with reasonable care.

199. Defendants' failure to exercise reasonable care increased the risk of harm to Plaintiff including but not limited to the following ways:

a. It delayed diagnosis of device failure;

b. It prolonged Plaintiff's exposure to stimulation through failing or displaced hardware; and

c. It deferred revision or explant.

200. Plaintiff's resulting and foreseeable harm was also a direct and proximate result of his reliance on the Representatives' assessments and statements in continuing to use his device and in not seeking other evaluation.

201. To the extent a Representative's conduct departed from or contradicted the FDA-approved labeling and instructions for use, Plaintiff also asserts that conduct as a basis for the parallel claims set forth herein.

#### *c) Boston Scientific's Misrepresentations and Concealment Through Its Sales Representatives*

202. Boston Scientific's sales representatives also made materially false and misleading statements to Plaintiff to induce Plaintiff to (a) agree to the initial implantation of the SCS device, and (b) delay or forgo removal of the device after complications arose.

203. These representations before trial and permanent implantations include but are not limited to Boston Scientific's sales representatives' statements, orally and in writing, to patients, including Plaintiff, that:[46]

a. the SCS Device would provide reliable, long-term pain relief, and stimulation was safe and localized;

b. quantified the promised efficacy;

c. the permanent SCS Device would provide pain relief equivalent to the relief obtained during the external trial, so that trial results reliably predicted the performance of the permanent implant;

d. the SCS Device was uniquely suited to provide the patient with long-term pain relief and was supported by clinical data;

e. the SCS Device would provide better pain relief than other treatment modalities, including dorsal root ganglion ("DRG") stimulation

---

[46] *See, e.g., Ollie Wilson v. Boston Scientific Corporation*, 2:25-cv-09958-JLS-PD; *Linda Guthrie v. Boston Scientific Corporation*, 2:25-cv-11508-JLS-PD; *Sherri Miyagi v. Boston Scientific Corporation*, 2:26-cv-06419-JLS-PD; *Tone Silas v. Boston Scientific Corporation*, 2:26-cv-03679-JLS-PD; *Steven Joe Cooper v. Boston Scientific Corporation*, 2:26-cv-12020-JLS-PD; *Myra Boyd v. Boston Scientific Corporation*, 2:26-cv-09806-JLS-PD; *Cynthia Galary v. Boston Scientific Corporation*, 2:26-cv-11311-JLS-PD; *Darrin Peterson v. Boston Scientific Corporation*, 2:26-cv-11312-JLS-PD; *Daniel Carmack v. Boston Scientific Corporation*, 2:26-cv-12158-JLS-PD; *Gloria Castleberry v. Boston Scientific Corporation*, 2:26-cv-10953-JLS-PD.

and other manufacturers' SCS devices; and

f. that patients would be pain-free with SCS Device.

204. Patients relied on these representations in selecting a Boston Scientific SCS Device for implantation.

205. These representations are part of a consistent and pervasive pattern of conduct by the Defendants and extend beyond Plaintiff to the other plaintiffs identified in footnote 46. The specific representations made to Plaintiff are alleged in Section V of this Complaint.

206. Insurance coverage for a permanent SCS implant commonly depends on the patient reporting a minimum level of pain relief during the trial, often fifty percent or greater. Boston Scientific's sales representatives knew this. On information and belief, sales representatives encouraged patients whose trial results fell below the coverage threshold to continue the trial. They adjusted the trial stimulator and steered patients' reports of trial pain relief toward the minimum needed for insurance to pay for the permanent implant.

207. After implantation, when patients, including Plaintiff, reported issues including inadequate pain relief, shocking or burning sensations, stimulation in unintended areas, and other complications described in this Complaint, Boston Scientific's sales representatives represented to them, among other things, that:

a. the patient would get pain relief once the sales representative found the right programming settings;

b. that inadequate relief or side effects simply meant the device needed reprogramming;

c. in direct contradiction of the FDA-approved labeling, that side effects such as unintended shocks are not known to be caused by the SCS Device, so the shocks the patient was experiencing could not be coming from the device;

d. the patient's symptoms had other causes, including that the

sensations were imagined or psychosomatic; and

e. downplayed the severity of the patients' injuries.

208. On those occasions, Boston Scientific's sales representatives adjusted patients' stimulation settings themselves, often without physician oversight or involvement.

209. Through these representations, Boston Scientific prevented patients from discovering the true cause of their symptoms, such as a migrated or fractured lead or a mechanical failure of the device. For some patients, the cause was identified only when a different physician evaluated the device or when it was revised or explanted.

210. This conduct and accompanying representations are part of a consistent and pervasive pattern of conduct by the Defendants and extend beyond Plaintiff to the other plaintiffs identified in footnote 46. The specific representations made to Plaintiff are alleged in Section V of this Complaint.

211. Boston Scientific and its sales representatives not only knew or should have known Plaintiff would rely on these representations, but that was the desired outcome.

212. As a result of his reliance, Plaintiff was induced to, among other things:

a. delay diagnosis of device failure;

b. prolong Plaintiff's exposure to stimulation through failing or displaced hardware; and

c. defer revision or explant.

213. The reasonably foreseeable harm Plaintiff experienced due to his continued exposure to the harmful electrical stimulation and defective devices was an exacerbation of his injuries and progression to permanent injuries. This is due to the nature of nerve injuries: the longer the insult on the nerve continues, the more severe and long-lasting the injury until it reaches permanence.

214. Because the sales representatives engaged in this conduct at the direction of, and in the scope of their employment by, Boston Scientific, the manufacturer is

vicariously liable for the harm and damages suffered by Plaintiff.

**2. Boston Scientific's Corporate Misconduct**

215. The clinical and sales representatives supporting Boston Scientific's SCS devices were employees and/or agents of Boston Scientific and acting within the scope of that relationship while interacting with patients and respective devices as described herein.

216. The conduct of Boston Scientific's sales and clinical representatives described herein was not incidental or isolated. It was the product of a deliberate corporate structure and policy by which Boston Scientific institutionalized the participation of its sales and clinical representatives in the practice of medicine, despite knowing this conduct was unauthorized under state law.

217. Defendants do not simply sell SCS Devices and leave their use to physicians. As a matter of corporate practice, Defendants employ sales representatives, field clinical representatives, and other personnel (together, "Representatives"). Defendants deploy them to provide continuing services in connection with implanted SCS Devices. On information and belief, those services include:

a. attending trial and permanent implantation procedures;

b. performing intraoperative and post-implant programming;

c. interrogating devices and evaluating impedance and other device data;

d. troubleshooting patient complaints; and

e. communicating directly with patients, in person and by telephone, about their symptoms and how their devices are working.

218. Evidence of the employment relationship and intended scope of duties can be seen, for example, in job postings for positions directly with Boston Scientific.[47] Calling the positions "clinical specialists" and "territory managers," Boston Scientific

---

[47] *See* Ex. A.

has identical job descriptions for positions all over the country.

219. Job duties for these positions show that these positions were intended to exceed the permissible scope for non-physicians and have a high degree of patient interaction by including job duties such as:

a. Provide expert clinical support through programming, troubleshooting, and intraoperative guidance for spinal cord stimulation procedures;

b. Deliver patient follow-up care, ensuring optimal therapy performance and long-term success;

c. Take an integral role in patient follow-up care by regularly monitoring therapy progress, addressing patient needs, and collaborating with healthcare teams to ensure optimal outcomes and satisfaction with company products;

d. Actively participate in surgical cases within hospital and surgery center environments, providing hands-on support throughout procedures;

e. Serve as a resource for current and prospective customers, providing updates on innovations and evidence-based therapies to support informed decision-making in pain management; and

f. Territory Manager will oversee the entire SCS process of patient care, pre-surgical education, post-surgical follow ups and long-term care of the device.

220. Defendant knew or should have known that its employees were not qualified for positions to perform these responsibilities, as the only required qualifications for the positions are a bachelor's degree or an equivalent combination of education and experience and a minimum of two years' work experience in a sales and/or clinical role.

221. Defendants offered and provided these services to implanting and managing physicians, to hospitals and clinics, and directly to patients, including

Plaintiff. Defendants did so for the purpose, among others, of keeping patients using their SCS Devices and keeping physicians using Defendants' products. Defendants knew, or should have recognized, that the services were necessary to protect patients. A patient whose implanted lead has fractured, migrated, or suffered an insulation breach, or whose IPG is malfunctioning, faces a risk of continuing and progressive physical injury if the failure is not identified and addressed.

222. Similarly, the widespread and systemic use of false and misleading statements by Boston Scientific's clinical and sales representatives was not isolated or incidental. Rather, it was the product of a deliberate corporate structure and policy by which Boston Scientific incentivized and institutionalized the practice of its representatives' use of false and misleading statements to encourage implantation of its devices, minimize patient concerns, and discourage removal of defective devices.

223. Boston Scientific knew, or in the exercise of reasonable care should have known, that its representatives were: (a) programming and reprogramming SCS devices in ways that constituted the practice of medicine; (b) making medical recommendations and representations to patients outside the representatives' permissible scope; and (c) misleading patients about device performance and complications.

224. Boston Scientific failed to take reasonable steps to prevent, stop, or correct this conduct. Specifically, Boston Scientific, among other things:

a. failed to establish and enforce adequate policies limiting the scope of its representatives' participation in device programming to permissible technical support activities;

b. Failed to ensure new hires were qualified for the job duties expected;

c. failed to train its representatives on the legal limits of their permissible conduct;

d. failed to supervise its representatives to ensure compliance with

applicable law and company policy; and

e. retained representatives whom it knew or should have known were engaging in impermissible conduct.

225. As a direct and proximate result of Boston Scientific's institutional conduct, Plaintiff was induced to undergo trial and permanent SCS implantation, was misled about device performance, and was dissuaded from seeking timely removal of the device after complications arose, thereby sustaining permanent nerve damage that would not have occurred or would have been less severe but for Defendants' conduct.

**3. Consumer Protection Violations through Patient-Directed Marketing and Communications**

226. Defendants did not limit their communications about the SCS Devices to physicians. Defendants also marketed and communicated directly to patients and prospective patients, including Plaintiff, through patient-directed websites, brochures, patient education programs, and other promotional materials and through Defendants' Representatives.

227. Defendants' patient-directed materials and representations made statements about the durability, reliability, longevity, and safety of the SCS Devices including the statements detailed in the section above. On information and belief, these statements went beyond, or were inconsistent with, the FDA-approved labeling for the SCS Devices.

228. When these statements were made, Defendants possessed information inconsistent with them. That information included complaints, adverse-event reports, returned-product analyses, and failure data about lead fracture, lead migration, insulation breach, and IPG/battery malfunction

229. Defendants' Representatives told Plaintiff things including but not limited to that the device had little to no side effects, that the permanent device would perform as well as the trial device, and that adjusting the device would make it feel better. On information and belief, Representatives made these statements without an adequate

basis.

230. Plaintiff saw, heard, and considered Defendants' patient-directed statements when deciding to undergo implantation, to continue using his SCS Device, and to forgo or delay revision or explant.

231. Plaintiff paid, or incurred liability for, amounts for the SCS Devices, implantation and revision procedures, follow-up care, and related medical expenses.

232. Boston Scientific had adequate notice of Plaintiff's complaints and the alleged product defects and issues.

233. For one, Boston Scientific received direct reports from Plaintiff, through its sales representative, in person and by text message, that the device was not providing effective stimulation and that its settings needed adjustment, and Boston Scientific was informed that the device's original battery had died and required replacement. On information and belief, Boston Scientific recorded those reports in its complaint-handling systems.

234. For another, Boston Scientific receives, investigates, and maintains records of complaints about the SCS Devices. Federal regulations require them to evaluate those complaints and report qualifying deaths, serious injuries, and malfunctions to FDA. 21 C.F.R. Part 803; 21 C.F.R. Part 820. On information and belief, Boston Scientific received complaint and adverse-event information about Plaintiff's own devices. They also received such information about the same device models, lead families, and components implanted in Plaintiff.

235. Furthermore, before this Complaint was filed, numerous patients filed lawsuits against Defendants alleging the same defects, misrepresentations, and conduct alleged here. On June 5, 2026, the Judicial Panel on Multidistrict Litigation centralized those actions in this Court as MDL No. 3181.

236. Despite receiving the information described above, Boston Scientific did not correct, repair, replace, or otherwise remedy the conduct complained of. They did not offer any remedy to Plaintiff, nor did they change the patient-directed statements

and conduct described above.

***Defendants' Receipt and Retention of Benefits From the Sale and Servicing of SCS***

237. Each SCS Device implanted in Plaintiff was sold by Boston Scientific, who received payment for each device and its components, including leads, extensions, IPGs, chargers, and remote controls. Payment came from Plaintiff or on his behalf, through hospitals, ambulatory surgery centers, and physician practices, and through Plaintiff's health insurers, Medicare, Medicaid, and other payors funded in part by Plaintiff's premiums, co-payments, deductibles, and co-insurance.

238. Payment for SCS Devices flows from the patient's procedure to Defendants. The amount Defendants receive for each device depends on that device being implanted in a specific patient. Each sale was known to Defendants and was made for the purpose of implantation in a specific patient.

239. Upon information and belief, Boston Scientific derived substantial revenue and profit from the sale of SCS Devices, including those implanted in Plaintiff.

240. Boston Scientific received additional benefits beyond the original sale. To the extent Plaintiff underwent revision, replacement, or explant procedures after his SCS Device failed, on information and belief, those procedures used replacement leads, IPGs, or other components sold by Defendants, generating additional revenue for Defendants. The services of Boston Scientific’s Representatives, including programming, troubleshooting, and patient follow-up, kept Plaintiff using the SCS Devices and kept his physicians using Defendants' products. Boston Scientific provided those services to support continued sales.

241. Boston Scientific knew they were receiving these benefits and accepted and retained them. Defendants tracked sales of SCS Devices by device, patient, physician, and facility. Through their Representatives, Defendants had direct, continuing contact with Plaintiff after implantation.

242. Boston Scientific received and retained these benefits under the circumstances including but not limited to:

a. selling SCS Devices that departed from their FDA-approved specifications and manufacturing requirements;

b. failing to report complaint and adverse-event information required by federal law;

c. communicating to Plaintiff, through Defendants' Representatives and patient-directed materials, that his device was functioning properly and that his symptoms were unrelated to device failure; and

d. continuing to receive payment for replacement components and services while attributing device failures to other causes.

243. Plaintiff did not receive what he paid for: SCS Devices manufactured in conformity with their FDA-approved specifications and serviced with reasonable care. Instead, Plaintiff received devices that failed and suffered the injuries alleged in this Complaint. Defendants have not returned or offered to return any portion of the amounts they received for Plaintiff's SCS Devices or related replacement components.

244. Plaintiff alleges privity exists with Defendants through course of conduct, implied representations and express representations. In the alternative, in the absence of an express contract between Plaintiff and Boston Scientific governing Defendants' obligation to return amounts received for nonconforming devices or for the consequences of Defendants' Representatives' conduct, Boston Scientific would be unjustly enriched if they inequitably retained the proceeds of their misconduct. To the extent Defendants contend that a written warranty governs any part of that subject matter that disclaims any liability for the misconduct alleged herein, Plaintiff asserts in the alternative that the warranty does not cover the conduct alleged here.

**E. Boston Scientific SCS Device Failures and Resulting Injuries**

245. The Boston Scientific SCS Products have an unacceptably high rate of failure, including lead fracture, insulation breach, migration from the implantation site, and IPG/battery malfunction causing interruption or alteration of therapy delivery.

246. Post-market published data confirm that SCS devices, including the

Boston Scientific SCS Products, are associated with serious complications at high rates. Lead migration and fracture rates have been reported at between 13.2% and 22.6% of implanted patients in published literature, often requiring surgical revision.[48] A 2025 study confirms that up to 40% of SCS patients experience complications from hardware failure (including lead migration and breakage), biological complications (infection, epidural hematoma), or other causes.[49] SCS explant rates have been reported at up to 38%, with most occurring within the first and second year of implantation.[50] Public Citizen's 2020 report independently documented that from 2004 to 2019 the FDA received 220,374 adverse event reports for SCS devices, including 156,817 reports of injuries and 931 reports of patient deaths — figures that include Boston Scientific devices.[51]

247. Injuries documented across manufacturers in the 2020 Public Citizen include spinal cord damage ranging from muscle weakness to paraplegia, device burns, lead migration, lead fracture, implant-related pain, infection, hematoma, seroma, cerebrospinal fluid leakage, and — in rare cases — chronic scar tissue formation

---

[48] ASRA, Complications of Spinal Cord Stimulator Implantation (Aug. 2019) available at https://asra.com/news-publications/asra-newsletter/newsletter-item/asra-news/2019/08/07/complications-of-spinal-cord-stimulator-implantation). *See also* Kumar K, Hunter G, Demeria D. Spinal cord stimulation in treatment of chronic benign pain: challenges in treatment planning and present status, a 22-year experience. Neurosurgery. 2006;58(3):481 – 496. https://doi.org/10.1227/01.NEU.0000192162.99567.96. *See also* Mekhail NA, Mathews M, Nageeb F, Guirguis M, Mekhail MN, Cheng J. Retrospective review of 707 cases of spinal cord stimulation: indications and complications. Pain Pract. 2011;11(2):148 – 153. https://doi.org/10.1111/j.1533-2500.2010.00407.x.

[49] Vanessa Choi Yin Wong et al., *Risk Factors for Spinal Cord Stimulator Explant After Implantation for Neuropathic Pain: A Systematic Review*, Neuromodulation (Mar. 6, 2026), https://doi.org/10.1016/j.neurom.2026.02.001, available at https://www.sciencedirect.com/science/article/pii/S1094715926000280.

[50] Amruta Pai et al., *Spinal Cord Stimulation Explantation and Chronic Pain*, 2025 J. *Pain Res.* (PMC), PMCID: PMC11929510, at *Conclusion* (Mar. 17, 2025), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC11929510/.

[51] Public Citizen Health Research Group, "The FDA's Reckless Oversight of Implanted Spinal Cord Stimulators for Pain Relief Has Seriously Endangered Patients" (June 10, 2020) (documenting complication rates of 30%-40% across literature reviews of implanted SCS devices, and from 2004-2019 the FDA received 220,374 adverse event reports for SCS devices including 156,817 reports of injuries and 931 reports of patient deaths). Available at: https://www.citizen.org/wp-content/uploads/2526_200610_Spinal-Cord-Stimulator-Report_FINAL.pdf.

around epidural leads causing spinal compression and myelopathy with paresis and sensory loss.[52]

248. These failures are not incidental side effects of an otherwise effective therapy; they are evidence of fundamental defects in the design and manufacture of Boston Scientific's leads and IPGs resulting from deviations from FDA-approved design and manufacturing specifications.

249. The known device failures of the Boston Scientific SCS devices include but are not limited to: total device failure, inconsistent therapeutic treatment, device and lead migration, lead breakage, lead insulation failure, battery failure, IPG overheating, excessive electrical stimulation, and unintended electrical stimulation.

250. When SCS leads or components fail, whether by fracturing, breaching insulation, or migrating, the electrical current delivered to the spinal cord is no longer directed to the therapeutic target. Uncontrolled electrical stimulation can cause burning pain, electrical shocking sensations, nerve irritation, and ultimately permanent nerve damage if the device is not promptly removed. Similarly, when the IPG/battery fails or resets unexpectedly, therapy is disrupted in ways that can cause adverse neurological effects, burns, and require additional surgical intervention.

251. The permanence of nerve damage resulting from delayed device removal is a foreseeable and known consequence of lead failure and IPG/battery malfunction. When a failing or migrated lead continues to deliver uncontrolled stimulation, nerve injury progresses over time. The longer a failing device remains implanted, the greater the potential for permanent neurological harm. Prompt recognition and removal are therefore essential to preventing permanent injury.

252. Representations by Boston Scientific's sales representatives that discouraged or delayed removal, as described herein, directly and foreseeably worsened the permanence and severity of Plaintiff's nerve injuries.

---

[52] *See id.*

253. In July 2024, Boston Scientific issued an Urgent Medical Device Advisory (Field Action 97178176B-FA) advising that WaveWriter Alpha rechargeable SCS IPGs could experience stimulation therapy transiently suspended during charging due to a device reset. The reset occurs in response to the presence of potential interference during IPG charging. When the system resets, the patient's programmed stimulation turns off for approximately 10-15 seconds. The issuance of this field action is a documented acknowledgment by Boston Scientific that its WaveWriter Alpha IPG was subject to a defect causing foreseeable, preventable failure during a routine patient activity — charging the device.[53]

254. Boston Scientific's PMA P030017 supplement history includes five documented Special (Immediate Track) supplements — S004 (November 2004, filed less than seven months post-original approval), S019 (February 2007), S024 (April 2007, the second Immediate Track supplement within a ten-week period), S090 (November 2008, filed within the high-volume 2008 supplement cluster), and S203 (September 2014). Immediate Track is reserved by the FDA for situations involving significant risk to the health of persons, warranting review in less than 180 days. The subject matter of all five Immediate Track supplements is not publicly available and constitutes evidence of undisclosed, urgent corrections to Boston Scientific's SCS platform.[54]

255. The devices are also associated with complex risks of device failures,

[53] Boston Scientific, Urgent Medical Device Advisory, Field Action 97178176B-FA (July 17, 2024) (advising of potential for WaveWriter Alpha SCS IPG stimulation therapy to be transiently suspended during charging due to a device reset; IPG firmware update developed to prevent reset behavior). Available at: https://www.bostonscientific.com/content/dam/bostonscientific/quality/documents/Recent%20Product%20Advisories/2024July_SCS_EffectsResetsRechargeableSCSIPGs.pdf.

[54] P030017 has five documented Special (Immediate Track) supplements: S004 (Nov. 2004, filed less than 7 months post-original approval), S019 (Feb. 2007), S024 (Apr. 2007, two urgent corrections in 10 weeks), S090 (Nov. 2008, within the high-volume 2008 supplement cluster), and S203 (Sept. 2014). *See* PMA P030017 Supplement History. Available at: https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?ID=P030017.

including but not limited to: device failure, inconsistent therapeutic treatment, device and lead migration, lead breakage, lead insulation failure, battery failure, IPG overheating, excessive electrical stimulation, and unintended electrical stimulation.

256. These device failures, in turn, are the proximate cause of foreseeable injuries in Plaintiff including but not limited to: exacerbation of pain, burns, vasovagal responses such as syncope, unexpected shocking, autonomic dysfunction, and severe and/or permanent electrical-induced neuropathy and neurological injuries such as paresthesia, nerve pain, urinary and/or fecal incontinence, urinary retention, dysphagia, gastroparesis, cardiac arrhythmia, and paralysis.

**F. Plaintiff's Claims Are Timely**

257. Plaintiff discovered the probable causal relationship between his injuries and Boston Scientific's conduct only after experiencing continued device-related complications, removal of devices, and/or finally being informed of the underlying facts of the SCS devices that contradicted representations made by Boston Scientific and its sales representatives.

258. Until Plaintiff learned the underlying facts of the safety and efficacy of Boston Scientific's SCS devices, he believed that his condition and the efficacy of the device were an aberration limited to himself and not caused by a pattern and practice of Boston Scientific.

259. At all times relevant to this Complaint, Boston Scientific fraudulently concealed from Plaintiff the truth about the safety and efficacy of its SCS devices, and Plaintiff could not have discovered that truth through reasonable diligence. Boston Scientific continues to maintain that its SCS devices are safe and effective.

260. Plaintiff did not discover the defects and unreasonably dangerous condition of Defendants' SCS Devices, and could not have discovered them with reasonable diligence. This includes the defective leads, the inadequate safety features, and the risks of lead fracture, insulation breach, lead migration, IPG/battery malfunction, and resulting nerve damage, among others. Plaintiff discovered these facts

only on a date within the applicable limitations and repose periods, as alleged in Section V of this Complaint. Plaintiff could not discover them sooner because Defendants failed to warn and suppressed material information about the risks of the SCS Devices. To the extent alleged in Section V of this Complaint, a further reason is that Defendants' sales and field representatives actively concealed device defects and Defendants' fault.

261. Plaintiff did not know, and could not have known with reasonable diligence, that his injuries were caused by a defect in Defendants' SCS Devices or by Defendants' wrongful conduct. Plaintiff may have known in general that spinal cord stimulator implantation carries risks, including risks described in the device labeling. That general awareness is different from knowing about the defect, about Defendants' wrongful conduct, or about the causal link between the two and Plaintiff's injuries. It did not start the running of any limitations or repose period. Plaintiff gained knowledge of the facts giving rise to a cause of action within the applicable limitations and repose periods.

262. Defendants had a duty to disclose that their SCS Devices were unreasonably dangerous. That duty arises under state laws that parallel the federal requirements. It required Defendants to disclose:

a. the true rates of lead failure, including as reflected in the complaint and adverse-event information that Defendants were required to collect, investigate, and report to FDA;

b. the known risk that lead fracture and migration cause permanent nerve damage;

c. the risk that IPG/battery failure causes uncontrolled stimulation;

d. the limits of reprogramming as a remedy for hardware failure; and

e. the serious risk that use of the SCS Devices would cause injuries such as those Plaintiff suffered.

263. Defendants breached that duty.

264. When Plaintiff was implanted with and used Defendants' SCS Devices,

Plaintiff did not know, and had no reasonable means of discovering, the defects in those devices or the true frequency and severity of the risks of using them. That information was within Defendants' exclusive or superior knowledge.

265. Defendants did not notify Plaintiff, his implanting and treating physicians, or the public that the SCS Devices were unreasonably dangerous. Specifically, Defendants did not disclose:

a. the true rates of lead failure and migration;

b. that post-implant reprogramming could not fix hardware defects;

c. the risk of progressive and permanent nerve damage from a retained defective device; and

d. that use of the SCS Devices carried a serious risk of injuries such as those Plaintiff suffered.

266. Defendants failed in their duty to notify Plaintiff, his physicians, and the public that the SCS Devices were unreasonably dangerous. To the extent alleged in Section V of this Complaint, Defendants' sales and field representatives also actively concealed device defects and Defendants' fault. They did so by attributing Plaintiff's symptoms to causes other than device failure and by stating that reprogramming would resolve Plaintiff's complaints. Because of this conduct, Defendants are equitably estopped from relying on any statute of limitations or statute of repose as a defense.

267. Separately, the running of any applicable limitations or repose period was tolled by the discovery rule, by Defendants' fraudulent concealment, and by equitable tolling, to the extent the governing state law recognizes each doctrine. To the extent Plaintiff’s claims are governed by Louisiana law, it was also tolled by the doctrine of contra non valentem.

268. Plaintiff's injuries were inherently difficult to connect to Defendants' conduct. That conduct includes the defective leads and IPGs, Defendants' failure to disclose known post-market complication data, and, where alleged, active concealment of device defects by Defendants' representatives. The difficulty arose in part because

Defendants knowingly suppressed material safety and risk information. Plaintiff had no actual or constructive knowledge that his injuries were caused by Defendants' SCS Devices.

269. Many of Plaintiff's injuries are latent and develop progressively after a defective device is implanted. Plaintiff noticed symptoms when they began. But Plaintiff did not know, and could not reasonably have known, that the symptoms were caused by a defect in Defendants' SCS Devices rather than by another condition or by the natural course of his underlying diagnoses.

270. Plaintiff is a lay person. Until a date within the applicable limitations and repose periods, Plaintiff did not know that the defects in Defendants' SCS Devices could cause or contribute to his injuries. Those defects include leads prone to fracture, migration, and insulation breach, and IPGs/batteries prone to malfunction and unexpected reset. To the extent alleged in Section V of this Complaint, Plaintiff also reasonably relied on statements by Defendants' sales and field representatives that his device was working properly and that his symptoms had causes unrelated to any device defect.

271. Plaintiff was not aware of any publicly available information sufficient to put a reasonable lay person on notice that Defendants' SCS Devices caused his injuries. This is particularly so because Defendants concealed post-market complication data. To the extent alleged in Section V of this Complaint, Defendants' sales and field representatives also falsely stated that no defect existed.

**G. Limitation and Reservation Regarding Federal Regulatory Allegations**

272. Plaintiff asserts traditional state-law causes of action arising from the design, manufacture, labeling, warning, testing, marketing, sale, distribution, and post-sale handling of Boston Scientific’s spinal cord stimulation devices. Plaintiff pleads those state-law claims, including claims Boston Scientific may contend are expressly or impliedly preempted, to identify fully the legal duties, injuries, and remedies that

would exist under applicable state law in the absence of a valid federal preemption defense. Plaintiff does not concede that any such claim is preempted, that 21 U.S.C. § 360k(a) applies to the claim, or that any FDA action upon which Boston Scientific may rely was lawful, procedurally valid, or entitled to preemptive effect.

273. Nothing in this Complaint seeks to enforce the Federal Food, Drug, and Cosmetic Act ("FDCA") or its implementing regulations; to create or assert a private right of action arising solely under federal law; to adjudicate a claim of fraud on the FDA; or to impose liability upon Boston Scientific merely because its conduct allegedly violated a federal statute, regulation, PMA requirement, approval condition, reporting obligation, manufacturing specification, or other FDA requirement. Except where a particular count expressly alleges an independently existing state-law duty that parallels a specifically identified federal requirement, Plaintiff's state-law claims do not depend upon proof that Boston Scientific violated federal law.

274. Plaintiff's challenges to the lawfulness or validity of FDA action or inaction, including PMA P030017 and subsequent approvals, are pursued, if at all, in the separate APA pleading and procedural track governed by the Court's orders. Such challenges are not asserted here as independent grounds for imposing liability on Boston Scientific or as a request to set aside FDA action in this product-liability complaint.

275. Plaintiff reserves all arguments properly available against any asserted preemption defense and all rights in the separate APA proceeding, subject to the Court's orders and applicable jurisdictional and procedural requirements.

### H. Limitations on Available Evidence

276. Allegations concerning Defendants' internal material specifications, supplier changes, validation testing, complaint investigations, adverse-event reporting, and corporate knowledge are made on information and belief. The factual bases include the specific material substitution, device failures, and representative conduct alleged below.

277. Plaintiff believes that the underlying specifications, supplier communications, device and lot records, complaint files, and internal communications are principally in Defendants' or their suppliers' possession and will provide further evidentiary support after a reasonable opportunity for discovery.

**V. PLAINTIFF-SPECIFIC ALLEGATIONS**

278. Plaintiff was initially implanted with a trial Boston Scientific spinal cord stimulator ("SCS") device on or about September 20, 2024, by Dr. Mitchell Engle at the Institute of Precision Pain Medicine in Corpus Christi, Texas, as a treatment for neuropathy in his legs. A Boston Scientific representative, known to Plaintiff as Steve, was present in the office when Dr. Engle completed the trial implant procedure and programmed the trial device.

279. Plaintiff's pain management physician recommended the SCS trial. The trial device remained implanted for approximately seven days. Steve was present when the trial device was removed and, at that time, strongly recommended that Plaintiff proceed with the permanent implant, telling him that it would help with the neuropathy in his legs and that Steve would adjust the device if needed to make it help more.

280. At that same visit, Steve told Plaintiff that the permanent stimulator would be the same as the trial device and that, because the trial had gone so well, the permanent device would be good as well. Steve also told Plaintiff that the device had little to no side effects. Steve did not disclose the risk of electrical shocking or any of the other adverse effects that Plaintiff would later experience.

281. On or about November 12, 2024, Dr. Engle permanently implanted Plaintiff with a Boston Scientific WaveWriter Alpha SCS system at the Institute of Precision Pain Medicine in Corpus Christi, Texas, including an implantable pulse generator, Model SC-1216 (Alpha 16 IPG), Serial No. 768858. Steve programmed the permanent device and met with Plaintiff after the permanent implant.

282. Following implantation, the device's settings required adjustment to improve the effectiveness of its stimulation. Steve met with Plaintiff on two occasions

at the office of Plaintiff's implanting physician, Dr. Engle, in Corpus Christi, Texas, to adjust the device's settings. Steve told Plaintiff that if he adjusted the device, it would feel better. On another occasion, Plaintiff texted Steve to request a meeting to adjust the device's settings, but Steve was unavailable to meet.

283. After the device's original battery died, Steve met Plaintiff in a parking lot in Corpus Christi, Texas, with no physician present, to provide him with a replacement battery.

284. Despite Steve's adjustments, the device failed to perform as represented. On or about December 16, 2025, Plaintiff stopped feeling any stimulation from the device and, at the same time, began experiencing side effects from it. When the device was turned on, it shocked Plaintiff. When the device was turned off, Plaintiff experienced full-body itching.

285. Plaintiff reported his symptoms to his treating physician, but he did not receive any explanation of their cause. Neither Steve nor anyone else at Boston Scientific ever communicated with Plaintiff about known problems or defects with Boston Scientific's SCS devices.

286. Because the device shocked him every time it was turned on, on or about June 1, 2026, Plaintiff turned the device off. The device remained off, and was never turned back on, until it was removed.

287. On the recommendation of his pain management physician, on or about August 25, 2026, Plaintiff underwent surgical removal of the Boston Scientific SCS system by Dr. Patrick Gleason at Christus Health in Corpus Christi, Texas, because the device shocked him every time he turned it on and caused full-body itching while it was turned off. Plaintiff was not told why the device had failed.

288. During the time the device was implanted, Plaintiff received a letter from Boston Scientific regarding his device, described as a notice to extend his warranty. By the time the letter arrived, the warranty offer had already expired. The letter did not alert Plaintiff to any safety concerns or defects associated with his device.

289. Before the permanent implantation, Boston Scientific's representative assured Plaintiff that the device would help the neuropathy in his legs, that it had little to no side effects, and that the permanent device would be the same as the trial and would work well because the trial had gone well. After implantation, the representative told Plaintiff that adjusting the device would make it feel better. When Plaintiff later developed side effects, his treating physicians offered no explanation of their cause, and no one identified his problems as the product of a defect in the device or of risks Boston Scientific had failed to disclose.

290. At all relevant times herein, Plaintiff understood only that the device had failed to provide the relief he had been advised to expect, and he attributed that failure to his own individual circumstances. Plaintiff did not know, and in the exercise of reasonable diligence could not have known, that the device's failure to perform and the injuries he suffered were the result of a defect in its design, manufacture, or warnings, as opposed to an ordinary and expected limitation of SCS therapy for his particular condition.

291. In reliance on Steve's representations, Plaintiff proceeded with the permanent implantation and continued using the device.

292. Plaintiff notified Boston Scientific that the device was not performing as represented through his communications with Boston Scientific's sales representative, Steve, including at the two post-implant reprogramming sessions and by text message requesting further adjustment of the device.

293. Plaintiff's claims are governed by the law of Texas. Of the statutes identified in Counts VII, IX, XI, and XXII, Plaintiff asserts those Counts under Tex. Bus. & Com. Code Ann. § 2.313, Tex. Bus. & Com. Code Ann. §§ 2.314, et seq., Tex. Occ. Code § 165.152, and Tex. Bus. & Com. Code Ann. §§ 17.41 et seq., respectively.

294. Plaintiff first learned that his injuries may have been caused by a defect in the Boston Scientific SCS device or by Defendants' wrongful conduct on or about March 3, 2026, when he saw an advertisement on social media regarding lawsuits

involving SCS devices that had failed to perform for patients on a broad scale. Before that date, Boston Scientific's sales representative had told Plaintiff that the device had little to no side effects and that adjustments would make it feel better, his treating physician had offered no explanation for his symptoms, and Boston Scientific had communicated with Plaintiff about his device without disclosing any safety concerns or defects, as alleged above. Any applicable statute of limitations was therefore tolled until that time under the discovery rule and by Boston Scientific's concealment of the defects and risks described herein.

## VI. CAUSES OF ACTION

## COUNT I – STRICT LIABILITY – DESIGN DEFECT

295. Plaintiff incorporates by reference all factual allegations set forth above in ¶¶ 1–294 as if fully set forth herein.

296. At all times relevant to this action, Boston Scientific was the manufacturer, distributor, and/or seller that designed, produced, created, made, constructed, assembled, and/or sold the SCS devices that were placed into the stream of commerce.

297. The SCS devices were defective at the time they left Defendants' control, as they were expected to, and did, reach the ultimate users, including Plaintiff, without substantial change in condition.

298. The Boston Scientific SCS devices were defective in design because the foreseeable risks of the lead and IPG design exceeded the benefits of that design as a result of Defendants' deviations from the FDA-approved design specifications.

299. By switching to a different polycarbonate polyol, UH-200, that was not included in the approved device development, design, and manufacture for the lead wire insulation sheaths, Defendants exposed patients to the risks of serious device failure including but not limited to insulation failure, lead fracture, unintended electrical shocking, nerve insult at the site(s) of insulation failure, unintended electrical stimulation at the site(s) of insulation failure, and device infection due to material

surface degradation.

300. These risks consequently caused injuries in patients including electrical shocks, device infection, vasovagal reactions such as syncope, and severe and/or permanent nerve injuries including nerve pain, electrical-induced neuropathy, numbness, lower limb paralysis, bowel and/or urinary incontinence, gastroparesis and dysphagia, often requiring device removal.

301. These device failure risks and resulting injury risks of these devices deviating from the FDA-approved specifications, weighed against the availability of approved and alternative lead and IPG designs and materials offering superior fixation, structural integrity, stimulation reliability and predictability, and battery reliability, exceed the benefits of the SCS devices.

302. In addition and in the alternative, Defendants' SCS devices failed to perform as safely as an ordinary consumer would have expected them to perform when used or misused in an intended or reasonably foreseeable manner. Plaintiff and his treating physicians used the SCS devices in an intended and reasonably foreseeable manner, and Plaintiff was injured during that use.

303. A practical and technically feasible alternative design was available at the time the leads left Defendants' control that would have prevented the harm without substantially impairing the usefulness or intended purpose of the product and without imposing excessive cost or other material disadvantages, that is, one conforming to the FDA-approved specifications.

304. Specifically, alternative lead designs as approved by the FDA providing superior mechanical fixation, improved insulation integrity, and better lead anchoring mechanisms were available and were used in surgical/paddle leads offered in other SCS devices. These alternative lead designs reduced the risk of device failures and injuries described above without substantially impairing the therapeutic utility of the SCS device.

305. Additionally, Boston Scientific made material changes to the design of its

SCS leads following original PMA approval without submitting the required PMA supplements under 21 C.F.R. § 814.39(a), or through PMA supplements that failed to comply with applicable regulations. These unauthorized design changes altered the leads' structural and performance characteristics in ways that were not evaluated by the FDA and were not disclosed to Plaintiff or Plaintiff's treating physicians.

306. Boston Scientific's provision of an unreasonably dangerous defective device that deviated from the FDA-approved specifications violated both federal regulations and the parallel state-law duty not to market unreasonably dangerous devices, such as those adopting the Restatement (Second) of Torts prohibition in §402(A) and comment g.

307. These defects existed at the time the SCS devices left Boston Scientific's control and were not detectable or otherwise known by Plaintiff or Plaintiff's treating physicians through reasonable inspection prior to implantation or other due diligence.

308. The SCS devices were in an unsafe, defective, and inherently dangerous condition which was unreasonably dangerous to their users.

309. The intended or actual utility of the SCS devices is not of such benefit as to justify the risks described herein, considering the gravity of the potential harm, the likelihood that the harm would occur, and the feasibility, cost, and disadvantages of the alternative designs described above.

310. At all times herein mentioned, the SCS devices were in a defective condition and unsafe, and Boston Scientific knew, or had reason to know, that they were defective and unsafe, especially when used as instructed by Boston Scientific and its agents and in the form and manner provided by Boston Scientific and its agents.

311. The SCS devices' defective design and failure to perform safely were a substantial factor in causing Plaintiff's harm. As a direct and proximate result of Defendants' design defects of the spinal cord stimulator devices and violations of state law, the devices failed, and those failures directly and proximately caused Plaintiff to sustain the injuries and damages described herein, including chronic pain, and other

losses including mental anguish, diminished enjoyment of life, medical, health and incidental and related expenses.

312. WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendants, as contained in the Prayer For Relief.

## COUNT II – STRICT LIABILITY – MANUFACTURING DEFECT

313. Plaintiff incorporates by reference all factual allegations set forth above in ¶¶ 1–294 as if fully set forth herein.

314. At all times relevant to this action, Boston Scientific was engaged in the business of designing, manufacturing, testing, labeling, distributing, and selling medical devices, including the spinal cord stimulators implanted in Plaintiff.

315. At all relevant times, the SCS devices implanted in Plaintiff were expected to and did reach Plaintiff without substantial change in their condition as manufactured, handled, sold, and distributed by Boston Scientific.

316. At all relevant times, the defective SCS devices were used by Plaintiff in an intended and foreseeable manner. The SCS devices were used as instructed by Boston Scientific and its agents and in the form and manner provided by Boston Scientific and its agents.

317. The SCS devices implanted in Plaintiff were not reasonably safe for their intended use due to manufacturing defect. The devices, as manufactured and sold, deviated from Defendants' own FDA-approved specifications and from applicable federal requirements governing Class III medical devices. These manufacturing defects existed when the SCS devices left Boston Scientific's possession and control.

318. The SCS devices did not conform to the design and performance standards described in PMA P030017 and its associated supplements.

319. Boston Scientific violated non-discretionary federal manufacturing and quality system regulations, including but not limited to:

a. **21 C.F.R. § 820.30**: failure to implement adequate design controls;

b. **21 C.F.R. § 820.70**: failure to establish process controls ensuring

conformity to design specifications;

c. **21 C.F.R. § 820.75**: failure to validate manufacturing processes capable of consistently producing conforming devices;

d. **21 C.F.R. § 820.100**: failure to implement corrective and preventive action in response to known device defects.

320. The SCS devices implanted in Plaintiff were manufactured with latent defects, as a result of their deviation from FDA-approved specifications, that affected performance, stability, and safety, including but not limited to:

a. Lead wire insulation sheaths manufactured with polyurethane synthesized from UH-200 rather than the specified and FDA-approved PC-1122, resulting in insulation failure, lead fracture, unintended electrical shocking, and device infection;

b. Hermetic seals of the IPGs manufactured with weld-specification nonconformances, compromising the integrity of the IPG enclosure;

c. Inadequate lead anchoring, resulting in migration, therapeutic failure, and unwanted shocking in patients;

d. Battery instability contributing to irregular stimulation output and early depletion, including need for battery replacement;

e. Defects impacting the physical stability of the battery in the bodies of patients;

f. Faulty firmware or programming inconsistencies affecting waveform delivery, and causing complications in patients, including shocking and unsatisfactory pain relief.

321. These defects were not detectable by Plaintiff or his physicians through reasonable inspection prior to implantation and were not reasonably foreseeable based on the information available to Plaintiff or his treating physicians at the time.

322. As a result of Defendants' failures to implement adequate design controls, establish adequate production and process controls, validate manufacturing processes,

implement corrective and preventive action in response to known patterns of lead failure and IPG/battery malfunction, and take adequate corrective action, the SCS devices implanted in Plaintiff deviated in a material way from the design specifications, formula, or performance standards of the manufacturer, or from otherwise identical units manufactured to the same design specifications, formula, or performance standards and thus violated state law requirements that parallel federal requirements.

323. Had Defendant complied with the Current Good Manufacturing Practices, 21 CFR 820 regulations and parallel state requirements under parallel state-law duty not to sell defective and unreasonably dangerous devices, such as those adopting the Restatement (Second) of Torts prohibition in §402(A) and comment g, the defects in Plaintiff's devices would not have occurred and/or would have been timely discovered so as to prevent Plaintiff from receiving a defective, malfunctioning SCS Device.

324. Plaintiff's manufacturing defect claim arises under state-law duties that parallel federal manufacturing obligations imposed on Defendants. These claims are not expressly or impliedly preempted under 21 U.S.C. § 360k(a), *Riegel*, 552 U.S. 312, or *Buckman Co.*, 531 U.S. 341.

325. The manufacturing defects in the SCS devices were a substantial factor in causing Plaintiff's harm. As a direct and proximate result of the manufacturing defects of the spinal cord stimulator devices implanted into Plaintiff, the devices failed, and those failures directly and proximately caused Plaintiff to sustain serious damages including, but not limited to, the following: bodily injury; severe physical pain and suffering; emotional distress; diminished enjoyment of life; medical expenses; loss of earnings; and disability, all of which losses and damages will continue into the future.

326. WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendants, as contained in the Prayer For Relief.

**COUNT III – STRICT LIABILITY – FAILURE TO WARN**

327. Plaintiff incorporates by reference all factual allegations set forth above in ¶¶ 1–294 as if fully set forth herein.

328. At all relevant times, Defendants were engaged in the design, manufacture, labeling, marketing, distribution, and sale of SCS devices throughout the United States, including the devices implanted in Plaintiff.

329. The warnings that Defendants provided and that accompanied the SCS devices failed to provide the level of information that an ordinary consumer, including Plaintiff herein, would expect when using the implants in a manner intended by and reasonably foreseeable to Defendants. In particular, Defendants failed to provide or adequately convey existing FDA-approved warnings and instructions to Plaintiff's treating physicians and, through their sales and clinical representatives, omitted, minimized, or contradicted that approved safety information in communications with Plaintiff and his physicians.

330. The SCS devices left Defendants' control without an adequate warning or instruction, and created an unreasonably dangerous condition in that Defendants, as the seller and manufacturer, knew or should have known, and the risks were known or knowable in light of the scientific and medical knowledge generally accepted in the scientific community at the time of manufacture, distribution, and sale, that the SCS devices posed a substantial danger when used or misused in an intended or reasonably foreseeable way. Neither ordinary consumers, including Plaintiff, nor Plaintiff's implanting and treating physicians would have recognized these potential risks. Alternatively, after the SCS devices left the Defendants' control, Defendants became aware of, or in the exercise of ordinary care should have known, that the devices posed a substantial risk of harm to patients, including Plaintiff herein, yet Defendants failed to take reasonable steps to give adequate warning or instruction or to take other reasonable action under the circumstances.

331. Boston Scientific had a duty to warn Plaintiff's implanting and treating physicians, Plaintiff, and the medical community of the material risks associated with its SCS devices for as long as the devices remained in use, including by providing and accurately conveying approved FDA-approved warnings and instructions concerning

those risks, including but not limited to:

a. The risk of lead migration, lead breakage, and device failure requiring surgical revision;

b. The risk of autonomic dysfunction, including arrhythmias, urinary and fecal incontinence, and hypotension;

c. The risk of neurological injury;

d. The risk that the temporary trial SCS device would not reliably or accurately predict the performance of the permanently implanted SCS device;

e. The risk of burns from overheating batteries;

f. The risk of premature and unpredictable battery failure, requiring surgical revision;

g. The risk of paralysis; and

h. The risk of device-related pain exacerbation, unintended electrical stimulation and shocking, and loss of therapeutic efficacy over time.

332. Defendants breached their duty to warn by:

a. Failing to adequately train sales representatives and clinicians regarding the safety limitations of multiwaveform stimulation present in many of Boston Scientific's SCS devices;

b. Actively promoting their SCS devices as superior and safe without disclosing material limitations and risks; and

c. Failing to provide or adequately convey applicable FDA-approved warnings and instructions to Plaintiff and Plaintiff's treating physicians.

333. In addition, Defendants breached their duties by actively conveying, through Defendants' sales and clinical representatives, information to Plaintiff that contradicted, downplayed, and undermined the FDA-approved labeling's risk disclosures, including by misrepresenting the significance of Plaintiff's complications and the efficacy of reprogramming as a remedy.

334. These deviations are further supported by the Plaintiff-specific allegations in Section V of this Complaint.

335. Defendants further failed to adequately communicate warnings and instructions concerning device malfunction and the appropriate response to device-related symptoms including that device reprogramming could not correct lead failure or IPG/battery malfunction and that delay in removal following device failure would worsen nerve injury. Instead, its representatives provided assurances concerning reprogramming that minimized the significance of reported symptoms and device failures, including lead failure and IPG/battery malfunction, and the need for timely medical evaluation and intervention.

336. These failures were compounded by violations of federal law, including:

a. 21 C.F.R. § 803.50: failure to timely report adverse events;

b. 21 C.F.R. § 814.39: failure to submit PMA supplements for significant changes; and

c. 21 C.F.R. § 820.198: failure to investigate and address post-market complaints.

337. Boston Scientific and its sales representatives initiated and conducted significant direct communication with Plaintiff.

338. These communications included direct discussion of risks and benefits of the SCS devices, including in many cases discussion of risks and benefits outside the presence and hearing of Plaintiff's physicians.

339. Through its sales representatives, Defendants downplayed and undermined the FDA-approved labeling and warnings for its SCS devices directly to Plaintiff, bypassing Plaintiff's physicians.

340. Defendants' employees and representatives negligently failed to provide or adequately transmit the applicable FDA-approved warnings and instructions to Plaintiff's treating physicians. These failures concerned the communication of existing approved safety information, not merely the absence of additional or different

warnings.

341. Additionally, Defendants' representatives communicated directly with Plaintiff concerning the devices' risks, benefits, operation, and the significance of device-related complications. Having undertaken those communications, the representatives failed to exercise reasonable care by omitting, minimizing, contradicting, or failing to provide FDA-approved warnings and instructions and by providing inaccurate or misleading patient-specific assurances.

342. As part of the sales representatives' activity described here, Boston Scientific's sales representatives, acting within the scope of their employment, circumvented physicians so that they communicated and provided warnings directly to patients. This conduct occurred both orally and in confirmed written communications, thereby depriving patients of their physicians' independent assessment and communication of those warnings. Through this conduct, Boston Scientific circumvented the physician-patient relationship by going directly to the consumer and deprived the patients of any of the benefits of their physician acting as a learned intermediary. Furthermore, Boston Scientific inserted itself so thoroughly into the patient experience that any contact between the physicians and patients was extremely limited.

343. In these direct-to-patient communications, Boston Scientific representatives (1) failed to provide the full breadth of FDA-approved warnings and (2) undermined and/or nullified FDA-approved warnings through representations (and misrepresentations) to the patients about safety, efficacy, the lack of risk, lack of injury causation, and lack of company knowledge, among other topics. This was in contravention of the FDCA and implementing regulations. As a result of these activities, the warnings conveyed to Plaintiff and his physicians were inadequate under applicable state law.

344. Boston Scientific, through their sales representatives, communicated directly with Plaintiff about the risks, benefits, programming, and expected results of

SCS therapy, assuming a role in conveying risk information to patients outside the physician relationship; and Defendants' representatives contradicted, diluted, and nullified the FDA-approved warnings in communications with Plaintiff's implanting and treating physicians and Plaintiff.

345. Had Defendants not done so, Plaintiff and Plaintiff’s physicians would have taken action including but not limited to declining implantation, investigating device issue causes, explanting the device sooner, and not deferring to representative programming, thereby avoiding the risks and subsequent injuries Plaintiff foreseeably experienced.

346. Employees negligently failed to warn physician/plaintiff, i.e. failure to transmit the approved warnings.

347. The absence of adequate, complete, and accurate material risk information, including Defendants’ failure to provide applicable FDA-approved warnings and instructions, prevented Plaintiff’s physicians from evaluating whether the device was appropriate for Plaintiff’s conditions prior to implantation.

348. Plaintiff’s treating physicians reasonably relied on the information provided by Defendants in recommending implantation of the SCS devices, and Plaintiff justifiably relied on those medical recommendations in weighing the risks and benefits of the device. Following implantation, Plaintiff also relied on patient-specific representations of the Defendants’ representatives concerning the significance of his symptoms, the functioning of his device, and the ability of reprogramming to address his complications.

349. Adequate and accurate risk information, including FDA-approved warnings and instructions presented without contradiction or minimization, would have been considered by treating physicians when evaluating whether implantation was appropriate and in determining whether to recommend the SCS devices. That information also would have been considered in evaluating reported complications and determining whether continued use, further evaluation, revision, replacement, or

removal was appropriate.

350. Adequate and accurate risk information, including FDA-approved warnings and instructions, would have been considered by Plaintiff in deciding whether to consent to implantation with the SCS devices. Following implantation, accurate information concerning his symptoms and device complications, without assurances contradicting or undermining the approved warnings and instructions, would have informed Plaintiff's decisions concerning continued device use and the need to seek timely medical evaluation and treatment.

351. Because Defendants failed to provide or adequately convey material risk information contained in applicable FDA-approved warnings and instructions, and because its representatives contradicted or undermined that information, Plaintiff and Plaintiff's treating physicians made treatment decisions without information a reasonably prudent manufacturer would disclose, and Plaintiff suffered the injuries described herein because of the treatment chosen under those circumstances. The lack of sufficient warnings and instructions was a substantial factor in causing Plaintiff's harm.

352. WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendants, as contained in the Prayer for Relief.

## COUNT IV – NEGLIGENCE- DESIGN DEFECT

353. Plaintiff incorporates by reference all factual allegations set forth above in ¶¶ 1–294 as if fully set forth herein.

354. Plaintiff pleads claims for negligence under all theories that may be actionable under any applicable state laws.

355. At all relevant times, Defendants negligently designed, manufactured, developed, tested, marketed, sold, detailed, labeled, distributed and advertised their SCS devices, both to consumers and physicians, including the SCS devices implanted in Plaintiff.

356. Defendants owed Plaintiff a duty of reasonable care in the design,

development, manufacture, labeling, testing, marketing, sale, and post-market surveillance of the SCS systems that they placed into the stream of commerce so that the devices would be reasonably safe when used in an intended or reasonably foreseeable manner. Defendants were required to use the amount of care in designing the SCS devices that a reasonably careful designer and manufacturer would use in similar circumstances to avoid exposing others to a foreseeable risk of harm.

357. Defendants knew or, in the exercise of reasonable care, should have known that defects in the design of the SCS devices' leads, IPGs, batteries, and firmware could result in lead migration, irregular or unintended stimulation, painful shocks, battery malfunction, loss of therapeutic efficacy, and other device failures capable of causing serious injury. Despite that knowledge of the likelihood and severity of potential harm, Defendants failed to adopt available safety measures, including the feasible alternative designs described above, even though the burden of adopting those measures was outweighed by the risk of harm.

358. Defendants breached their duty in one or more of the following ways:

a. By negligently failing to ensure that the devices were manufactured in accordance with FDA-approved specifications, including labeling, firmware, battery safety, and programming reliability standards;

b. By negligently introducing cumulative design changes through successive PMA supplements without proper validation, public clinical testing, or physician disclosure;

c. By negligently failing to investigate known risks associated with stimulation loss, painful shocks, and therapy failure, despite pre-market complaints, post-market adverse event reports, and internal device testing;

d. By negligently failing to update its IFU, provider communications, or promotional materials in accordance with 21 C.F.R. § 814.39(d) and 21 C.F.R. § 820.198, despite known malfunctions;

e. By negligently failing to report known adverse events related to its

SCS systems in accordance with 21 C.F.R. Part 803;

f. By negligently failing to initiate corrective and preventive actions under 21 C.F.R. § 820.100 after receiving adverse reports of stimulation instability, lead migration, or battery failure consistent with the experience of Plaintiff and other patients; and

g. By negligently failing to adopt feasible, safer alternative designs for the SCS devices' leads and IPGs, including lead insulation conforming to the FDA-approved specifications, despite knowing the likelihood and severity of harm posed by the existing design.

359. Defendants, as the manufacturer, supplier, and seller of these medical devices, had superior knowledge and owed a duty of care to their customers and to Plaintiff, who was implanted with the SCS devices.

360. As described in the factual allegations, the SCS devices implanted in Plaintiff contained design defects affecting their performance, stability, and safety. Those defects resulted from Defendants' failure to use reasonable care in designing the SCS devices and were present when the devices left Defendants' control.

361. Plaintiff used the SCS devices in an intended and reasonably foreseeable manner. The devices reached Plaintiff without substantial change in the design-related conditions alleged herein.

362. Defendants' negligence was a substantial factor in causing Plaintiff's harm. As a direct and proximate result of Defendants' negligent design, development, and testing, the SCS devices implanted in Plaintiff failed, causing lead migration, stimulation instability, battery malfunction, unintended electrical stimulation, loss of therapeutic efficacy, and other device failures described herein.

363. Those device failures, in turn, directly and proximately caused Plaintiff to sustain serious damages including, but not limited to, the following: bodily injury; severe physical pain and suffering; emotional distress; diminished enjoyment of life; medical expenses; loss of earnings; and disability, all of which losses and damages will

continue into the future. The injuries were a reasonably foreseeable consequence of the design-related failures alleged herein.

364. WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendants, as contained in the Prayer For Relief.

**COUNT V – NEGLIGENCE-MANUFACTURING DEFECT**

365. Plaintiff incorporates by reference all factual allegations set forth above in ¶¶ 1–294 as if fully set forth herein.

366. At all relevant times, Defendants manufactured, assembled, inspected, tested, sold, and distributed the SCS devices implanted in Plaintiff.

367. Defendants owed Plaintiff a duty to exercise reasonable care in manufacturing, assembling, inspecting, and testing their SCS devices to ensure that the finished devices conformed to the applicable FDA-approved design, specifications, and performance standards. Defendants were required to use the amount of care in manufacturing, inspecting, and testing the SCS devices that a reasonably careful manufacturer would use in similar circumstances to avoid exposing others to a foreseeable risk of harm.

368. Defendants knew or, in the exercise of reasonable care, should have known that deviations from the approved design, specifications, or performance standards could cause lead failure, battery malfunction, irregular stimulation, painful shocks, and other device failures capable of causing serious injury, in particular with respect to the lead insulation sheath material, Infinion CX leads, and hermetic sealing processes. Despite that knowledge of the likelihood and severity of potential harm, Defendants failed to adopt available manufacturing, inspection, and testing measures to prevent those deviations, even though the burden of adopting those measures was outweighed by the risk of harm.

369. Defendants breached their duty of reasonable care in one or more of the following ways:

a. By failing to ensure that the devices were manufactured in

conformity with the applicable FDA-approved specifications, including specifications governing lead integrity, firmware, battery safety, and programming reliability;

b. By failing to establish and implement adequate production and process controls to consistently produce devices conforming to the approved design and specifications;

c. By failing to adequately validate manufacturing processes and verify the conformity of finished devices;

d. By failing to adequately inspect and test the devices to identify manufacturing deviations before their release; and

e. By failing to investigate complaints, adverse-event reports, and internal testing information identifying patterns of lead failure, stimulation instability, or battery malfunction attributable to manufacturing nonconformities.

370. At the time they left Defendants' control, the SCS devices implanted in Plaintiff deviated materially from the applicable FDA-approved design, specifications, or performance standards, or from otherwise identical units manufactured in conformity with those requirements. These deviations include the use of UH-200 in place of the specified and FDA-approved PC-1122 in the lead wire insulation sheaths and weld-specification nonconformances affecting the IPG hermetic seals.

371. These manufacturing deviations affected the devices' performance, stability, and safety and were not detectable by Plaintiff or his treating physicians through reasonable inspection before implantation.

372. These devices reached Plaintiff without substantial change in the manufacturing-related conditions alleged herein and were used in an intended and reasonably foreseeable manner.

373. As a direct and proximate result of Defendants' negligent manufacture, assembly, inspection, and testing, the devices implanted in Plaintiff contained

manufacturing defects when they left Defendants' control. Those defects caused lead failure, battery malfunction, irregular or unintended stimulation, and other device failures described herein.

374. Defendants' negligence was a substantial factor in causing Plaintiff's harm. Those device failures, in turn, directly and proximately caused Plaintiff to sustain serious injuries and damages, including, but not limited to, bodily injury; severe physical pain and suffering; emotional distress; diminished enjoyment of life; medical expenses; loss of earnings; and disability, all of which losses and damages will continue into the future.

375. WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendants as contained in the Prayer for Relief.

## COUNT VI – NEGLIGENCE-FAILURE TO WARN

376. Plaintiff incorporates by reference all factual allegations set forth above in ¶¶ 1–294 as if fully set forth herein.

377. At all relevant times, Defendants manufactured, labeled, marketed, sold, and distributed the SCS devices implanted in Plaintiff and communicated information concerning those devices to Plaintiff and his treating physicians.

378. Defendants owed a duty to exercise reasonable care in warning Plaintiff's treating physicians of reasonably foreseeable risks associated with the intended and reasonably foreseeable use of their SCS devices, including by providing and accurately conveying applicable FDA-approved warnings and instructions. Defendants' duty to warn Plaintiff's treating physicians continued for as long as the SCS devices remained in use.

379. Defendants further undertook, through their sales and clinical representatives, to communicate directly with Plaintiff and his treating physicians concerning device operation, reported symptoms, device-related complications, and the effectiveness of programming and reprogramming. In undertaking those communications, Defendants had a duty to exercise reasonable care and not to omit,

minimize, or contradict material safety information contained in the applicable FDA-approved warnings and instructions.

380. Defendants knew, or in the exercise of reasonable care should have known, that their SCS devices were dangerous or likely to be dangerous when used or misused in a reasonably foreseeable manner, including through reasonably foreseeable risks of lead migration, lead failure, battery malfunction, unintended electrical stimulation, painful shocks, neurological injury, and other complications described herein. These risks included unreasonable and non-obvious dangers that Plaintiff and his treating physicians could not adequately assess without accurate safety information. Defendants knew or reasonably should have known that Plaintiff and his treating physicians would not realize these dangers.

381. Defendants acquired or should have acquired knowledge of these risks through device testing, internal complaint files, adverse-event reports, post-market surveillance, and communications concerning patients’ symptoms and device failures.

382. Defendants breached their duty of care to Plaintiff in one or more of the following ways:

a. By failing to provide or adequately convey applicable FDA-approved warnings and instructions to Plaintiff’s treating physicians;

b. By failing to adequately train their sales and clinical representatives to accurately communicate existing warnings, device limitations, and instructions concerning reported malfunctions;

c. By providing incomplete or misleading information concerning the risks and benefits of the devices and the significance of Plaintiff’s reported symptoms;

d. By contradicting, minimizing, or undermining existing FDA-approved warnings and instructions through assurances that Plaintiff’s complications were unrelated to the devices or could be resolved through further reprogramming;

e. By failing to accurately communicate the limitations of reprogramming when symptoms indicated possible lead failure, IPG/battery malfunction, or another underlying device defect;

f. By advising Plaintiff to continue device use or delay medical evaluation or removal without adequately communicating the risks of continued exposure to a malfunctioning device; and

g. By failing to investigate and respond to known malfunctions and adverse-event information and to provide resulting safety communications to the extent required by applicable law.

383. Defendants' sales and clinical representatives breached their duty of care to Plaintiff in one or more of the following ways:

a. By programming and reprogramming Plaintiff's SCS devices without sufficient knowledge, skill, and expertise to do so;

b. By continuing to reprogram Plaintiff's SCS devices after they determined or should have determined that the reprogramming was futile, and would not alleviate Plaintiff's complications or increase therapeutic benefit;

c. By advising Plaintiff to forgo or delay other necessary medical treatment while they continued to reprogram Plaintiff's SCS devices;

d. By advising Plaintiff to delay removal of the SCS devices, thereby causing and worsening Plaintiff's permanent damage;

e. By advising Plaintiff that side effects and complications Plaintiff experienced after being implanted with the SCS devices were not related to the SCS devices or could be alleviated by reprogramming;

f. By providing inaccurate or incomplete information to Plaintiff regarding the risks and benefits of the SCS devices;

g. By providing medical advice to Plaintiff without the necessary knowledge, experience, or qualification to do so;

h. By representing to Plaintiff that the permanent SCS device would perform the same as the trial device and had little to no side effects;

i. By providing device setting recommendations to Plaintiff's physicians without sufficient knowledge, skill, and expertise to do so;

j. By influencing intraoperative lead positioning and stimulation testing without sufficient knowledge, skill, and expertise to do so;

k. By negligently performing the programming, reprogramming, adjustments, and other device-related services they undertook, including by selecting or implementing settings without adequately assessing Plaintiff's reported symptoms, responses to prior adjustments, or indications of device malfunction;

l. By performing adjustments, reprogramming, or other device-related activities beyond the scope of their training, qualifications, or permitted device-support role, without obtaining appropriate direction from Plaintiff's treating physicians;

m. By failing to discontinue adjustments or reprogramming and refer Plaintiff to his treating physicians when the representatives knew or reasonably should have known that continued reprogramming would not correct the underlying device malfunction or could cause or aggravate Plaintiff's injuries; and

n. By continuing to undertake device-related services and provide assurances concerning their effectiveness under circumstances in which Plaintiff relied on those services and assurances to continue device use or delay seeking appropriate medical evaluation and treatment.

384. These deviations are further supported by the Plaintiff-specific allegations in Section V of this Complaint.

385. Plaintiff's failure-to-warn claim is based principally on Defendants' failure to provide or convey existing FDA-approved warnings and instructions and

their representatives' affirmative contradiction or minimization of that safety information, rather than merely the absence of additional or different warnings.

386. A reasonably prudent manufacturer possessing the information available to Defendants would have provided and accurately communicated the applicable warnings and instructions and would not have undermined them through contrary patient-specific assurances.

387. Plaintiff's treating physicians relied on the safety information Defendants provided when evaluating whether to recommend implantation and how to respond to subsequent complications. Plaintiff relied on his physicians' recommendations and on the information communicated directly by Defendants' representatives in consenting to implantation and making decisions concerning continued use and further medical evaluation.

388. Had Defendants provided and accurately conveyed the applicable warnings and instructions, Plaintiff would have declined implantation or sought earlier medical evaluation and removal.

389. Defendants' failure to adequately communicate the warnings and instructions was a substantial factor in causing Plaintiff to undergo implantation of defective devices and, after device failures occurred, to continue using the malfunctioning devices and delay appropriate medical evaluation and treatment. Defendants' failure to warn was a substantial factor in causing Plaintiff's harm.

390. The devices failed because of their underlying defects, and those failures directly and proximately caused Plaintiff's injuries. Defendants' warning failures caused Plaintiff to undergo implantation or remain exposed to those malfunctioning devices, thereby causing injuries that otherwise would have been avoided or aggravating injuries that otherwise would have been less severe.

391. As a direct and proximate result of Defendants' negligent failure to warn, Plaintiff sustained serious injuries and damages, including, but not limited to, bodily injury; severe physical pain and suffering; emotional distress; diminished enjoyment

of life; medical expenses; loss of earnings; and disability, all of which losses and damages will continue into the future.

392. WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendants as contained in the Prayer for Relief.

**COUNT VII – BREACH OF EXPRESS WARRANTY**

393. Plaintiff incorporates by reference all factual allegations set forth above in ¶¶ 1–294 as if fully set forth herein.

394. At all relevant times, Defendant Boston Scientific expressly warranted, through its labeling, advertising, marketing materials, website representations, and sales representatives, that its SCS devices, including the SCS devices implanted in Plaintiff, were safe, effective, durable, supported by clinical data, and fit for the treatment of chronic pain conditions.

395. Due to the extensive direct communications between Boston Scientific sales representatives and Plaintiff, privity of contract existed between Boston Scientific and Plaintiff.

396. Boston Scientific made numerous express warranties to Plaintiff, which it subsequently breached in violation of applicable state laws, including:

a. Ala. Code § 7-2-313;

b. Alaska Stat. § 45.02.313;

c. Ariz. Rev. Stat. Ann. § 47-2313;

d. Ark. Code Ann. § 4-2-313;

e. Cal. Com. Code § 2313;

f. Colo. Rev. Stat. § 4-2-313;

g. Conn. Gen. Stat. Ann. § 42a-2-313;

h. Del. Code Ann. tit. 6, § 2-313;

i. D.C. Code Ann. § 28:2-313;

j. Fla. Stat. Ann. §§ 672.313;

k. O.C.G.A. § 11-2-313;

l. Haw. Rev. Stat. § 490:2-313;

m. Idaho Code § 28-2-313;

n. Ill. Comp. Stat. Ann. Ch. 810, 5/2-313;

o. Indiana Code Ann. § 26-1-2-313;

p. Iowa Code Ann. § 554.2313;

q. Kan. Stat. Ann. § 84-2-313;

r. Ky. Rev. Stat. Ann. § 355.2-313;

s. La. R.S. 9:2800.58;

t. Me. Rev. Stat. Ann. tit. 11, § 2-313;

u. Md. Code Ann., Com. Law § 2-313;

v. Mass. Gen. Laws Ann. Ch. 106, § 2-313;

w. Mich. Comp. Laws Ann. § 440.2313;

x. Minn. Stat. Ann. § 336.2-313;

y. Miss. Code Ann. § 75-2-313;

z. Mo. Rev. Stat. Ann. § 400.2-313;

aa. Mont. Code Ann. § 30-2-313;

bb. Neb. Rev. Stat. § 2-313;

cc. Nev. Rev. Stat. § 104.2313;

dd. N.H. Rev. Stat. Ann. § 382-A:2-313;

ee. N.J. Stat. Ann. § 12A:2-313;

ff. N.M. Stat. Ann. § 55-2-313;

gg. N.Y. U.C.C. Law § 2-313;

hh. N.C. Gen. Stat. Ann. § 25-2-313;

ii. N.D. Cent. Code § 41-02-30;

jj. Ohio Rev. Code Ann. § 1302.26;

kk. Okl. Stat. Tit. 12A, § 2-313;

ll. Or. Rev. Stat. § 72.3130;

mm. 13 Pa. Stat. Ann. § 2313;

nn. R.I. Gen. Laws § 6A-2-313;

oo. S.C. Code Ann. § 36-2-313;

pp. S.D. Codified Laws § 57A-2-313;

qq. Tenn. Code Ann. § 47-2-313;

rr. Tex. Bus. & Com. Code Ann. § 2.313;

ss. Utah Code Ann. § 70A-2-313;

tt. Va. Code Ann. § 8.2-313;

uu. Vt. Stat. Ann. § 9A-2-313;

vv. Wash. Rev. Code § 62A.2-313;

ww. W. Va. Code § 46-2-313;

xx. Wis. Stat. Ann. § 402.313; and

yy. Wyo. Stat. Ann. § 34.1-2-313.

397. The express warranties that Boston Scientific made to Plaintiff, even though the SCS devices deviated from the approved FDA specifications, included, but were not limited to, assurances that:

a. The safety and effectiveness of the SCS devices were validated by clinical data or clinical evidence;

b. The permanent SCS devices would provide greater or equivalent pain relief compared to the temporary trial SCS;

c. The devices' multi-waveform stimulation technology provided superior pain relief without significant risk of adverse side effects;

d. The devices were durable and appropriately designed for long-term implantation and therapeutic use without significant risks of lead migration, neurological injury, battery failure, rapidly declining efficacy, or stimulation-induced autonomic dysfunction; and

e. The devices had been adequately tested for safety and effectiveness consistent with FDA requirements.

398. Such express warranties were made to Plaintiff's healthcare providers and

directly to Plaintiff through Boston Scientific's promotional materials and sales representatives.

399. Plaintiff and his healthcare providers reasonably relied on these express warranties in choosing to proceed with implantation of the Boston Scientific systems and in making ongoing treatment decisions.

400. These express warranties became part of the basis of the bargain between Plaintiff and Boston Scientific – they were critical to Plaintiff's decision to be implanted with the SCS devices and, therefore, were far more than mere puffery. These assurances were specific, unequivocal affirmations of fact and promises about the safety, testing, durability, and performance of the SCS devices, not statements of opinion or recommendation.

401. Contrary to Boston Scientific's express warranties, due to deviations from FDA specifications, the SCS devices implanted in Plaintiff were defective, unreasonably dangerous, and incapable of delivering the promised therapeutic benefits. They were also not validated by clinical data, as represented to Plaintiff and his physicians. Instead, they caused Plaintiff to suffer injuries including persistent ineffective pain relief, nerve damage, device failure, stimulation-related complications, and ultimately, significant physical and emotional harm.

402. Contrary to Boston Scientific's express warranties, the permanent SCS devices do not— and in Plaintiff's case did not — provide greater or equivalent pain relief compared to the temporary trial SCS devices.

403. As such, the SCS devices failed to conform to Boston Scientific's promises, descriptions, and affirmations of fact and did not perform as Boston Scientific stated and promised.

404. As a result of this failure, Plaintiff sustained injuries that include, but are not limited to, therapy loss, painful electrical sensations, device communication failure, and required surgical revision and removal. The devices were not safe, effective, or reliable as expressly warranted by Boston Scientific, who failed to provide adequate

warnings or updates contradicting its original claims.

405. Boston Scientific therefore breached its express warranties to Plaintiff herein in violation of applicable state statutes and common law, by manufacturing, selling, and marketing the spinal cord stimulator systems to Plaintiff herein, thereby causing injuries and damages. The failure of the SCS devices to be as represented was a substantial factor in causing Plaintiff's harm.

406. Plaintiff has already been injured by Boston Scientific's breach of the express warranties described above. As such, Boston Scientific cannot cure the breach of express warranties. Therefore, any pre-suit notice of the breaches to Boston Scientific would be futile and should not be required of Plaintiff. In addition and in the alternative, pre-suit notice is not required because Plaintiff asserts personal injury claims against the manufacturer of the SCS devices.

407. WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendants, as contained in the Prayer for Relief.

## COUNT VIII – NEGLIGENCE

(Sales and Other Representative)

408. Plaintiff incorporates by reference all factual allegations set forth above in ¶¶ 1–294 as if fully set forth herein.

409. This Count is based on the acts and omissions of Defendants' sales representatives, territory managers, clinical specialists, field clinical representatives, and other field personnel (together, "Representatives") in their direct dealings with Plaintiff and Plaintiff's physicians. It is not based on the design, manufacture, or FDA-approved labeling of the SCS Devices. It does not seek to impose any requirement concerning the content of the FDA-approved labeling, and it does not depend on any alleged misrepresentation to, or fraud on, FDA.

410. At all relevant times, the Representatives who interacted with Plaintiff were employed by, and acted as agents of, Boston Scientific. The Representatives acted within the course and scope of that employment and agency, under policies, training,

and compensation structures that Defendants created and controlled.

411. Defendants assigned the Representatives job duties that included "[p]rovid[ing] expert clinical support through programming, troubleshooting, and intraoperative guidance," "[d]eliver[ing] patient follow-up care," "regularly monitoring therapy progress, addressing patient needs," and "oversee[ing] the entire SCS process of patient care, pre-surgical education, post-surgical follow ups and long-term care of the device."[55]

412. The only stated qualifications for these patient-facing positions were "a bachelor's degree or an equivalent combination of education and experience and a minimum of two years' work experience in a sales and/or clinical role." Upon information and belief, the Representatives who dealt with Plaintiff were not licensed physicians, nurses, or other licensed healthcare providers, and many had no clinical licensure, clinical education, or clinical training beyond Defendants' internal product and sales training.

413. A person who voluntarily acts must exercise reasonable care in doing so, and must exercise reasonable care to avoid creating an unreasonable risk of physical harm to others. Defendants, through the Representatives, chose to communicate directly with Plaintiff about SCS therapy; to program, interrogate, troubleshoot, and adjust Plaintiff's implanted devices; and to respond to Plaintiff's reports of symptoms. Defendants and the Representatives knew or should have recognized that these services were needed for Plaintiff's protection. Having done so, Defendants and the Representatives owed Plaintiff a duty to act with reasonable care in performing that work.

414. A person who undertakes to render services in a trade or profession must exercise the skill and knowledge normally possessed by members of that trade or profession in good standing.[56] By holding the Representatives out as providers of

---

[55] *See* Ex. A.
[56] *See*, *e.g.*, Restatement (Second) of Torts § 299A

"expert clinical support," device programming, troubleshooting, and "patient follow-up care," Defendants and the Representatives undertook to perform those services with the skill and care of a reasonably careful device representative performing them, and to refer clinical questions to licensed physicians.

415. A person who, in the course of business, gives information to another owes a duty of reasonable care in giving it when the person knows or should know that the other will rely on it in a way that risks physical harm.[57] The Representatives knew that Plaintiff would rely on what the Representatives told him about the device, his symptoms, and the Representatives' own qualifications in deciding whether to proceed with implantation, continue therapy, seek medical evaluation, or request explant.

416. A supplier of a product who communicates directly with users about its risks owes a duty to communicate accurately and completely, and not to contradict, dilute, or minimize the warnings that accompany the product.[58]

417. These duties arise under the general state common law of negligence, which applies to all persons. They do not depend on, and are not created by, the Federal Food, Drug, and Cosmetic Act. FDA does not approve or regulate the content of a representative's unscripted oral and written statements to individual patients, where a representative meets with patients, or the channels a representative uses to communicate with patients about their care.

418. Defendants, through the Representatives, breached these duties in at least the following five respects: failing to provide adequate warnings and information in direct communications with Plaintiff; failing to meet the standard of care in performing their jobs; misleading Plaintiff about the Representatives' training, experience, and knowledge; and holding patient meetings and consultations in inappropriate settings.

419. The Representatives were frequently Plaintiff's first and primary point of contact about his SCS Device, before and after implantation, and often communicated

---

[57] *See* Restatement (Second) of Torts § 311.
[58] *See* Restatement (Second) of Torts § 388.

with Plaintiff outside the presence of any physician. In those direct communications, the Representatives failed to exercise reasonable care to convey, and affirmatively contradicted, diluted, or minimized, risk information contained in the FDA-approved labeling.

420. Among other things, they:

a. described SCS therapy to Plaintiff during pre-implant meetings and calls without disclosing, or while minimizing, the risks of lead migration, lead fracture, loss of therapy, unintended or uncomfortable stimulation, shocking, and the need for revision or explant surgery identified in the labeling;

b. told Plaintiff that the permanent device would be the same as the trial device and would work well because the trial had gone well, and that the device had little to no side effects, without disclosing that results with the permanent device may be less than, and may decline from, results during the trial;

c. after implantation, attributed Plaintiff's reported shocking, burning, jolting, loss of therapy, and pain to causes other than the device, including in contradiction of the FDA-approved labeling;

d. told Plaintiff that his symptoms could be resolved by reprogramming, instead of advising him that the symptoms were consistent with known device failure modes requiring medical evaluation; and

e. failed to advise Plaintiff to report his symptoms to his implanting or treating physician, and in some instances discouraged him from doing so.

421. Reasonable care required the Representatives, when they chose to speak with Plaintiff about the devices' risks, benefits, and performance, to do so accurately and consistently with the FDA-approved labeling, and to direct Plaintiff to his

physicians for clinical evaluation of symptoms. This Count imposes no labeling requirement different from or in addition to federal requirements. It asks only that the Representatives not contradict or dilute the existing FDA-approved warnings in their own communications with patients.

422. The Representatives failed to exercise the care and skill of a reasonably careful device representative performing the same tasks. Among other things, they:

a. programmed and reprogrammed Plaintiff's trial and permanent devices, including stimulation parameters, waveforms, amplitude, and frequency, without a physician's contemporaneous order, review, or supervision;

b. made real-time decisions about device settings based on their own assessment of Plaintiff's responses, substituting their judgment for that of Plaintiff's licensed physicians;

c. programmed trial devices to produce short-term pain relief that was not achievable on a long-term basis with a permanent device;

d. directed Plaintiff's reporting of trial results toward the minimum pain-relief threshold required for third-party payer coverage, rather than accurately recording Plaintiff's actual experience;

e. repeatedly reprogrammed devices in response to symptoms instead of referring Plaintiff for imaging or clinical evaluation of possible hardware failure;

f. upon information and belief, failed to document their programming changes and Plaintiff's reported symptoms in a manner that reached Plaintiff's treating physicians and medical records; and

g. failed to follow applicable standards governing Representative interaction with patients.

423. The statements and presentations made by the Representatives when interacting with patients, including Plaintiff, created the reasonable impression that the

Representatives had clinical training, expertise, and knowledge comparable to licensed healthcare providers, and the competence to assess Plaintiff's symptoms and decide on his treatment. In fact, the Representatives were sales and product-support employees whose qualifications for patient-facing roles were a bachelor's degree or equivalent combination of education and experience plus two years of sales or clinical work, and who had no license to diagnose or treat patients.

424. The Representatives failed to exercise reasonable care to disclose the limits of their training, experience, and authority. In particular, they failed to tell Plaintiff that they were not licensed clinicians, that (upon information and belief) their compensation was based, in part, on device sales and patient retention, and that their assessments of Plaintiff's symptoms were not medical evaluations.

425. Plaintiff reasonably relied on the Representatives' apparent clinical training and expertise. In that reliance, Plaintiff accepted the Representatives' explanations of his symptoms, allowed the Representatives to adjust his therapy without physician involvement, delayed seeking medical evaluation, and continued using malfunctioning devices.

426. The Representatives met face-to-face with Plaintiff to discuss SCS therapy, trial results, symptoms, and device performance at medical facilities, but also in Plaintiff's home and in public places such as parks, coffee shops, and restaurants. On information and belief, the Representatives also adjusted or reprogrammed devices at these non-clinical locations.

427. These settings were not appropriate for discussing a patient's medical condition, assessing symptoms, or adjusting an implanted Class III device. They had no physician or licensed clinician present, no way to examine the patient or to obtain imaging or diagnostic testing, and no clinical documentation. They also had no confidentiality. Patients' symptoms, diagnoses, and treatment decisions were discussed in front of members of the public.

428. By holding these meetings outside clinical settings and away from

Plaintiff's physicians, the Representatives:

a. removed Plaintiff's physicians from decisions about device programming and symptom evaluation;

b. ensured that symptoms Plaintiff reported, and changes the Representatives made, were not recorded in Plaintiff's medical records or communicated to his physicians;

c. placed Plaintiff in informal settings where the Representatives' sales role was blurred and Plaintiff could not make informed, considered decisions about his care; and

d. exposed Plaintiff's confidential health information to third parties.

429. A reasonably careful device representative would not hold patient consultations about symptoms, therapy decisions, or device adjustments outside a clinical setting or without the treating physician's knowledge and involvement.

430. Defendants' breaches were a direct and proximate cause, and a substantial factor, in causing Plaintiff's injuries. In particular:

a. but for the Representatives' inaccurate and incomplete communications and their misleading presentation of their own qualifications, Plaintiff would not have consented to the permanent implants, continued therapy, and/or delayed treatment;

b. because the Representatives attributed Plaintiff's symptoms to non-device causes and treated them with reprogramming instead of referring Plaintiff for medical evaluation, the device failures were not identified and treated promptly. This allowed continued and progressive injury, including prolonged exposure to uncontrolled stimulation, nerve injury, and the need for more extensive revision or explant surgery; and

c. because symptom reports and programming changes were made in non-clinical settings and through unsecured channels outside the medical record, Plaintiff's physicians did not receive information that would have

led them to order imaging, interrogate the device, investigate hardware failure, or recommend explant sooner.

431. The harm Plaintiff suffered was the foreseeable result of the risks that made the Representatives' conduct negligent. A device representative who programs implanted neurostimulators, tells patients what their symptoms mean, and keeps the physician out of the loop foreseeably causes delayed diagnosis of device failure and continued physical injury. The Representatives' failure to use reasonable care added to the risk of harm to Plaintiff, and Plaintiff also suffered harm because he relied on the Representatives' services.

432. Defendants are vicariously liable for the Representatives' negligence under the doctrines of respondeat superior and agency, because the Representatives acted within the course and scope of their employment and agency, carrying out duties Defendants assigned under compensation structures Defendants designed within corporate policies created by Defendants.

433. Defendants are also directly liable, because they designed the Representatives' patient-facing role; authorized, directed, and ratified the conduct described above; and failed to establish or enforce reasonable policies governing where and how Representatives communicate with patients and what Representatives tell patients about their qualifications.

434. As a direct and proximate result of Defendants' negligence, Plaintiff suffered, and will continue to suffer:

a. physical injury, pain, and suffering;

b. additional surgeries, including revision and explant procedures;

c. nerve injury;

d. mental anguish and emotional distress;

e. loss of enjoyment of life;

f. past and future medical expenses;

g. lost wages and loss of earning capacity; and

h. other economic and non-economic damages.

435. WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, punitive damages to the extent permitted by applicable law, pre- and post-judgment interest, costs, and such other relief as the Court deems just and proper.

## COUNT IX – BREACH OF IMPLIED WARRANTY

436. Plaintiff incorporates by reference all factual allegations set forth above in ¶¶ 1–294 as if fully set forth herein.

437. A seller who is a merchant with respect to goods of that kind warrants that the goods shall be merchantable and fit for the ordinary purposes for which such goods are used. *See*:

a. Ala. Code §§ 7-2-314, et seq.;

b. Alaska Stat. §§ 45.02.314, et seq.;

c. Ariz. Rev. Stat. Ann. §§ 47-2314, et seq.;

d. Ark. Code Ann. §§ 4-2-314, et seq.;

e. Cal. Com. Code §§ 2314, et seq.;

f. Colo. Rev. Stat. §§ 4-2-314, et seq.;

g. Conn. Gen. Stat. Ann. §§ 42a-2-314, et seq.;

h. Del. Code Ann. tit. 6, §§ 2-314, et seq.;

i. D.C. Code Ann. §§ 28:2-314, et seq.;

j. Fla. Stat. Ann. §§ 672.314, et seq.;

k. O.C.G.A. §§ 11-2-314, et seq.;

l. Haw. Rev. Stat. §§ 490:2-314, et seq.;

m. Idaho Code §§ 28-2-314, et seq.;

n. Ill. Comp. Stat. Ann. Ch. 810, 5/2-314, et seq.;

o. Indiana Code Ann. §§ 26-1-2-314, et seq.;

p. Iowa Code Ann. §§ 554.2314, et seq.;

q. Kan. Stat. Ann. §§ 84-2-314, et seq.;

r. Ky. Rev. Stat. Ann. §§ 355.2-314, et seq.;

s. La. Civ. Code Ann. art. 2520, et seq. (and is liable for redhibition under this statute);

t. Me. Rev. Stat. Ann. tit. 11, §§ 2-314, et seq.;

u. Md. Code Ann., Com. Law §§ 2-314, et seq.;

v. Mass. Gen. Laws Ann. Ch. 106, §§ 2-314, et seq.;

w. Mich. Comp. Laws Ann. §§ 440.2314, et seq.;

x. Minn. Stat. Ann. §§ 336.2-314, et seq.;

y. Miss. Code Ann. §§ 75-2-314, et seq.;

z. Mo. Rev. Stat. Ann. §§ 400.2-314, et seq.;

aa. Mont. Code Ann. §§ 30-2-314, et seq.;

bb. Neb. Rev. Stat. §§ 2-314, et seq.;

cc. Nev. Rev. Stat. §§ 104.2314, et seq.;

dd. N.H. Rev. Stat. Ann. §§ 382-A:2-314, et seq.;

ee. N.J. Stat. Ann. §§ 12A:2-314, et seq.;

ff. N.M. Stat. Ann. § 55-2-314, et seq.;

gg. N.Y. U.C.C. Law §§ 2-314, et seq.;

hh. N.C. Gen. Stat. Ann. §§ 25-2-314, et seq.;

ii. N.D. Cent. Code §§ 41-02-31, et seq.;

jj. Ohio Rev. Code Ann. §§ 1302.27, et seq.;

kk. Okl. Stat. Tit. 12A, §§ 2-314 et seq.;

ll. Or. Rev. Stat. §§ 72.3140, et seq.;

mm. 13 Pa. Stat. Ann. §§ 2314 et seq.;

nn. R.I. Gen. Laws §§ 6A-2-314, et seq.;

oo. S.C. Code Ann. §§ 36-2-314, et seq.;

pp. S.D. Codified Laws §§ 57A-2-314, et seq.;

qq. Tenn. Code Ann. §§ 47-2-314, et seq.;

rr. Tex. Bus. & Com. Code Ann. §§ 2.314, et seq.;

ss. Utah Code Ann. §§ 70A-2-314, et seq.;

tt. Va. Code Ann. §§ 8.2-314, et seq.;

uu. Vt. Stat. Ann. §§ 9A-2-314, et seq.;

vv. Wash. Rev. Code §§ 62A.2-314, et seq.;

ww. W. Va. Code §§ 46-2-314, et seq.;

xx. Wis. Stat. Ann. §§ 402.314, et seq.; and

yy. Wyo. Stat. Ann. §§ 34.1-2-314, et seq.

438. At all relevant and material times, Boston Scientific manufactured, distributed, advertised, promoted, and sold the SCS devices. Plaintiff, directly or through the hospitals, surgical centers, and physicians that acquired the devices for implantation in Plaintiff, bought the SCS devices from Boston Scientific. In addition and in the alternative, privity existed between Boston Scientific and Plaintiff through the direct dealings between Boston Scientific's sales representatives and Plaintiff described above.

439. Boston Scientific is a merchant engaged in the business of manufacturing, marketing, and selling SCS devices, including the devices implanted in Plaintiff. These devices are used and intended for the ordinary purpose of treating chronic pain.

440. When Boston Scientific marketed and sold its SCS devices implanted in Plaintiff, it impliedly warranted that the devices were of merchantable quality, conformed to FDA-approved specifications, and were reasonably safe for their intended medical purpose. Boston Scientific also impliedly warranted that the devices were fit for the specific purpose of long-term implantation to treat Plaintiff's condition, as recommended by his physicians.

441. The devices implanted in Plaintiff were not of merchantable quality, nor were they fit for their intended purpose. As a result of deviations from the FDA-approved specifications, they failed to operate as expected due to known defects in lead composition and fixation, firmware execution, wireless programming, battery recharging, and therapy delivery. Plaintiff experienced painful shocks, therapy failure,

and ultimately underwent surgical removal due to the devices' unreliability, defects, and malfunctions.

442. These failures were not caused by misuse or physician error. They were the direct result of design-altering changes Boston Scientific implemented in deviation from FDA-approved specifications without corresponding clinical testing or validation, and without disclosing these risks in labeling or provider materials. The devices failed to conform to the minimum standards of merchantability and fitness for long-term neuromodulation therapy.

443. These deviations are further supported by the Plaintiff-specific allegations in Section V of this Complaint.

444. Boston Scientific's breach of implied warranties was a proximate cause of Plaintiff's injuries, including physical pain, surgical intervention, economic loss, and emotional distress. The failure of the SCS devices to have the expected quality was a substantial factor in causing Plaintiff's harm. Plaintiff would not have consented to the implantation had his physicians known the devices were unfit for their intended use. Pre-suit notice of the breach is not required because Plaintiff asserts personal injury claims against the manufacturer of the SCS devices. In the alternative, any pre-suit notice would be futile because Plaintiff has already been injured and Boston Scientific cannot cure the breach.

445. WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendants, as contained in the Prayer For Relief.

## COUNT X - NEGLIGENT UNDERTAKING

446. Plaintiff incorporates by reference all factual allegations set forth above in ¶¶ 1–294 as if fully set forth herein.

447. Plaintiff pleads this claim in the alternative, to the extent Defendants contend that they otherwise owed no duty to provide programming, reprogramming, troubleshooting, or other patient-specific device-support services. This claim arises from Defendants' actual and voluntary undertaking to provide those services and their

failure to exercise reasonable care in performing them.

448. At all relevant times, Defendants, through their sales and clinical representatives, specifically undertook to provide services to Plaintiff and his treating physicians concerning the operation and performance of Plaintiff's SCS devices. Those services included programming and reprogramming the devices, adjusting stimulation parameters, troubleshooting reported malfunctions, evaluating Plaintiff's responses to adjustments, and recommending responses to device-related symptoms and complications.

449. Defendants' representatives assumed an active role in providing these services. Their involvement was not limited to selling the devices, supplying general product information, or passively observing treatment. Rather, they personally performed device adjustments and reprogramming and provided patient-specific advice concerning device performance, the significance of reported symptoms, and the purported ability of further reprogramming to alleviate complications.

450. Defendants undertook these services directly for Plaintiff and, alternatively, for Plaintiff's treating physicians for Plaintiff's benefit and protection. Defendants knew or reasonably should have recognized that reasonable care in performing those services was necessary to protect Plaintiff from physical harm associated with harmful stimulation, device malfunction, continued use of failing devices, and delayed medical evaluation and treatment.

451. By actually undertaking these services, Defendants assumed a duty to exercise reasonable care within the scope of the undertaking. That duty included exercising reasonable care in making adjustments, recognizing the limitations of reprogramming, accurately communicating the results of troubleshooting, and recognizing when reported symptoms or persistent malfunctions required evaluation by Plaintiff's treating physicians rather than further device adjustments.

452. This duty arose from the services Defendants' representatives actually undertook, including when the representatives performed activities beyond their

training, qualifications, or permitted device-support role. Plaintiff does not premise this claim merely on a failure to undertake services that Defendants never agreed or attempted to provide.

453. Defendants, through their representatives, failed to exercise reasonable care in performing the undertaking in one or more of the following ways:

a. By programming, reprogramming, or adjusting Plaintiff's devices without adequately assessing their reported symptoms, responses to previous adjustments, or indications of underlying device failure;

b. By continuing to reprogram the devices when they knew or reasonably should have known that additional reprogramming would not correct the underlying malfunction or alleviate Plaintiff's complications;

c. By providing patient-specific assurances that symptoms were unrelated to the devices or resulted merely from suboptimal settings without an adequate basis for those conclusions;

d. By representing that further reprogramming would resolve complications caused by lead failure, lead migration, IPG/battery malfunction, or other conditions that reprogramming could not correct;

e. By performing device-related services beyond their training, qualifications, or permitted role without appropriate physician direction;

f. By failing to discontinue ineffective troubleshooting and directing Plaintiff to his treating physicians when persistent symptoms or malfunctions required medical evaluation;

g. By advising Plaintiff to continue using malfunctioning devices or delay medical evaluation, treatment, revision, replacement, or removal; and

h. By failing to accurately communicate persistent symptoms, unsuccessful reprogramming, and indications of device failure to Plaintiff's treating physicians.

454. Defendants' negligent performance increased the risk of physical harm beyond the risk that would have existed had Defendants not undertaken the services at all. In particular, Defendants' affirmative adjustments, repeated troubleshooting, and patient-specific assurances induced continued device use and displaced or delayed physician evaluation that Plaintiff otherwise would have sought.

455. This increased risk did not arise merely because Defendants failed to eliminate a preexisting danger. Rather, Defendants' affirmative conduct caused Plaintiff to continue using malfunctioning devices and postpone medical evaluation or removal in reliance on the purported effectiveness of the services being provided, thereby prolonging exposure to harmful device failures.

456. Alternatively, and independently, Plaintiff suffered harm because he relied on Defendants' undertaking. Plaintiff submitted to repeated adjustments and reprogramming and relied on Defendants' representatives to exercise reasonable care in performing those services and communicating their limitations. In reliance on the undertaking and accompanying assurances, Plaintiff continued device use and delayed seeking further medical evaluation or removal.

457. To the extent Defendants provided troubleshooting and device-performance information to Plaintiff's treating physicians, those physicians likewise relied on the undertaking and the information supplied in determining how to respond to Plaintiff's reported symptoms and whether further evaluation or intervention was necessary.

458. Had Defendants not undertaken these services and provided the accompanying assurances, or had they exercised reasonable care in performing the services, Plaintiff would have sought or received earlier physician evaluation and appropriate treatment, including revision, replacement, or removal where indicated.

459. Plaintiff's SCS devices failed because of their underlying defects. Defendants' negligent undertaking caused Plaintiff to continue using the failing devices and delayed appropriate medical evaluation and treatment. The device failures

directly and proximately caused physical injuries, while Defendants' negligent performance prolonged Plaintiff's exposure to those failures and caused additional injury or aggravated injuries that otherwise would have been avoided or less severe.

460. Defendants' failure to exercise reasonable care in performing the services they undertook was a substantial factor in causing Plaintiff's harm. As a direct and proximate result of Defendants' negligent performance of the services they undertook, Plaintiff's prolonged exposure to the defective devices caused Plaintiff serious injuries and damages, including, but not limited to, bodily injury; permanent nerve damage; chronic pain; severe physical pain and suffering; emotional distress and mental anguish; diminished enjoyment of life; medical and related expenses; loss of earnings; and disability, all of which losses and damages will continue into the future.

461. WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendants as contained in the Prayer for Relief.

## COUNT XI – NEGLIGENCE PER SE

(Unauthorized Practice of Medicine)

462. Plaintiff incorporates by reference all factual allegations set forth above in ¶¶ 1–294 as if fully set forth herein.

463. No person may practice medicine in the state without being duly licensed, and the practice of medicine includes diagnosing, treating, operating on, or prescribing for any human disease, pain, injury, deformity, or physical condition.

464. Defendants have engaged in unauthorized practice of medicine in violation of:

a. Alabama Code § 34-24-51;

b. Alaska Stat. § 08.64.170;

c. Arizona Rev. Stat. § 32-1455;

d. Ark. Code Ann. § 17-95-401;

e. Cal. Bus. & Prof. Code § 2052;

f. Colo. Rev. Stat. § 12-240-135;

g. Conn. Gen. Stat. § 20-9;

h. 24 Del. Code § 1720;

i. D.C. Code §§ 3-1210.01, et seq.;

j. Fla. Stat. § 458.327;

k. O.C.G.A. § 43-34-22;

l. Hawaii Rev. Stat. § 453-2;

m. Idaho Code § 54-1804;

n. 225 ILCS 60/50;

o. Ind. Code Ann. § 25-22.5-8-1;

p. Iowa Code § 147.2;

q. Kan. Stat. Ann. § 65-2803;

r. Kentucky Rev. Stat. § 311.560;

s. La. R.S. § 37:1271;

t. 32 M.R.S. § 3270;

u. Md. Health Occupations Code Ann. § 14-601;

v. ALM GL ch. 112, § 6;

w. MCL § 333.17011;

x. Minn. Stat. § 147.081;

y. Miss. Code Ann. § 73-25-127;

z. R.S. Mo. § 334.010;

aa. § 37-20-411, MCA;

bb. R.R.S. Neb. § 38-2025;

cc. Nev. Rev. Stat. Ann. § 630.400;

dd. RSA 329:24;

ee. N.J. Stat. § 2C:21-20;

ff. N.M. Stat. Ann. § 61-6-20;

gg. N.Y. Educ. Law § 6512;

hh. N.C. Gen. Stat. § 90-18;

ii. N.D. Cent. Code § 43-17-34;
jj. Ohio Rev. Code Ann. § 4731.41;
kk. Okla. Stat. tit. 59, § 491;
ll. ORS § 677.080;
mm. 63 P.S. § 422.10;
nn. 20 L.P.R.A. § 135d;
oo. R.I. Gen. Laws § 5-37-12;
pp. S.C. Code Ann. § 40-47-200;
qq. S.D. Codified Laws § 36-4-8;
rr. Tenn. Code Ann. § 63-6-201;
ss. Tex. Occ Code § 165.152;
tt. Utah Code Ann. § 58-67-301;
uu. 26 V.S.A. § 1314;
vv. Va. Code Ann. § 54.1-2902;
ww. 27 V.I.C. § 16;
xx. Rev. Code Wash. (ARCW) § 18.71.021;
yy. W. Va. Code § 30-3-13;
zz. Wis. Stat. § 448.03; and
aaa. Wyo. Stat. § 33-26-301

465. These statutes are designed to protect patients from unqualified persons making medical treatment decisions, and Plaintiff is a member of the class of persons these statutes were designed to protect. The harms Plaintiff suffered are precisely the type of harms these statutes were designed to prevent.

466. The law applicable to Plaintiff's claims is identified in the Applicable Law section above and in Section V of this Complaint.

467. To the extent that any applicable state law does not recognize negligence per se or does not permit a statute to create a duty or standard of care, violation of the above referenced statutes is evidence of Boston Scientific and its representatives'

breach of their duty to act reasonably toward patients, including Plaintiff.

468. The statutes listed above are designed to ensure that those who provide medical treatment and make medical treatment decisions are qualified to do so. The medical license represents the qualifications that each state has determined are necessary for an individual to practice medicine.

469. Boston Scientific's sales and clinical representatives, acting within the scope of their employment with and as agents of Boston Scientific, engaged in unauthorized practice of medicine by advising, recommending, and administering device treatment – including programming, reprogramming, and medical recommendations – for the treatment of Plaintiff's pain and other medical conditions. The representatives did so without the direction or supervision of Plaintiff's licensed physicians and beyond the scope of any authorized delegation of technical device support.

470. By practicing medicine without a license or the qualifications that such a license represents, Boston Scientific's sales and clinical representatives' conduct breached the standard of care created by the statutes that require medical licensure for the practice of medicine.

471. Boston Scientific's sales and clinical representatives, none of whom were licensed healthcare professionals, routinely and in Plaintiff's cases:

a. Entered surgical suites during SCS device implantation procedures;

b. Advised surgeons and operating room staff on intraoperative lead positioning and stimulation testing;

c. Participated in real-time programming of the devices based on patient response during surgery;

d. Provided device setting recommendations to healthcare providers during post-operative care;

e. Adjusted or instructed adjustment of device parameters that materially influenced treatment decisions;

f. Directly advised patients, including Plaintiff, about the safety and efficacy of the SCS system, benefits of the system, and impacts of reprogramming the SCS system;

g. Directly advised patients, including Plaintiff, to keep the SCS system in his body despite complications and lack of efficacy of the system;

h. Provided medical advice to patients, including Plaintiff, regarding the SCS system, symptoms now alleged to be caused by the SCS system, and decisions related to the SCS system.

472. This claim is based entirely on state law violations and is not preempted by the MDA or the FDCA. Federal regulations confirm that FDA preemption of state medical device requirements does not reach state licensing or other requirements relating to the practice of medicine. 21 C.F.R. § 808.1. This claim does not depend on the content of any FDA requirement, and it seeks to enforce only state laws governing who may practice medicine.

473. The representatives' violations of these statutes were a substantial factor in causing Plaintiff's harm. As a direct and proximate result of Defendants' violation of state laws prohibiting the unlicensed practice of medicine, Plaintiff suffered the injuries and damages described herein, including but not limited to chronic pain, incontinence, numbness, and other losses including mental anguish, diminished enjoyment of life, medical, health and incidental and related expenses.

474. WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendants, as contained in the Prayer for Relief.

## COUNT XII – NEGLIGENCE PER SE

(Failure to Make Required Reports)

475. Plaintiff incorporates by reference all factual allegations set forth above in ¶¶ 1–294 as if fully set forth herein.

476. Defendants were subject to, and violated, multiple non-discretionary

federal duties that were enacted for the protection of public health and safety. These duties are embodied in the FDCA, the MDA, and FDA regulations promulgated thereunder, including the mandated adverse event reporting under 21 C.F.R. § 803.50.

477. Boston Scientific failed to report adverse events its sales representatives learned of from patients, including Plaintiff, and instead persuaded patients that there were no issues with the SCS devices.

478. Plaintiff is a member of the class of persons these statutes and regulations are intended to protect, being a patient receiving Class III medical implants under the FDA's PMA regulatory framework. Plaintiff's injuries are of the kind these reporting requirements are intended to prevent, specifically, harms resulting from device malfunctions and injuries that went unreported to FDA and therefore did not reach patients and their physicians.

479. The law applicable to Plaintiff's claims is identified in the Applicable Law section above and in Section V of this Complaint.

480. To the extent that any applicable state law does not recognize negligence per se or does not permit a statute to create a duty or standard of care, violation of the federal reporting requirements described above is evidence of Boston Scientific's breach of its duty to act reasonably toward patients, including Plaintiff, particularly in jurisdictions adopting the rule of Restatement (Second) of Torts § 388 that one who supplies a chattel for another's use is subject to liability if the supplier knows or has reason to know the chattel is or is likely to be dangerous for its intended use and fails to exercise reasonable care to inform those whom it expects to use it.

481. As a direct and proximate result of Defendants' violations of federal regulations and any and all applicable state law, Plaintiff sustained serious damages including, but not limited to, the following: bodily injury; severe physical pain and suffering; emotional distress; diminished enjoyment of life; medical expenses; loss of earnings; and disability, all of which losses and damages will continue into the future.

482. WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted

relief against Defendants, as contained in the Prayer for Relief.

**COUNT XIII – NEGLIGENT MISREPRESENTATION**

483. Plaintiff incorporates by reference all factual allegations set forth above in ¶¶ 1–294 as if fully set forth herein.

484. This claim arises from negligent provision of false and incomplete information to physicians and patients in connection with medical decision-making.

485. At all relevant times, Defendants were engaged in the business of designing, manufacturing, marketing, and distributing Boston Scientific SCS devices for the treatment of chronic intractable pain. In the course of that business, and for pecuniary purposes, Defendants supplied information to Plaintiff and his treating physicians intended to guide their medical treatment decisions. Defendants had a pecuniary interest in the transactions in which they supplied this information because they derived revenue from the sale of their SCS devices.

486. At all relevant times, Defendants, acting individually and through their agents, employees, and representatives, owed a duty to exercise reasonable care in communicating truthful, accurate, and complete information about their spinal cord stimulator systems.

487. Defendants are responsible for the acts and omissions of their agents, employees, and representatives acting within the course and scope of their respective agency and employment relationships, including the sales and clinical representatives who supplied the information described herein.

488. Defendants supplied false information in their promotional materials, sales presentations, IFU, labeling, and direct communications to healthcare providers and patients regarding the safety, efficacy, design features, and regulatory status of their SCS devices.

489. As set forth in detail in the preceding allegations, Defendants and their sales representatives initiated, encouraged, and conducted extensive and aggressive direct communication with Plaintiff. These communications were not incidental or

insignificant – they were targeted and intentional sales tactics, intended to convince Plaintiff to agree to be implanted with a Boston Scientific SCS device.

490. Defendants and their representatives continued to communicate directly with Plaintiff during the temporary SCS trials and after implantation of the permanent SCS devices.

491. Through promotional materials, sales presentations, IFU, labeling, and direct communications, Defendants negligently misrepresented to Plaintiff and his physicians that, despite deviating from FDA-approved design and manufacturing specifications:

a. The SCS devices were safe and effective for the long-term treatment of chronic pain;

b. The devices' multiwaveform stimulation would enhance therapeutic outcomes and reduce adverse effects compared to previous devices;

c. The results achieved during trial stimulation were reliable predictors of permanent implant performance;

d. The permanent SCS systems would provide greater pain relief than the temporary SCS trial;

e. The systems were accompanied by complete safety information necessary for physicians to evaluate treatment risks;

f. The safety and efficacy of the SCS systems were validated by clinical data, as required for PMA, and the systems were approved for sale based on such clinical data; and

g. The systems had been appropriately validated through regulatory submissions consistent with FDA standards for safety and effectiveness.

492. Defendants' sales representatives also made statements directly to

patients, including Plaintiff[59], that include but are not limited to:

a. the SCS Device would provide reliable, long-term pain relief, and stimulation was safe and localized;

b. quantifying the promised efficacy;

c. the permanent SCS Device would provide pain relief equivalent to the relief obtained during the external trial, so that trial results reliably predicted the performance of the permanent implant;

d. the SCS Device was uniquely suited to provide the patient with long-term pain relief and was supported by clinical data;

e. the SCS Device would provide better pain relief than other treatment modalities, including dorsal root ganglion ("DRG") stimulation and other manufacturers' SCS devices;

f. that patients would be pain-free with SCS Device;

g. the patient would get pain relief once the sales representative found the right programming settings;

h. that inadequate relief or side effects simply meant the device needed reprogramming;

i. in direct contradiction of the FDA-approved labeling, that side effects such as unintended shocks are not known to be caused by the SCS Device, so the shocks the patient was experiencing could not be coming from the device;

j. the patient's symptoms had other causes, including that the

---

[59] *See*, *e.g.*, *Ollie Wilson v. Boston Scientific Corporation*, 2:25-cv-09958-JLS-PD; *Linda Guthrie v. Boston Scientific Corporation*, 2:25-cv-11508-JLS-PD; *Sherri Miyagi v. Boston Scientific Corporation*, 2:26-cv-06419-JLS-PD; *Tone Silas v. Boston Scientific Corporation*, 2:26-cv-03679-JLS-PD; *Steven Joe Cooper v. Boston Scientific Corporation*, 2:26-cv-12020-JLS-PD; *Myra Boyd v. Boston Scientific Corporation*, 2:26-cv-09806-JLS-PD; *Cynthia Galary v. Boston Scientific Corporation*, 2:26-cv-11311-JLS-PD; *Darrin Peterson v. Boston Scientific Corporation*, 2:26-cv-11312-JLS-PD; *Daniel Carmack v. Boston Scientific Corporation*, 2:26-cv-12158-JLS-PD; *Gloria Castleberry v. Boston Scientific Corporation*, 2:26-cv-10953-JLS-PD.

sensations were imagined or psychosomatic; and

k. statements downplaying the severity of the patients' injuries.

493. Each of these representations was false when made. Defendants made these representations without reasonable grounds for believing them to be true. A reasonable manufacturer exercising appropriate care would have known that, especially because SCS devices differed from FDA-approved specifications:

a. The permanent implant differed materially in performance from the temporary SCS trial device;

b. The SCS devices were associated with a materially increased risk of lead migration, therapy abandonment, stimulation-induced autonomic dysfunction, and device-related complications;

c. The modified stimulation technologies and battery architecture introduced new and significant risks not present in predicate devices;

d. Clinical data validating the long-term safety and efficacy of the device modifications were lacking or insufficient; and

e. Adverse event trends, including stimulation-related autonomic dysfunction, required disclosure to regulators and treating physicians.

494. These representations are part of a consistent and pervasive pattern of conduct by the Defendants and extend beyond Plaintiff to the other plaintiffs identified in footnote 46. The specific representations made to Plaintiff are alleged in Section V of this Complaint.

495. At the time the representations were made, Defendants had internal performance information indicating that the permanent implants could perform differently from the trial device and could present risks not disclosed to treating physicians. Defendants' representations concerning the devices' safety and effectiveness failed to accurately reflect or account for the internal performance information and post-market adverse-event information available to them.

496. Defendants had a duty to disclose these materials facts due to their special

relationship with Plaintiff they voluntarily undertook with respect to the SCS devices

497. Plaintiff's healthcare providers reasonably relied on Defendants' representations in recommending implantation of the SCS systems, and Plaintiff reasonably relied on the same representations in consenting to implantation.

498. Plaintiff had no reasonable basis for independently verifying the accuracy of Defendants' representations when they were made. Plaintiff's reliance was reasonable given the medical setting, Defendants' superior knowledge as the device manufacturers, and the authority with which Defendants' representatives communicated.

499. Accurate and complete risk information would have been considered by Plaintiff and his physicians when evaluating treatment options and deciding whether to recommend or consent to implantation.

500. The incomplete safety information communicated to Plaintiff and his treating physicians influenced the decision to implant the device in Plaintiff.

501. The undisclosed risk information would have been considered by Plaintiff and his physicians in deciding whether to recommend implantation.

502. Had Plaintiff and his healthcare providers been accurately and fully informed of the true risks and limitations associated with the device, they would not have elected to proceed with implantation or would have pursued alternative treatment options.

503. Defendants and their representatives continued to communicate directly with Plaintiff during the temporary SCS trials and after implantation of the permanent SCS devices. These communications included patient-specific representations concerning device performance, inadequate pain relief, reported complications, and the ability of programming or reprogramming to address those problems.

504. After Plaintiff experienced complications and inadequate pain relief following permanent implantation, Defendants, through their sales and clinical representatives, represented that repeated reprogramming would alleviate Plaintiff's

complications and increase his pain relief. These representations were made in connection with the representatives' programming and reprogramming of Plaintiff's devices. Defendants intended that Plaintiff rely on these representations in deciding whether to continue using his device and whether to seek further medical evaluation or removal.

505. Defendants' representatives also represented that Plaintiff's post implantation complications were unrelated to the SCS devices or were attributable to suboptimal programming rather than device failure and could be resolved through reprogramming. These representations prevented Plaintiff from making informed decisions concerning continued device use and the need for further medical evaluation or removal.

506. Defendants and their representatives knew or should have known that these post implantation representations were false or lacked a reasonable factual basis. In particular, the representatives lacked reasonable grounds for assuring Plaintiff that reprogramming would resolve his complications without adequately determining whether those complications resulted from lead failure, IPG/battery malfunction, or another condition that reprogramming could not correct.

507. Plaintiff relied on these representations in electing not to have the system removed earlier than he ultimately did, causing his additional and continued injuries.

508. Defendants failed to exercise reasonable care or competence in obtaining or communicating the post implantation information supplied to Plaintiff, including, but not limited to the following:

a. Making patient-specific representations concerning the cause and significance of Plaintiff's complications without an adequate factual or clinical basis;

b. Permitting sales and clinical representatives to make clinical representations beyond their training and qualifications concerning the significance of Plaintiff's symptoms and the adequacy of reprogramming

as a remedy; and

c. Failing to adequately train their representatives to communicate accurate and complete information concerning lead failure, IPG/battery malfunction, and the limitations of reprogramming.

509. Plaintiff reasonably relied on these post implantation representations in continuing to use his SCS device and delaying further medical evaluation or removal. In particular, Plaintiff elected not to have the devices removed earlier than he ultimately did because he relied on the representatives' assurances that further reprogramming would alleviate his complications and improve pain relief.

510. Had Defendants and their representatives accurately communicated the limitations of reprogramming and the potential significance of Plaintiff's reported complications, Plaintiff would have sought further medical evaluation and removal earlier, thereby avoiding or reducing the additional and continued injuries caused by the delay.

511. As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiff consented to implantation of the SCS devices and, after complications arose, continued using the devices and delayed seeking their removal. These misrepresentations thereby caused Plaintiff to be implanted with and remain exposed to devices that failed through lead migration, lead failure, IPG/battery malfunction, and other malfunctions described herein. These device failures directly and proximately caused Plaintiff injuries that would not have occurred, or would have been substantially less severe, absent his reliance on Defendants' false and incomplete information.

512. As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiff suffered physical injuries, chronic pain, emotional distress, additional medical expenses, financial losses, diminished enjoyment of life, and the other injuries and damages described herein. Absent those misrepresentations, Plaintiff would not have undergone implantation or would have sought timely medical

evaluation and earlier removal, thereby avoiding or reducing the injuries caused by the device failures. Plaintiff's reliance on Defendants' misrepresentations was a substantial factor in causing Plaintiff's harm.

513. WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendants, as contained in the Prayer for Relief.

## COUNT XIV - FRAUDULENT MISREPRESENTATION

514. Plaintiff incorporates by reference all factual allegations set forth above in ¶¶ 1–294 as if fully set forth herein.

515. At all relevant times, Defendants were engaged in the business of designing, manufacturing, marketing, and distributing Boston Scientific SCS devices for the treatment of chronic intractable pain. In the course of that business, and for pecuniary purposes, Defendants supplied information to Plaintiff and his treating physicians intended to guide their medical treatment decisions. Defendants had a pecuniary interest in the transactions in which they supplied this information because they derived revenue from the sale of their SCS devices.

516. At all relevant times, Boston Scientific, acting individually and through its agents, employees, and representatives, made material misrepresentations and omissions of fact regarding the safety, efficacy, and regulatory compliance of its SCS devices.

517. Boston Scientific's sales and clinical representatives made the representations described herein while acting within the course and scope of their employment and/or agency relationships and in furtherance of Boston Scientific's business interests. Boston Scientific is responsible for their acts and omissions as alleged herein.

518. In light of SCS devices deviating from FDA-approved specifications, Defendants supplied false and incomplete information in their promotional materials, sales presentations, IFU, labeling, and direct communications to healthcare providers and patients regarding the safety, efficacy, design features, performance, and

regulatory status of their SCS devices.

519. As set forth in detail in the preceding allegations, Defendants and their sales representatives initiated, encouraged, and conducted extensive and aggressive direct communications with Plaintiff. These communications were not incidental or insignificant; they were targeted and intentional sales tactics intended to convince Plaintiff to agree to implantation of Boston Scientific SCS devices.

520. Through promotional materials, sales presentations, IFU, labeling, and direct communications, Defendants fraudulently represented to Plaintiff and his physicians that, despite deviating from FDA-approved design and manufacturing specifications:

a. The SCS devices were safe and effective for the long-term management of chronic pain;

b. The benefits achieved during trial stimulation reliably predicted the success of the permanently implanted devices;

c. The devices' multiwaveform stimulation capabilities reduced the risk of therapy failure and side effects compared to older systems;

d. The devices had been adequately validated and reviewed consistent with FDA requirements for significant design and functionality changes.

521. Defendants' sales representatives also made statements directly to patients, including Plaintiff[60], that include but are not limited to:

a. the SCS Device would provide reliable, long-term pain relief, and stimulation was safe and localized;

---

[60] *See*, *e.g.*, *Ollie Wilson v. Boston Scientific Corporation*, 2:25-cv-09958-JLS-PD; *Linda Guthrie v. Boston Scientific Corporation*, 2:25-cv-11508-JLS-PD; *Sherri Miyagi v. Boston Scientific Corporation*, 2:26-cv-06419-JLS-PD; *Tone Silas v. Boston Scientific Corporation*, 2:26-cv-03679-JLS-PD; *Steven Joe Cooper v. Boston Scientific Corporation*, 2:26-cv-12020-JLS-PD; *Myra Boyd v. Boston Scientific Corporation*, 2:26-cv-09806-JLS-PD; *Cynthia Galary v. Boston Scientific Corporation*, 2:26-cv-11311-JLS-PD; *Darrin Peterson v. Boston Scientific Corporation*, 2:26-cv-11312-JLS-PD; *Daniel Carmack v. Boston Scientific Corporation*, 2:26-cv-12158-JLS-PD; Gl *oria Castleberry v. Boston Scientific Corporation*, 2:26-cv-10953-JLS-PD.

b. quantifying the promised efficacy;

c. the permanent SCS Device would provide pain relief equivalent to the relief obtained during the external trial, so that trial results reliably predicted the performance of the permanent implant;

d. the SCS Device was uniquely suited to provide the patient with long-term pain relief and was supported by clinical data;

e. the SCS Device would provide better pain relief than other treatment modalities, including dorsal root ganglion ("DRG") stimulation and other manufacturers' SCS devices;

f. that patients would be pain-free with SCS Device;

g. the patient would get pain relief once the sales representative found the right programming settings;

h. that inadequate relief or side effects simply meant the device needed reprogramming;

i. in direct contradiction of the FDA-approved labeling, that side effects such as unintended shocks are not known to be caused by the SCS Device, so the shocks the patient was experiencing could not be coming from the device;

j. the patient's symptoms had other causes, including that the sensations were imagined or psychosomatic; and

k. statements downplaying the severity of the patients' injuries.

522. Each of these representations was false when made. Defendants made these representations knowing them to be false, or recklessly and without regard for their truth, because post-market surveillance and adverse event reporting showed that:

a. The SCS systems were associated with a materially increased risk of lead migration, therapy abandonment, stimulation-induced autonomic dysfunction, premature therapeutic failure, and device-related complications;

b. The permanent device materially differed in performance and risk profile from the external trial device;

c. Boston Scientific had not submitted adequate clinical evidence to substantiate the safety and effectiveness of its multiwaveform and posture-adaptive programming technologies;

d. Boston Scientific's devices were being marketed under serial PMA supplements rather than undergoing new PMA review.

523. These representations are part of a consistent and pervasive pattern of conduct by the Defendants and extend beyond Plaintiff to the other plaintiffs identified in footnote 46. The specific representations made to Plaintiff are alleged in Section V of this Complaint.

524. At the time these representations were made, Boston Scientific possessed information concerning the devices' actual performance and risks through internal testing, complaint files, post-market surveillance, adverse-event reports, and post-approval data. Boston Scientific failed to accurately reflect that information in its representations to Plaintiff and his healthcare providers and concealed adverse material information concerning the devices' safety, performance, and limitations.

525. Boston Scientific made these representations and omissions knowing they were false or misleading, or with reckless disregard for their truth or falsity. The representations were made intentionally and with the intent to induce Plaintiff's healthcare providers to recommend, and Plaintiff to consent to, trial and permanent implantation of Boston Scientific SCS devices.

526. Defendants had a duty to disclose these materials facts due to their special relationship with Plaintiff they voluntarily undertook with respect to the SCS devices.

527. Plaintiff's healthcare providers justifiably relied on Boston Scientific's representations in recommending the SCS systems, and Plaintiff justifiably relied on the same representations in consenting to implantation and subsequent medical decisions.

528. Plaintiff had no reasonable means of independently discovering the falsity of Defendants' statements at the time they were made, as Boston Scientific had superior knowledge of the device's design changes, clinical performance, and regulatory history, and actively concealed adverse information from physicians, patients, and regulators.

529. Had Plaintiff and his healthcare providers been accurately informed of the devices' true risks, limitations, and performance, they would not have elected to proceed with implantation or would have pursued alternative treatment options.

530. After implantation, Boston Scientific, through its sales representatives, also made misrepresentations to Plaintiff about complications and inadequate pain relief he experienced after the permanent implant, representing to him that repeated reprogramming would alleviate his complications and increase his pain relief. These representations were made at the time of the reprogramming.

531. During these communications, including at the time of programming and reprogramming, Boston Scientific's representatives represented that:

a. Plaintiff's complications were attributable to suboptimal device settings rather than device failure;

b. Plaintiff's symptoms and complications were unrelated to the SCS devices; and/or

c. Repeated reprogramming would alleviate Plaintiff's complications and increase his pain relief.

532. These post-implantation representations were materially false or misleading. Plaintiff's complications arose from lead failure, lead migration, IPG/battery malfunction, uncontrolled electrical stimulation, or other device failures that repeated reprogramming could not correct.

533. Defendants knew that these post-implant representations were false, or made them recklessly and without regard for their truth. Boston Scientific possessed internal complaint and device-performance information concerning these failure

modes, and its representatives had direct knowledge of Plaintiff's reported symptoms, responses to prior reprogramming, and continuing complications.

534. Plaintiff relied on these representations in electing not to have the system removed earlier than he ultimately did, causing his additional and continued injuries.

535. Boston Scientific and its sales representatives intended for Plaintiff and his physicians to rely on these representations by continuing to use the devices, undergoing additional reprogramming, and refraining from seeking further medical evaluation or removal.

536. Plaintiff justifiably relied on these representations in continuing to use his SCS devices and electing not to have them removed earlier than he ultimately did. Their reliance was reasonable in light of Boston Scientific's superior knowledge as the manufacturer, the representatives' involvement in device programming, and the authority with which the representatives communicated.

537. Had Boston Scientific and its representatives accurately disclosed the significance of Plaintiff's complications and the limitations of reprogramming, Plaintiff would have sought further medical evaluation and earlier removal, thereby avoiding or reducing his continued exposure to malfunctioning devices and the resulting harm.

538. As a direct and proximate result of Defendants' fraudulent misrepresentations and omissions, Plaintiff consented to implantation and, after complications arose, continued using and delayed removal of his SCS devices. Those misrepresentations thereby caused Plaintiff to undergo implantation of and remain exposed to devices that failed through lead migration, lead failure, IPG/battery malfunction, uncontrolled electrical stimulation, and other malfunctions described herein. They also caused Plaintiff to retain the implanted devices longer, thereby causing exacerbation of his injuries and an escalation to permanence due to the failure to timely remove the insult on the nerve.

539. Those device failures, in turn, directly and proximately caused Plaintiff's

injuries. Plaintiff's continued use and delayed removal of the malfunctioning devices prolonged his exposure to those failures and caused or aggravated his injuries.

540. Plaintiff's reliance on Defendants' misrepresentations was a substantial factor in causing Plaintiff's harm. As a direct and proximate result of the foregoing, Plaintiff sustained significant injuries, including physical pain, autonomic dysfunction, emotional distress, medical expenses, lost income, diminished quality of life, and other consequential damages.

541. WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendants, as contained in the Prayer for Relief.

## COUNT XV – FRAUDULENT CONCEALMENT

542. Plaintiff incorporates by reference all factual allegations set forth above in ¶¶ 1–294 as if fully set forth herein.

543. Defendants Boston Scientific Corporation and Boston Scientific Neuromodulation Corporation concealed material facts relating to the risks, regulatory status, and performance of the spinal cord stimulator system that was implanted in Plaintiff, as well as the qualifications and conduct of the sales and clinical representatives who interacted with Plaintiff and his treating physicians.

544. As the manufacturers and distributors of the SCS devices, Defendants possessed superior knowledge concerning the devices' design, clinical performance, failure modes, regulatory history, and associated risks. Defendants also possessed superior knowledge concerning their representatives' training, qualifications, assigned responsibilities, and limitations. These facts were not known to Plaintiff or his treating physicians and were not reasonably discoverable through inspection of the devices or independent inquiry by Plaintiff. Defendants knew that these facts were not known to, or reasonably discoverable by, Plaintiff or his treating physicians.

545. Defendants made affirmative representations concerning the devices' safety and efficacy and their representatives' ability to provide device-related support, while withholding material information necessary to make those representations

complete and not misleading. Defendants' superior knowledge, partial disclosures, and ongoing communications with Plaintiff and his treating physicians gave rise to a duty to disclose the concealed facts.

546. Defendants obtained or had access to material information concerning device performance and adverse events through internal testing, complaint files, post-market surveillance, and their federal reporting and post-approval activities. Plaintiff alleges that Defendants concealed material information obtained through those activities while continuing to promote the devices and provide patient-specific assurances concerning their safety, performance, and continued use.

547. These material facts Defendants concealed include:

a. That the SCS devices deviated from the FDA-approved specifications, including with respect to lead insulation sheath material, lead wire integrity, and hermetic sealing processes, and that the spinal cord stimulator system had undergone multiple PMA Supplements that substantially modified waveform programming; and

b. That Defendants possessed post-market information concerning these failures that was not accurately reflected in their communications to Plaintiff and his treating physicians.

548. Despite the contents of the FDA-approved labeling, Defendants failed to provide those warnings, or nullified the warnings they gave, and thereby also concealed material facts concerning the significance of device failures and the limitations of reprogramming, including:

a. That lead failure and IPG/battery malfunction could cause neurological injury and permanent nerve damage;

b. That repeated reprogramming could not correct the underlying lead fracture, insulation breach, lead migration, or IPG/battery malfunction responsible for Plaintiff's complications;

c. That assurances concerning further reprogramming did not

adequately disclose the need to evaluate Plaintiff for underlying device failure; and

d. That continued use or delayed removal of a failing device could prolong exposure to harmful stimulation and cause or aggravate neurological injury.

549. Defendants and their agents also concealed material facts concerning the qualifications and conduct of their sales and clinical representatives, including:

a. That the representatives providing patient-specific advice and performing device-related services lacked the healthcare licenses, training, or qualifications necessary to perform certain functions they undertook;

b. That the representatives were performing activities beyond their permitted device-support role, including conduct Plaintiff alleges constituted the unauthorized practice of medicine;

c. That the representatives' role and qualifications did not authorize them to independently determine the medical significance of Plaintiff's symptoms or whether further medical evaluation, revision, replacement, or removal was necessary; and

d. That the representatives were trained or incentivized to encourage implantation and continued device use and to discourage removal in a manner that prioritized Defendants' financial interests over Plaintiff's welfare.

550. These representations and conduct are part of a consistent and pervasive pattern of conduct by the Defendants and extend beyond Plaintiff to the other plaintiffs identified in footnote 46. The specific representations made to Plaintiff are alleged in Section V of this Complaint.

551. Defendants knew the concealed facts through their design and manufacturing activities, internal testing, complaint investigations, post-market

surveillance, and oversight of their representatives. Nevertheless, Defendants intentionally withheld that information while continuing to make affirmative representations concerning the devices' safety and performance and the ability of their representatives to address Plaintiff's complications.

552. The concealed facts were material to Plaintiff's and his treating physicians' decisions concerning whether to proceed with trial implantation, whether to proceed with permanent implantation, and whether to continue device use or seek timely medical evaluation and removal after complications arose. A reasonable person in Plaintiff's position would have considered this information important in making those decisions.

553. Defendants concealed these facts with the intent to deceive Plaintiff and his treating physicians and to induce Plaintiff's healthcare providers to recommend, and Plaintiff to consent to, implantation and continued use of the SCS devices. After complications arose, Defendants continued to withhold material information to induce Plaintiff to undergo further reprogramming and delay seeking removal, thereby generating and preserving Defendants' device-related revenue.

554. This concealment was intentional rather than inadvertent and was undertaken to promote device adoption and continued use by withholding adverse information from Plaintiff and his treating physicians.

555. Unaware of the concealed facts, Plaintiff justifiably relied on Defendants' partial disclosures, affirmative assurances of safety and efficacy, and failure to disclose information materially qualifying those assurances. Plaintiff's treating physicians likewise made recommendations without the material information Defendants withheld.

556. Plaintiff had no reasonable means of independently discovering the concealed information concerning device failure rates, IPG/battery malfunction, the risks of continued use following device failure, or the actual qualifications and limitations of Defendants' representatives. Plaintiff's reliance was reasonable given

Defendants' superior knowledge, the medical setting of the interactions, and the authority with which the representatives presented their device-related advice and services.

557. In reliance on the incomplete and misleading information Defendants provided, Plaintiff consented to implantation of the SCS devices and, after complications arose, continued using the devices and delayed seeking further medical evaluation or removal. Defendants' concealment thereby deprived Plaintiff and his treating physicians of the information necessary to make informed implantation and subsequent treatment decisions.

558. Defendants had a duty to disclose these materials facts due to their special relationship with Plaintiff they voluntarily undertook with respect to the SCS devices.

559. Had Defendants disclosed the material facts described herein, Plaintiff would not have consented to implantation or would have sought further medical evaluation and earlier removal after complications arose, thereby avoiding or reducing the resulting harm.

560. Defendants' concealment was a substantial factor in causing Plaintiff's harm. As a direct and proximate result of Defendants' fraudulent concealment, Plaintiff underwent implantation of and remained exposed to SCS devices that failed through lead migration, lead fracture, insulation breach, IPG/battery malfunction, and other malfunctions described herein. Those device failures, in turn, directly and proximately caused Plaintiff's injuries, while continued use and delayed removal prolonged his exposure to the malfunctioning devices and aggravated his injuries.

561. As a direct and proximate result of the foregoing, Plaintiff sustained serious injuries and damages, including, but not limited to, bodily injury; permanent nerve damage; chronic pain; severe physical pain and suffering; emotional distress and mental anguish; diminished enjoyment of life; medical and related expenses; loss of earnings; disability; and the other injuries and damages described herein.

562. WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted

relief against Defendants, as contained in the Prayer for Relief.

## COUNT XVI - VICARIOUS LIABILITY

(Respondeat Superior)

563. Plaintiff incorporates by reference all factual allegations set forth above in ¶¶ 1–294 as if fully set forth herein.

564. Plaintiff provides the following paragraphs as an allegation section to be applied as needed to the appropriate counts, rather than a request for relief.

565. At all relevant times, Boston Scientific's sales and clinical representatives were employees or agents of Boston Scientific acting within the course and scope of their employment and/or agency relationship with Boston Scientific in all respects relevant to this action. All Boston Scientific representatives who interacted in any way with Plaintiff or Plaintiff's physicians, regardless of how Boston Scientific refers to these individuals, are hereafter referred to as "sales representatives."

566. Evidence of the employment relationship and intended scope of duties can be seen, for example, in job postings for positions directly with Boston Scientific.[61] Calling the positions "clinical specialists" and "territory managers," Boston Scientific has identical job descriptions for positions all over the country.

567. The sales representatives' conduct — including actively participating in device selection, actively participating in device programming, making medical representations to Plaintiff, and advising Plaintiff on treatment decisions regarding the SCS devices — was undertaken in furtherance of Boston Scientific's business interests, within the scope of the sales representatives' assigned duties, and in the manner authorized, directed, or ratified by Boston Scientific.

568. In undertaking these activities, the sales representatives acted on Boston Scientific's behalf to promote the implantation and continued use of its SCS devices and to provide device-related support to Plaintiff and his treating physicians.

---

[61] *See* Ex. A.

569. By voluntarily undertaking programming, reprogramming, adjustments, and other device-related services, the sales representatives assumed a duty to exercise reasonable care in performing those services. Plaintiff alleges that the representatives negligently performed the services they undertook, including when they exceeded the limits of their training, qualifications, or permitted device-support role while carrying out their assigned responsibilities on Boston Scientific's behalf.

570. The sales representatives' negligent and wrongful acts and omissions included, but were not limited to:

a. Participating in device selection and making recommendations concerning Plaintiff's suitability for implantation without sufficient knowledge, training, or qualifications;

b. Negligently programming, reprogramming, or adjusting Plaintiff's SCS devices without sufficient knowledge, skill, or expertise;

c. Continuing to reprogram or adjust Plaintiff's devices when they knew or reasonably should have known that further reprogramming would not correct the underlying malfunction or alleviate Plaintiff's complications;

d. Providing medical advice and making patient-specific treatment recommendations beyond their qualifications and permitted device-support role, including conduct alleged herein to constitute the unauthorized practice of medicine;

e. Providing false, misleading, or incomplete information concerning the devices' safety, performance, risks, and expected therapeutic benefits;

f. Failing to provide or accurately convey existing FDA-approved warnings and instructions and making statements that contradicted, minimized, or undermined those warnings and instructions;

g. Misrepresenting that Plaintiff's complications were unrelated to the SCS devices or could be resolved through additional programming or

reprogramming;

h. Advising Plaintiff to continue using malfunctioning devices or to forgo or delay appropriate medical evaluation and treatment; and

i. Advising Plaintiff to delay revision, replacement, or removal of the devices, thereby prolonging his exposure to malfunctioning devices and causing or aggravating his injuries.

571. These acts and omissions occurred in the course of the sales representatives' performance of their assigned sales and device-support responsibilities for Boston Scientific. Although particular acts exceeded the representatives' training, qualifications, or permitted device-support role, those acts were undertaken while performing services on Boston Scientific's behalf and in furtherance of its business interests. Those acts were reasonably related to the kinds of tasks the sales representatives were employed to perform, including device selection, programming, troubleshooting, and patient-facing device support, and were reasonably foreseeable in light of Boston Scientific's business and the representatives' job responsibilities.

572. Under the respondeat superior doctrine, Boston Scientific is vicariously liable for all of the negligent and wrongful acts and omissions of its sales representatives committed within the scope of their employment and/or agency relationships, including the conduct described herein.

573. As a direct and proximate result of the sales representatives' acts and omissions, Plaintiff underwent implantation of SCS devices that subsequently failed, received negligently performed programming and adjustment services, and/or continued using malfunctioning devices while delaying appropriate medical evaluation, treatment, or removal. The device failures and negligently performed services, together with the prolonged exposure to malfunctioning devices, directly and proximately caused Plaintiff's injuries. The sales representatives' acts and omissions, committed within the scope of their employment and agency, were a substantial factor in causing Plaintiff's harm.

574. As a direct and proximate result of the foregoing conduct, for which Boston Scientific is vicariously liable, Plaintiff sustained serious injuries and damages, including, but not limited to, bodily injury; permanent nerve damage; chronic pain; severe physical pain and suffering; emotional distress and mental anguish; diminished enjoyment of life; medical and related expenses; loss of earnings; and disability, all of which losses and damages will continue into the future.

575. To the extent the Court determines that any applicable state statutory product-liability or exclusive-remedy provision governs or supersedes a common-law theory alleged herein, Plaintiff alternatively seek relief under that applicable statutory provision based on the same acts, omissions, injuries, and damages alleged in this Complaint.

576. WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, punitive damages where permitted, attorneys' fees where allowed by statute, costs of suit, pre- and post-judgment interest, and all such other and further relief as the Court deems just and proper.

## COUNT XVII – NEGLIGENCE

(Corporate – Against Boston Scientific Defendants)

577. Plaintiff incorporates by reference all factual allegations set forth above in ¶¶ 1–294 as if fully set forth herein.

578. Boston Scientific owed Plaintiff a direct, non-delegable corporate duty of care to exercise ordinary care with respect to Boston Scientific's own institutional conduct. This Count rests on Boston Scientific's own conduct in designing, staffing, compensating, training, and supervising its field sales and clinical support operation. It does not depend on whether any individual representative acted within the scope of employment, and it applies with particular force where representatives exceeded their permitted role.

579. As a result of its possession of sales representative notes and complaints

from patients and physicians,[62] Boston Scientific knew or should have known its sales and clinical representatives were engaged in the unauthorized practice of medicine and were making material misrepresentations to patients, and Boston Scientific constructed and maintained the corporate structure and compensation scheme that enabled and incentivized this conduct.

580. Evidence of the employment relationship and intended scope of duties can be seen, for example, in job postings for positions directly with Boston Scientific.[63] Calling the positions "clinical specialists" and "territory managers," Boston Scientific has identical job descriptions for positions all over the country.

581. Moreover, Boston Scientific had a duty to conduct itself as a reasonable medical device company in same or similar circumstances. In this instance, that includes selling medical devices for pain relief to vulnerable patient populations suffering from chronic pain. In addition, it is a company with devices controlled by the sales representatives, thereby introducing an increased degree of patient-sales representative contact.

582. Boston Scientific breached its corporate duty of care by: (a) designing and implementing a business model that deployed sales and clinical representatives in the operating room and in post-operative care settings in a role that exceeded permissible technical support and constituted the practice of medicine; (b) establishing a compensation structure that financially incentivized representatives to maximize device implantations and discourage device removal; (c) failing to establish adequate

---

[62] *See*, *e.g.*, *Ollie Wilson v. Boston Scientific Corporation*, 2:25-cv-09958-JLS-PD; *Linda Guthrie v. Boston Scientific Corporation*, 2:25-cv-11508-JLS-PD; *Sherri Miyagi v. Boston Scientific Corporation*, 2:26-cv-06419-JLS-PD; *Tone Silas v. Boston Scientific Corporation*, 2:26-cv-03679-JLS-PD; *Steven Joe Cooper v. Boston Scientific Corporation*, 2:26-cv-12020-JLS-PD; *Myra Boyd v. Boston Scientific Corporation*, 2:26-cv-09806-JLS-PD; *Cynthia Galary v. Boston Scientific Corporation*, 2:26-cv-11311-JLS-PD; *Darrin Peterson v. Boston Scientific Corporation*, 2:26-cv-11312-JLS-PD; *Daniel Carmack v. Boston Scientific Corporation*, 2:26-cv-12158-JLS-PD; *Gloria Castleberry v. Boston Scientific Corporation*, 2:26-cv-10953-JLS-PD.

[63] *See* Ex. A.

policies and procedures limiting representatives to permissible conduct; (d) failing to train, supervise, and discipline representatives to ensure compliance with applicable state medical practice laws; (e) affirmatively directing and ratifying the representatives' unlawful conduct; and (f) failing to ensure the SCS devices were manufactured and promoted in compliance with FDA-approved specifications.

583. Boston Scientific's corporate negligence was a substantial factor in causing Plaintiff's harm and was a direct and proximate cause of Plaintiff's injuries, including Plaintiff's initial implantation of the SCS devices based on misrepresentations, Plaintiff's delayed removal of the SCS devices based on continuing misrepresentations, and the resulting injuries and damages, including bodily injury, permanent nerve damage, chronic pain, severe physical pain and suffering, emotional distress and mental anguish, diminished enjoyment of life, medical and related expenses, loss of earnings, and disability.

584. WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendants, as contained in the Prayer For Relief.

## COUNT XVIII – NEGLIGENT HIRING

585. Plaintiff incorporates by reference all factual allegations set forth above in ¶¶ 1–294 as if fully set forth herein.

586. At all relevant times, Defendants employed the sales and clinical representatives who interacted with Plaintiff and his treating physicians, including the representatives who programmed and reprogrammed Plaintiff's SCS devices, adjusted stimulation settings, provided troubleshooting services, and made patient-specific representations concerning device performance and complications.

587. Defendants owed Plaintiff a duty to exercise reasonable care in hiring individuals to perform these responsibilities. That duty included reasonably evaluating whether prospective employees possessed the knowledge, training, experience, competence, and judgment necessary to safely perform their assigned device-support functions and recognize the limits of their permitted role.

588. Evidence of the employment relationship and intended scope of duties can be seen, for example, in job postings for positions directly with Boston Scientific.[64] Calling the positions "clinical specialists" and "territory managers," Boston Scientific has identical job descriptions for positions all over the country.

589. Defendants knew or reasonably should have anticipated that the representatives they hired would interact with patients experiencing device-related symptoms and would participate in programming, reprogramming, and troubleshooting implanted SCS devices. Defendants further knew or reasonably should have anticipated that patients and treating physicians would rely on those representatives' claimed device expertise.

590. Job duties for these positions show that these positions were intended to exceed the permissible scope for non-physicians and have a high degree of patient interaction by including job duties such as:

a. Provide expert clinical support through programming, troubleshooting, and intraoperative guidance for spinal cord stimulation procedures;

b. Deliver patient follow-up care, ensuring optimal therapy performance and long-term success;

c. Take an integral role in patient follow-up care by regularly monitoring therapy progress, addressing patient needs, and collaborating with healthcare teams to ensure optimal outcomes and satisfaction with company products;

d. Actively participate in surgical cases within hospital and surgery center environments, providing hands-on support throughout procedures;

e. Serve as a resource for current and prospective customers, providing updates on innovations and evidence-based therapies to support

---

[64] *See* Ex. A.

informed decision-making in pain management; and

f. Territory Manager will oversee the entire SCS process of patient care, pre-surgical education, post-surgical follow ups and long-term care of the device.

591. Defendants knew or should have known that the representatives they hired were not qualified to perform these responsibilities, because the only required qualifications for the positions are a bachelor's degree or an equivalent combination of education and experience and a minimum of two years' work experience in a sales and/or clinical role.

592. The representatives who provided services to Plaintiff were unfit or insufficiently competent for the responsibilities Defendants hired them to perform. Their deficiencies included insufficient knowledge, skill, experience, or judgment to:

a. Safely perform programming, reprogramming, adjustments, and troubleshooting within their assigned role;

b. Recognize when persistent symptoms or unsuccessful reprogramming indicated a need for physician evaluation rather than further adjustments;

c. Accurately communicate the limitations of reprogramming as a response to lead failure, lead migration, IPG/battery malfunction, and other device failures;

d. Distinguish permissible technical support from patient-specific medical assessment and treatment advice; and

e. Refrain from providing unsupported assurances concerning the cause of symptoms, the effectiveness of further reprogramming, or the need for medical evaluation or removal.

593. At the time of hiring, Defendants knew or, through the exercise of reasonable care in evaluating the representatives' qualifications and suitability, should have known of these deficiencies. Defendants also knew or should have known that

these deficiencies created a particular risk of harm to patients, including Plaintiff, because Defendants hired the representatives to interact with patients experiencing device-related symptoms and to program, reprogram, and troubleshoot implanted SCS devices, and Defendants knew that patients and treating physicians would rely on the representatives' claimed device expertise.

594. Defendants breached their duty of reasonable care by hiring these representatives for patient-facing and device-support responsibilities despite their known or reasonably discoverable lack of competence or fitness for those responsibilities, including by:

a. Failing to adequately evaluate their relevant education, technical training, experience, and qualifications;

b. Failing to reasonably assess their ability to safely perform the programming, reprogramming, and troubleshooting responsibilities they would be assigned;

c. Failing to reasonably assess their ability to recognize and adhere to the limits of a nonphysician device-support role; and

d. Hiring them for responsibilities requiring patient-safety judgments they were not competent to make.

595. After being hired, these representatives engaged in conduct reflecting the deficiencies that Defendants knew or reasonably should have discovered at hiring. That conduct included continuing ineffective reprogramming, providing unsupported assurances that Plaintiff's symptoms were unrelated to device failure or could be resolved through further adjustments, and advising Plaintiff to continue device use or delay appropriate medical evaluation and removal.

596. The representatives' acts and omissions caused Plaintiff to rely on ineffective troubleshooting and inaccurate patient-specific assurances, continue using malfunctioning devices, and delay seeking appropriate medical evaluation and treatment.

597. Defendants' negligent hiring placed the representatives in positions to provide the services and assurances on which Plaintiff relied. The resulting harm was a foreseeable consequence of the representatives' lack of competence or fitness for the responsibilities Defendants hired them to perform.

598. Plaintiff's SCS devices failed because of their underlying defects. The representatives' acts and omissions caused Plaintiff to remain exposed to the failing devices and delayed appropriate medical evaluation and treatment. The device failures directly and proximately caused Plaintiff's physical injuries, while the continued use and delayed treatment prolonged his exposure to those failures and caused additional injury or aggravated injuries that otherwise would have been avoided or less severe.

599. Defendants' negligence in hiring the representatives was therefore a substantial factor in causing Plaintiff's harm and a direct and proximate cause of the additional or aggravated injuries resulting from the representatives' conduct.

600. As a direct and proximate result of Defendants' negligent hiring, Plaintiff sustained serious injuries and damages, including, but not limited to, bodily injury; permanent nerve damage; chronic pain; severe physical pain and suffering; emotional distress and mental anguish; diminished enjoyment of life; medical and related expenses; loss of earnings; and disability, all of which losses and damages will continue into the future.

601. WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendants as contained in the Prayer for Relief.

## COUNT XIX - NEGLIGENT TRAINING

602. Plaintiff incorporates by reference all factual allegations set forth above in ¶¶ 1–294 as if fully set forth herein.

603. Defendants owed a duty to Plaintiff to adequately train its sales and clinical representatives on: (a) the legal scope of their permissible activities in clinical settings, including the prohibition on the unauthorized practice of medicine; (b) the accurate, truthful, and complete disclosure of the risks and limitations of the Boston

Scientific SCS Products to patients and physicians; and (c) the proper response to patient complaints, complications, and signs of device failure, including advising patients to seek timely medical evaluation and, where warranted, device removal.

604. Defendants breached their duty to train their representatives by: (a) failing to provide training on the applicable prohibitions against the unauthorized practice of medicine; (b) training representatives to minimize, dismiss, and counter patient concerns about device complications and to encourage continued device use regardless of patient symptoms; (c) training representatives to represent that reprogramming would resolve complications without disclosing that reprogramming cannot remediate lead failure or IPG/battery malfunction; and (d) failing to train representatives on the known risk of permanent nerve damage arising from delayed removal of a failing device. In doing so, Defendants failed to act with reasonable care and knew, or should have known, that their training was inadequate.

605. Defendants' breach of their duty to train their representatives was a substantial factor in causing Plaintiff's harm and a direct and proximate cause of Plaintiff's injuries. Had the representatives been adequately trained, they would not have engaged in the unauthorized practice of medicine with respect to Plaintiff, would not have made material misrepresentations about device performance and the significance of complications, and would not have discouraged Plaintiff from seeking timely removal of the failing devices. Plaintiff's harm was a foreseeable consequence of Defendants' failure to train their representatives on the limits of their role.

606. As a direct and proximate result of Defendants' negligent training, their sales and clinical representatives failed to appropriately respond to signs that Plaintiff's SCS devices were failing due to underlying defects and instead continued reprogramming and advised Plaintiff to continue using the devices, delaying appropriate medical evaluation and treatment. The device failures directly and proximately caused Plaintiff's injuries, while the continued use and delayed treatment prolonged Plaintiff's exposure to the malfunctioning devices and aggravated those

injuries. Plaintiff thereby sustained the injuries and damages described herein, including bodily injury; permanent nerve damage; chronic pain; severe physical pain and suffering; emotional distress and mental anguish; diminished enjoyment of life; medical and related expenses; loss of earnings; and disability, all of which losses and damages will continue into the future.

607. WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, punitive damages where permitted, attorneys' fees where allowed by statute, costs of suit, pre- and post-judgment interest, and all such other and further relief as the Court deems just and proper.

## COUNT XX – NEGLIGENT SUPERVISION

608. Plaintiff incorporates by reference all factual allegations set forth above in ¶¶ 1–294 as if fully set forth herein.

609. Defendants employed the sales and clinical representatives who interacted with Plaintiff and Plaintiff's treating physicians, and Defendants had the right and the duty to control those representatives' conduct. Defendants owed a duty to Plaintiff to adequately supervise their sales and clinical representatives to ensure those representatives did not: (a) engage in the unauthorized practice of medicine; (b) make material misrepresentations to patients regarding the safety and efficacy of Defendants' SCS devices; or (c) advise patients to retain failing devices contrary to Plaintiff's medical interests.

610. Defendants knew or should have known that their representatives were engaging in the unauthorized practice of medicine, making material misrepresentations to patients, and inducing patients to delay device removal. This knowledge arose from, among other sources: (a) the nature of the representatives' assigned roles, which placed them in clinical settings with patients and physicians; (b) the compensation structure, which incentivized the conduct described herein; and (c) actual notice through complaints, adverse event reports, and publicly filed litigation. Defendants also knew or should have known that this conduct created a particular risk of harm to patients,

including Plaintiff.

611. Defendants failed to exercise ordinary care in supervising their representatives and breached their duty of supervision by failing to adequately monitor, review, and correct the conduct of their representatives; by failing to implement and enforce compliance protocols limiting representatives to permissible non-medical technical support activities; by failing to discipline representatives for known violations of those limits; and by failing to take corrective action upon learning of instances of impermissible conduct.

612. Defendants' representatives committed tortious acts against Plaintiff, including the negligent conduct, misrepresentations, and unauthorized practice of medicine alleged above. Defendants' breach of their supervisory duty was a substantial factor in causing Plaintiff's harm and a direct and proximate cause of Plaintiff's injuries, in that the absence of adequate supervision allowed the sales representatives' unlawful conduct to continue unchecked, resulting in Plaintiff's implantation and delayed removal of defective devices and the permanent nerve damage resulting therefrom.

613. As a direct and proximate result of Defendants' negligent supervision, their sales and clinical representatives failed to appropriately respond to signs that Plaintiff's SCS devices were failing due to underlying defects and instead continued reprogramming and advised Plaintiff to continue using the devices, delaying appropriate medical evaluation and treatment. The device failures directly and proximately caused Plaintiff's injuries, while the continued use and delayed treatment prolonged Plaintiff's exposure to the malfunctioning devices and aggravated those injuries. Plaintiff thereby sustained the injuries and damages described herein, including bodily injury; permanent nerve damage; chronic pain; severe physical pain and suffering; emotional distress and mental anguish; diminished enjoyment of life; medical and related expenses; loss of earnings; and disability, all of which losses and damages will continue into the future.

614. WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendants, as contained in the Prayer For Relief.

**COUNT XXI - NEGLIGENT RETENTION**

615. Plaintiff incorporates by reference all factual allegations set forth above in ¶¶ 1–294 as if fully set forth herein.

616. Defendants employed the sales and clinical representatives who interacted with Plaintiff and Plaintiff's treating physicians. Defendants owed a duty to Plaintiff not to retain sales and clinical representatives whom they knew, or in the exercise of reasonable care should have known, were engaging in conduct that posed an unreasonable risk of harm to patients, including by engaging in the unauthorized practice of medicine and making material misrepresentations to induce device implantation and discourage removal.

617. Upon information and belief, Defendants knew or should have known that the representatives who interacted with Plaintiff had become unfit and incompetent for their patient-facing roles, and that this unfitness created a particular risk of harm to patients, because before their interactions with Plaintiff those representatives had engaged in the same pattern of conduct with other patients and in other clinical settings — engaging in the unauthorized practice of medicine, making misleading representations, and improperly discouraging device removal.

618. This knowledge arose from, inter alia, the systemic nature of the conduct (which reflected Defendants' institutional practices rather than individual deviation), prior patient and physician complaints, sales representative notes and complaint logs, and prior adverse event reports.

619. Despite this knowledge, Defendants retained the representatives in their positions, and the representatives continued to engage in this conduct with Plaintiff, including the negligent programming, misrepresentations, and unauthorized practice of medicine alleged above. Defendants' decision to retain the representatives in these roles, despite knowledge of their propensity for the conduct described herein, was a

substantial factor in causing Plaintiff's harm and a direct and proximate cause of Plaintiff's injuries.

620. As a direct and proximate result of Defendants' negligent retention of their agents, their sales and clinical representatives failed to appropriately respond to signs that Plaintiff's SCS devices were failing due to underlying defects and instead continued reprogramming and advised Plaintiff to continue using the devices, delaying appropriate medical evaluation and treatment. The device failures directly and proximately caused Plaintiff's injuries, while the continued use and delayed treatment prolonged Plaintiff's exposure to the malfunctioning devices and aggravated those injuries. Plaintiff thereby sustained the injuries and damages described herein, including bodily injury; permanent nerve damage; chronic pain; severe physical pain and suffering; emotional distress and mental anguish; diminished enjoyment of life; medical and related expenses; loss of earnings; and disability, all of which losses and damages will continue into the future.

621. WHEREFORE, Plaintiff demands judgment against Defendants for compensatory damages, punitive damages where permitted, attorneys' fees where allowed by statute, costs of suit, pre- and post-judgment interest, and all such other and further relief as the Court deems just and proper.

## COUNT XXII – VIOLATION OF CONSUMER PROTECTION LAW AND/OR UNFAIR AND DECEPTIVE TRADE PRACTICES

622. Plaintiff incorporates by reference all factual allegations set forth above in ¶¶ 1–294 as if fully set forth herein.

623. Defendants have a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of their SCS devices, including those devices implanted in Plaintiff. Plaintiff is a consumer who acquired the SCS devices by purchase, directly or through the hospitals, surgical centers, and physicians that acquired the devices for implantation in Plaintiff, for personal purposes, namely the treatment of Plaintiff's own chronic pain.

624. Defendants initiated, conducted, and participated in unfair methods of competition or deceptive acts or practices that were proscribed by law, including the following:

a. Advertising the device as safe and effective without disclosing the deviations from FDA-approved specifications associated with its creation and marketing;

b. Omitting material risks from marketing materials, sales presentations, and direct-to-patient communications;

c. Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

d. Advertising goods or services with the intent not to sell them as advertised;

e. Representing to Plaintiff that the permanent SCS device would be the same as the trial device and had little to no side effects, while omitting known risks including unintended electrical shocking; and

f. Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

625. Plaintiff was injured by the cumulative and indivisible nature of Defendants' conduct, particularly because Plaintiff relied on Defendants' representations and omissions. The cumulative effect of Defendants' conduct directed at patients, physicians and consumers was to create demand for and sell the SCS devices. Each aspect of Defendants' conduct combined to artificially create sales of the SCS systems.

626. Had Defendants not engaged in the deceptive conduct described herein, Plaintiff, his physicians, and hospitals and medical centers would not have purchased and/or paid for the SCS systems, and would not have incurred related medical costs and injuries.

627. Defendants engaged in wrongful conduct while at the same time

obtaining, under false pretenses, moneys from Plaintiff, his physicians, and hospitals for the SCS systems that would not have been paid had Defendants not engaged in unfair and deceptive conduct.

628. Defendants' deceptive, unconscionable, or fraudulent representations and material omissions to patients, physicians and consumers, including Plaintiff, constituted unfair and deceptive acts and trade practices in violation of the state consumer protection statutes listed.

629. Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts, or trade practices in violation of state consumer protection statutes, as listed below.

630. Defendants have engaged in unfair competition or unfair or deceptive acts or trade practices or have made false representations in violation of the statutes listed below, as well as any additional consumer protection statutes identified in Section V of this Complaint:

a. Ala. Code §§ 8-19-1 et seq.;

b. Alaska Stat. §§ 45.50.471 et seq.;

c. Ariz. Rev. Stat. Ann. §§ 44-1522 et seq.;

d. Ark. Code Ann. §§ 4-88-101 et seq.;

e. Cal. Civ. Code §§ 1770 et seq. and Cal. Bus. & Prof. Code §§ 17200 et seq.;

f. Colo. Rev. Stat. §§ 6-1-105 et seq.;

g. Conn. Gen. Stat. §§ 42-110a et seq.;

h. Del. Code Ann. tit. 6, §§ 2511 et seq. and §§ 2531 et seq.;

i. D.C. Code Ann. §§ 28-3901 et seq.;

j. Fla. Stat. Ann. §§ 501.201 et seq.;

k. O.C.G.A. §§ 10-1-370 et seq. and §§ 10-1-390;

l. Haw. Rev. Stat. §§ 480-1 et seq.;

m. Idaho Code Ann. §§ 48-601 et seq.;

n. Ill. Comp. Stat. Ann. ch. 815, 505/1 et seq.;

o. Ind. Code Ann. §§ 24-5-0.5-1 et seq.;

p. Iowa Code Ann. §§ 714.16 et seq.;

q. Kan. Stat. Ann. §§ 50-623 et seq.;

r. Ky. Rev. Stat. Ann. §§ 367.170 et seq.;

s. La. Rev. Stat. Ann. §§ 51:1401 et seq.;

t. Me. Rev. Stat. Ann. tit. 5, §§ 205A et seq.;

u. Md. Code Ann., Com. Law §§ 13-101 et seq.;

v. Mass. Gen. Laws Ann. Ch. 93A et seq.;

w. Mich. Comp. Laws §§ 445.901 et seq.;

x. Minn. Stat. §§ 325D.43 et seq. and §§ 325F.67 et seq.;

y. Miss. Code Ann. §§ 75-24-1 et seq.;

z. Mo. Ann. Stat. §§ 407.010 et seq.;

aa. Mont. Code Ann. §§ 30-14-101 et seq.;

bb. Neb. Rev. Stat. §§ 59-1601 et seq.;

cc. Nev. Rev. Stat. §§ 598.0903 et seq.;

dd. N.H. Rev. Stat. Ann. §§ 358-A:1 et seq.;

ee. N.J.S.A. §§ 56:8-1 et seq.;

ff. N.M. Stat. Ann. §§ 57-12-1 et seq.;

gg. N.Y. Gen. Bus. Law §§ 349 et seq.;

hh. N.C. Gen. Stat. §§ 75-1.1 et seq.;

ii. N.D. Cent. Code §§ 51-12-01 et seq. and §§ 51-15-01 et seq.;

jj. Ohio Rev. Code Ann. §§ 1345.01 et seq.;

kk. 15 Okl. St. §§ 751 et seq.;

ll. Or. Rev. Stat. §§ 646.605 et seq.;

mm. 73 Pa. Stat. §§ 201-1 et seq.;

nn. R.I. Gen. Laws §§ 6-13.1-1 et seq.;

oo. S.C. Code Ann. §§ 39-5-10 et seq.;

pp. S.D. Codified Laws §§ 37-24-1 et seq.;

qq. Tenn. Code Ann. §§ 47-18-101 et seq.;

rr. Tex. Bus. & Com. Code Ann. §§ 17.41 et seq.;

ss. Utah Code Ann. §§ 13-11-1 et seq.;

tt. Vt. Stat. Ann. tit. 9, §§ 2451 et seq.;

uu. Va. Code Ann. §§ 59.1-196 et seq.;

vv. Wash. Rev. Code §§ 19.86.010 et seq.;

ww. W. Va. Code §§ 46A-6-101 et seq.;

xx. Wis. Stat. Ann. §§ 100.20 et seq.; and

yy. Wyo. Stat. Ann. §§ 40-12-101 et seq.

631. Under the statutes listed above, which protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, Defendants are the suppliers, manufacturers, advertisers, and sellers, who are subject to liability under such legislation for unfair, deceptive, fraudulent and unconscionable consumer sales practices.

632. Defendants violated the statutes that were enacted in these states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, by knowingly and falsely representing that the SCS systems were safe and effective.

633. Defendants had adequate notice under the applicable law as described in ¶¶ 232–236.

634. The law and facts applicable to Plaintiff's claims are identified in the Applicable Law section above and in Section V of this Complaint.

635. The actions and omissions of Defendants alleged herein are uncured or incurable deceptive acts under the statutes enacted in the states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising.

636. These deviations are further supported by the Plaintiff-specific allegations

in Section V of this Complaint.

637. Plaintiff and the medical community relied upon Defendants' misrepresentations and omissions in determining which SCS system to use. Defendants' misrepresentations and omissions were a substantial factor in Plaintiff's decisions to undergo implantation of the SCS devices and to continue using them. The misrepresented and omitted facts were material because a reasonable consumer would consider them important in deciding whether to acquire an SCS device.

638. Defendants' deceptive, unconscionable or fraudulent representations and material omissions to patients, physicians, and consumers, constituted unfair and deceptive acts and practices. Defendants' conduct was likely to mislead a reasonable consumer and, indeed, did mislead Plaintiff and his healthcare providers.

639. By reason of the unlawful acts engaged in by Defendants, and as a direct and proximate result thereof, Plaintiff has suffered ascertainable losses and damages.

640. As a direct and proximate result of Defendants' deceptive conduct in violation of the provided states' consumer protection laws, Plaintiff has sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

641. WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendants, as contained in the Prayer For Relief.

## COUNT XXIII – UNJUST ENRICHMENT

642. Plaintiff incorporates by reference all factual allegations set forth above in ¶¶ 1–294 as if fully set forth herein.

643. This Count is asserted under the common law of unjust enrichment, restitution, or quasi-contract of each jurisdiction whose law governs Plaintiff's claims. To the extent Plaintiff's claims are governed by the law of a jurisdiction that does not recognize unjust enrichment as an independent cause of action, this Count is asserted as a quasi-contract claim for restitution. Where that jurisdiction's law permits, it is also asserted as a basis for restitutionary relief under the other Counts of this Complaint.

644. This Count is pleaded in the alternative under Fed. R. Civ. P. 8(d)(2)– (3). It is asserted only to the extent Plaintiff does not have an adequate remedy at law and no enforceable express contract governs the subject matter of this Count.

645. Plaintiff conferred a benefit on Defendants. Plaintiff, and others paying on his behalf, paid money for the SCS Devices and components implanted in Plaintiff, and for replacement components used in revision procedures, as alleged herein. That money passed through hospitals, surgical facilities, physician practices, and payors to Defendants. Defendants received this money because those devices and components were implanted in Plaintiff.

646. Defendants knew of, appreciated, and accepted that benefit. Defendants tracked each sale by device, patient, physician, and facility. Through their Representatives, Defendants maintained direct, continuing contact with Plaintiff after implantation, as alleged herein.

647. Under circumstances alleged herein, it would be inequitable and unjust for Defendants to retain the benefit without paying its value to Plaintiff. Those circumstances include:

a. Defendants sold Plaintiff SCS Devices that departed from their FDA-approved specifications and manufacturing requirements;

b. Defendants' Representatives told Plaintiff that his device was functioning properly and that his symptoms were unrelated to device failure;

c. Defendants continued to receive payment for replacement components and related services while attributing device failures to other causes.

648. This Count does not challenge the FDA-approved design, the FDA-approved labeling, or the FDA's premarket approval of any SCS Device. It does not assert that any SCS Device manufactured in conformity with its FDA-approved specifications was worth less than its price. This Count rests on Defendants' deviations

from FDA-approved specifications and requirements, asserted only to the extent the state-law duty parallels those requirements, and on conduct of Defendants' Representatives that no federal requirement governs.

649. No enforceable express contract between Plaintiff and Defendants governs the subject matter of this Count. That subject matter is Defendants' retention of payment for nonconforming devices and for components and services obtained through the conduct of Defendants' Representatives. To the extent Defendants contend that any written warranty governs any part of that subject matter, Plaintiff alleges that the warranty does not cover the conduct alleged here, and Plaintiff asserts this Count in the alternative.

650. Plaintiff lacks an adequate remedy at law for the benefit Defendants unjustly retained, for the following reasons:

a. Plaintiff’s legal claims may be barred, limited, or displaced under the law of particular jurisdictions, including by product liability statutes, limitations on recoverable damages, or defenses specific to those claims. Restitution is measured by Defendants' gain, not by Plaintiff's loss.

b. Restitution reaches the revenue and profit Defendants obtained from the sale of replacement components and from the continued use of their products that the Representatives' conduct secured. Damages on Plaintiff's legal claims would not necessarily reach those amounts.

c. The elements of this Count differ from the elements of Plaintiff's legal claims. This Count does not require proof of a product defect at the time of sale, a duty to warn, reliance, or the statutory prerequisites of the Consumer Protection Statutes.

651. It is unjust to allow Defendants to earn revenues and retain the benefits and profits from these devices while Plaintiff suffered injuries and damages as specified herein. Plaintiff therefore seek restitution and disgorgement of the benefits Defendants unjustly retained, measured by Defendants’ gain.

652. WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendants, as contained in the Prayer for Relief.

**COUNT XXIV – WRONGFUL DEATH [RESERVED]**

**COUNT XXV – SURVIVAL ACTION [RESERVED]**

**COUNT XXVI – LOSS OF CONSORTIUM [RESERVED]**

**COUNT XXVII - PUNITIVE DAMAGES ALLEGATIONS**

653. Plaintiff incorporates by reference all factual allegations set forth above in ¶¶ 1–294 as if fully set forth herein.

654. Defendants acted with malice, oppression, and fraud. Defendants' conduct was despicable and was carried out with a willful and knowing disregard of the rights and safety of Plaintiff and similarly situated patients. Defendants were aware of the probable dangerous consequences of their conduct and deliberately failed to avoid those consequences, including by:

a. Knowingly marketing and distributing SCS devices that deviated from FDA-approved manufacturing specifications and cGMP requirements, while concealing known lead failure risks and IPG/battery malfunction risks from patients and physicians;

b. Constructing and operating a corporate scheme by which sales and clinical representatives were deployed to engage in the unauthorized practice of medicine and to make material misrepresentations to patients for the purpose of maximizing device sales, in knowing violation of applicable state law;

c. Making material misrepresentations to Plaintiff about the performance of the SCS devices, the nature of Plaintiff's complications, and the efficacy of reprogramming as a remedy, while knowing these representations were false;

d. Encouraging patients to falsify their pain reduction during trials;

and

e. Retaining and continuing to deploy the sales representatives after having actual or constructive knowledge of the sales representatives' pattern of impermissible conduct.

655. Defendants, on their own and through their sales representatives, engaged in fraudulent misrepresentation and fraudulent concealment as pleaded in Counts XIV and XV. Defendants intentionally misrepresented and concealed material facts concerning the safety, efficacy, and regulatory compliance of their SCS devices, the causes of the issues Plaintiff experienced, and the representatives' knowledge, skill, and qualifications to address SCS device issues, including programming and reprogramming. Defendants did so intending to deprive Plaintiff of his rights and to cause Plaintiff to undergo implantation and continue using the devices despite the resulting harm.

656. Defendants' conduct reflects a systematic, willful, and conscious disregard for the rights and safety of Plaintiff and similarly situated patients and subjected Plaintiff to cruel and unjust hardship, making an award of punitive damages appropriate to punish Defendants and deter similar conduct.

657. Defendants' officers, directors, and managing agents, who exercised substantial independent authority and judgment in corporate decision-making such that their decisions determined Defendants' corporate policy, committed, authorized, and ratified the conduct described above. Among other things, they designed and approved the field sales and clinical support model that placed representatives in operating rooms and patient-facing settings, established the compensation structure that rewarded implantations and discouraged device removal, and adopted the uniform nationwide job descriptions for clinical specialists and territory managers. They also received notice of the representatives' conduct through patient and physician complaints, adverse event reports, and publicly filed litigation, and they adopted and approved that conduct by continuing to deploy, compensate, and retain the representatives without

corrective action.

658. WHEREFORE, Plaintiff respectfully requests that Plaintiff be granted relief against Defendants, as contained in the Prayer for Relief.

## PRAYER FOR RELIEF

659. **WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants Boston Scientific Corporation and Boston Scientific Neuromodulation Corporation, jointly and severally, as to all counts and award the following relief:

a) Awarding compensatory damages for physical injury, pain and suffering, emotional distress, medical expenses, loss of enjoyment of life, and all other actual damages recoverable under applicable law, based on Defendants' fraud and willful, malicious, and/or reckless disregard for the safety and rights of Plaintiff and the public;

b) Awarding statutory damages and attorneys' fees and costs pursuant to any applicable consumer protection statutes;

c) Awarding punitive or exemplary damages, as allowed by law, based on Defendants' fraud and willful, malicious, and/or reckless disregard for the safety and rights of Plaintiff and the public;

d) Awarding attorneys' fees and costs associated under applicable law;

e) Awarding pre-judgment and post-judgment interest to Plaintiff;

f) Awarding all statutory damages and relief;

g) Awarding the costs and the expenses of this litigation to Plaintiff;

h) Awarding punitive damages, where appropriate, to the Plaintiff;

i) Granting Plaintiff equitable relief in the nature of disgorgement and restitution to remedy Boston Scientific's unjust enrichment; and

j) Granting all such other relief as the Court deems necessary, just and proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims in this Complaint so triable.

Dated: November 11, 2026

Respectfully submitted,

WISNER BAUM, LLP

*/s/ Behram V. Parekh*
Behram V. Parekh (CA Bar # 180361)
bparekh@wisnerbaum.com
11111 Santa Monica Blvd., Ste. 1750
Los Angeles, CA 90025
Telephone: (310) 207-3233
Facsimile: (310) 820-7444

*Counsel for Plaintiff*